# EXHIBIT B

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | **)** | |
| | **)** | |
| Rules and Regulations Implementing the | **)** | CG Docket No. 02-278 |
| Telephone Consumer Protection Act of 1991 | **)** | |

**REPORT AND ORDER**

**Adopted:  August 2, 2016**                    **Released:  August 11, 2016**

By the Commission:      Chairman Wheeler and Commissioner Clyburn issuing separate statements;
Commissioner Rosenworcel concurring and issuing a statement; Commissioners Pai and O'Rielly
dissenting and issuing separate statements.

**TABLE OF CONTENTS**

Heading                                                        Paragraph #

I.   INTRODUCTION ................................................................................................................ 1
II.  BACKGROUND .................................................................................................................. 3
III. DISCUSSION ...................................................................................................................... 10
     A.  Covered Calls................................................................................................................ 11
     B.  Limits on Number and Duration of Federal Debt Collection Calls .............................. 30
     C.  Other Implementation Issues ........................................................................................ 50
     D.  Severability ................................................................................................................... 58
     E.  Effective Date ............................................................................................................... 59
IV. JURISDICTION .................................................................................................................. 61
V.  PROCEDURAL MATTERS................................................................................................. 67
VI. ORDERING CLAUSES....................................................................................................... 72
APPENDIX A – Final Rules
APPENDIX B – Comments Filed
APPENDIX C – Final Regulatory Flexibility Analysis

I.      **INTRODUCTION**

        1.      In this Report and Order (*Order*), we take steps to implement Section 301 of the
Bipartisan Budget Act of 2015,[1] which amends the Telephone Consumer Protection Act[2] by excepting
from that Act's consent requirement robocalls "made solely to collect a debt owed to or guaranteed by the
United States"[3] and authorizing the Commission to adopt rules to "restrict or limit the number and

---

[1] Bipartisan Budget Act of 2015, Pub. L. No. 114-74, 129 Stat. 584 (Budget Act).

[2] The Telephone Consumer Protection Act (TCPA) is codified at section 227 of the Communications Act of 1934, as
amended.  *See* 47 U.S.C. § 227.

[3] Budget Act § 301(a)(1)(A) (amending 47 U.S.C. § 227(b)(1)(A)); *see also id.* § 301(a)(1)(B) (amending 47 U.S.C.
§ 227(b)(1)(B) to read, in part, that artificial- or prerecorded-voice calls cannot be made to a residential telephone
line without the consent of the called party unless the call is "made solely pursuant to the collection of a debt owed
to or guaranteed by the United States").   "Robocalls" include calls made either with an automatic telephone dialing

(continued….)

duration" of any wireless calls "to collect a debt owed to or guaranteed by the United States."[4]  The Budget Act requires the Commission to "prescribe regulations to implement the amendments made" by Section 301 within nine months of enactment.[5]  In implementing these provisions, we recognize and seek to balance the importance of collecting debt owed to the United States[6] and the consumer protections inherent in the TCPA.[7]

2.        Based on record evidence that consumers may benefit from calls that can prevent them from falling into potentially devastating debt, we make clear that certain debt servicing calls are permitted under the exception.  At the same time, and in recognition of the substantial number of comments urging clear, strong limits on the number and duration of debt collection calls, we cap the number of permitted calls to wireless numbers at no more than three within a thirty-day period;[8] ensure that consumers have the right to stop such calls at any time; and adopt other consumer protections.  The measures we adopt today implement Congress's mandate to ensure the TCPA does not thwart important calls that can help consumers avoid debt troubles while preserving consumers' ultimate right to determine what calls they wish to receive.

## II.        BACKGROUND

3.        *The TCPA and the Current Rules.*  In 1991, Congress enacted the TCPA and made clear that "[i]ndividuals' privacy rights, public safety interests, and commercial freedoms of speech and trade must be balanced in a way that protects the privacy of individuals and permits legitimate telemarketing practices."[9]  Among other things, the TCPA requires the called party's consent before certain robocalls

---

(Continued from previous page) ————————————

system ("autodialer") or with a prerecorded or artificial voice.  *See Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, Declaratory Ruling and Order, 30 FCC Rcd 7961, 7694, para. 1 n.1 (2015) (*2015 TCPA Declaratory Ruling and Order*).  The Commission has interpreted the TCPA to apply both to voice calls and to text messages.  *Id.* at 8016-17, para. 107.  Throughout this *Order* we refer to robocalls that are subject to the Budget Act's consent exception as "covered calls."

"Calls," for this exception, include any initiated call; this is consistent with the Commission's previous interpretation of "call" for TCPA purposes.  *See also* para. 28, *infra.*

[4] Budget Act § 301(a)(2) (amending 47 U.S.C. § 227(b)(2)).

[5] Budget Act § 301(b).

[6] *See* para. 8, *infra.*

[7] *See 2015 TCPA Declaratory Ruling and Order*, 30 FCC Rcd at 7964, paras. 1-2 ("we affirm the vital consumer protections of the TCPA").

While one dissent suggests that Congress determined in the Budget Act amendments that the benefits of these calls outweigh the privacy concerns, we disagree with this assessment.  Congress's authorization allowing us to set number and duration limits on these calls, as well as the consumer protections inherent in the TCPA itself, indicate that Congress intended the Commission to balance the statutory consumer protection purposes against the benefits of robocalls for the purpose of collecting debt owed to or guaranteed by the United States.

[8] As explained at paras. 48-49, *infra*, we determine that the Budget Act amendments do not alter our current rules regarding non-telemarketing autodialed, prerecorded-voice, and artificial-voice calls to residential numbers.

[9] TCPA, Pub. L. No. 102-243, § 2(9).  As its name makes clear, the Telephone Consumer Protection Act is a broad consumer protection statute that addresses the calling practices of both bad actors attempting to perpetrate frauds and legitimate callers who employ calling practices consumers may find objectionable.  The TCPA makes it unlawful for any person to make robocalls that do not comply with the provisions of the statute.  While the Commission has sought to "reasonably accommodate[] individuals' rights to privacy as well as the legitimate business interests of telemarketers," *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 92-90, Report and Order, 7 FCC Rcd 8752, 8754, para. 3 (1992) (*1992 TCPA Order*), legitimate callers are not exempt from the statute's consumer protections.

can be made to residential and wireless phones,[10] restricts unsolicited facsimile advertisements,[11] regulates the manner of artificial and prerecorded telephone messages,[12] and grants consumers a private right of action against alleged violators separate from regulatory enforcement.[13]

4.     The TCPA and the Commission's rules generally require a caller to obtain the prior express consent of the called party when: (1) making a non-emergency telemarketing call using an artificial or prerecorded voice to *residential* telephone lines;[14] and (2) making a non-emergency call using an automatic telephone dialing system ("autodialer") or an artificial or prerecorded voice to a *wireless* telephone number, among other specified recipients.[15]  Unless exempted by rule or an order of the Commission,[16] a caller must ensure that he or she has the consent of the called party[17] prior to each such call he or she makes.[18]

5.     *Budget Act Amendments.*  As amended by Section 301 of the Budget Act, Sections 227(b)(1)(A) and (B) of the TCPA now explicitly except from the prior express consent requirement certain autodialed, artificial-voice, and prerecorded-voice calls either to wireless phones or to residential landline phones, if the calls are "made solely to collect a debt owed to or guaranteed by the United States."[19]  The law says that, in implementing the Budget Act amendments, the Commission "may restrict or limit the number and duration of calls made to a telephone number assigned to a cellular telephone service to collect a debt owed to or guaranteed by the United States."[20]  While no legislative history exists that lays out the legislative intent, we believe two reasonable interpretations of the statute are to: (1) make

---

[10] *See* 47 U.S.C. § 227(b)(1)(A)-(B); 47 CFR § 64.1200(a)(1)-(3).

[11] *See* 47 U.S.C. § 227(b)(1)(C); 47 CFR § 64.1200(a)(4).

[12] *See* 47 U.S.C. § 227(d)(3); 47 CFR § 64.1200(a)(7)(i)(B), (b)(3).

[13] *See id.* § 227(b)(3).

[14] *Id*. § 227(b)(1)(B); 47 CFR § 64.1200(a)(3).  Consent to telemarketing calls must be in writing and satisfy the requirements of 47 CFR § 64.1200(f)(8).  *See* 47 CFR § 64.1200(a)(3).  Telemarketing calls to residential lines that are made by or on behalf of a tax-exempt nonprofit organization and telemarketing calls subject to the Health Insurance Portability and Accountability Act of 1996 (HIPAA) may be made without the consent of the called party. *Id*.

[15] 47 U.S.C. § 227(b)(1)(A); 47 CFR § 64.1200(a)(1)-(2).  The restriction also applies to such calls directed to emergency numbers and other specified locations.  For autodialed or artificial- or prerecorded-voice telemarketing calls to wireless numbers, prior express consent must be in writing and satisfy the requirements of 47 CFR § 64.1200(f)(8).  *See Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, Report and Order, 27 FCC Rcd 1830, 1838, para. 20 (2012) (*2012 TCPA Order*); 47 CFR § 64.1200(a)(2).

[16] *See* 47 U.S.C. § 227(b)(2)(B), (C).

[17] *See 2015 TCPA Declaratory Ruling*, 30 FCC Rcd at 8000-06, paras. 73-84.

[18] *See id.* at 8014, para. 100; *see also id.* at 7993-99, paras. 55-70 (explaining that a consumer may revoke consent through any reasonable means).

[19] Budget Act § 301(a)(1) (amending 47 U.S.C. § 227(b)(1)(A)).  The phrasing is slightly different in the amended § 227(b)(1)(B): "made solely pursuant to the collection of a debt owed to or guaranteed by the United States."  Section 227(b)(1)(A)(iii) is not limited to wireless phone numbers, but states that non-emergency robocalls require consumer consent if made "to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call, unless such call is made solely to collect a debt owed to or guaranteed by the United States."  47 U.S.C. § 227(b)(1)(A)(iii) (as amended).

[20] Budget Act § 301(a)(2)(C) (adding 47 U.S.C. § 227(b)(2)(H)).

it easier for owners of debts owed to or guaranteed by the United States and their contractors[21] to make calls to collect the debts; and (2) make it easier for consumers to obtain useful information about debt repayment, which may be conveyed in these calls.

6.      On timing, the Budget Act states: "Not later than 9 months after the date of enactment of this Act, the Federal Communications Commission, in consultation with the Department of the Treasury, shall prescribe regulations to implement the amendments made by this section."[22]  Commission staff has consulted with Department of Treasury staff, along with other interested agencies, on Budget Act implementation questions.  The Commission issued a Notice of Proposed Rulemaking (NPRM) on May 6, 2016, to begin the process of prescribing regulations to implement the TCPA amendments, as Congress directed.[23]

7.      *Robocalls Generally*.  TCPA complaints as a whole are the largest category of informal complaints the Commission receives.[24]  In addition, the Federal Trade Commission (FTC) received more than 900,000 consumer complaints in 2015 relating to debt collection—more than any other industry or practice.[25]  In its comments, FTC staff states: "Robocalling increases the number of possible collection contacts, and any expansion in their use likely will magnify consumer harms arising from debt collection calls."[26]  The FTC staff also notes that, "[b]ecause the TCPA amendments now allow robocalls to collect a debt owed to the U.S. Government, it will be more challenging for consumers to distinguish between legitimate debt collection calls and calls placed by scammers impersonating the government."[27]

8.      *Collection of Federal Debt and Debt Collection Generally*.  According to the Department of Treasury, in Fiscal Year 2015, the federal Government had $1.3 trillion of non-tax receivables (current and delinquent), of which $162.1 billion was delinquent.[28]  According to the same report, the top federal creditor agencies were the Department of Education, the Department of Agriculture, the Department of Housing and Urban Development, the Department of Health and Human Services, and the Export-Import

---

[21] For purposes of this *Order* and the accompanying rules, we use the term "contractor" to refer to both contractors and agents.

[22] Budget Act § 301(b).

[23] *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, Notice of Proposed Rulemaking, FCC 16-57 (May 6, 2016) (*NPRM*).  Because of this congressionally mandated deadline, the Commission declines to entertain the request by ACA International that it "wait to see how the [Consumer Financial Protection Bureau] addresses" certain issues before issuing rules.  *See* ACA Comments at 15.

[24] *See* Federal Communications Commission Encyclopedia, Quarterly Reports-Consumer Inquiries and Complaints, Top Complaint Subjects, http://www.fcc.gov/encyclopedia/quarterly-reports-consumer-inquiries-and-complaints (last visited July 14, 2016).

[25] FTC BCP Staff Comments at 2.

[26] *Id.* at 3.

[27] *Id.* at 3.

[28] U.S. Dept. of the Treasury, *Fiscal Year 2015 Report to the Congress: U.S. Government Receivables and Debt Collection Activities of Federal Agencies* (April 2016), https://fiscal.treasury.gov/fsservices/gov/debtColl/pdf/reports/debt15.pdf.  One media source reports that, according to the Federal Reserve Bank of New York, student debt has "more than doubled since 2007 to $1.3 trillion, and as many as one in four borrowers—excluding those still in school—are 90 days behind on payments."  Brent Kendall and Josh Mitchell, *Supreme Court Denies Appeal on Student-Loan Erasure*, Wall Street Journal, Jan. 11, 2016, http://www.wsj.com/articles/supreme-court-denies-appeal-on-student-loan-erasure-1452527286.  "More than 80% of all outstanding student debt in the U.S. is guaranteed by or directly owed to the Education Department."  *Id.*  The Department of Education reports: "At the end of fiscal year 2016, 41.7 million student loan borrowers owed $1.25 trillion in federal student loans to the Department, banks, guaranty agencies, and schools."  Dept. of Education Reply Comments at 2.

Bank.[29]  Federal agencies employ a variety of collection tools to recover this debt, including calls.[30]  The Debt Collection Improvement Act (DCIA) guides agencies and contractors acting on their behalf in their efforts to collect non-tax debts owed to the United States.[31]  In Fiscal Year 2015, private collection agencies assisted federal creditor agencies by collecting $465.2 million.[32]  The Fair Debt Collection Practices Act (FDCPA)[33] governs consumer debt collection practices by eliminating abusive debt collection practices, ensuring that debt collectors who refrain from using abusive practices are not competitively disadvantaged, and promoting consistent State action to protect consumers against debt collection abuses.[34]

9.  *The Record in Response to the NPRM.*  Consumer response to the NPRM reflects the public's general dislike for robocalls and their desire for the Commission to provide them greater protection against unwanted calls.  Over 15,700 individuals filed comments directly in the record.  Over 12,500 of those comments expressed a general dislike for robocalls, while approximately 2,500 included more pointed comments regarding debt collection and calls by the federal government.  In addition to the 15,700 individual comments, Consumer's Union submitted a petition containing 4,800 signatures asking the FCC to stop robocalls to cellphones and Americans for Financial Reform submitted a petition containing 5,346 comments from members in support of the FCC's proposed limitations on calls.  Commenters also report consumers' fear of scam robocalls, fear for their safety when receiving robocalls while driving, and fear that robocalls impact the physical and mental health of senior adults.[35]  One commenter states that because the Budget Act amendments could expose an additional 47 to 61 million people to robocalls that previously required consent, the Commission must consider these concerns and the increase in the magnitude of these concerns.[36]  By contrast, debt servicers and collectors emphasize the important need served by such calls, *i.e.*, that they can help educate debtors, often younger individuals, about repayment options that can save them from substantial debt from which they may not recover.  Consumer groups and our federal partners generally agree on the value of such calls but ask the Commission to adopt reasonable limits.

---

[29] U.S. Dept. of the Treasury, *Fiscal Year 2015 Report to the Congress: U.S. Government Receivables and Debt Collection Activities of Federal Agencies*, 4 (April 2016), https://fiscal.treasury.gov/fsservices/gov/debtColl/pdf/reports/debt15.pdf.

[30] *See, e.g.*, *id.* at 12.

[31] Debt Collection Improvement Act of 1996, Pub. L. No. 104-134, 110 Stat. 1321 (1996) (codified at 31 U.S.C. § 3701(b)(1), (f)).

[32] U.S. Dept. of the Treasury, *Fiscal Year 2015 Report to the Congress: U.S. Government Receivables and Debt Collection Activities of Federal Agencies* at 11 (April 2016), https://fiscal.treasury.gov/fsservices/gov/debtColl/pdf/reports/debt15.pdf.

[33] 15 U.S.C. §§ 1692-1692p.

[34] 15 U.S.C. § 1692(e).

[35] *See, e.g.*, LL Price Comments at 1 ("Scammers will gleefully join the robocall party to target seniors, and to prey on the feeble.  Don't sanction mass-harassment of ordinary citizens."); Alan Rosenfeld Comments at 1 ("It's especially unsafe to receive these annoying calls when driving."); Jeanette Burket Comments at 1 ("Seniors are being frightened, coerced, and financially exploited by these calls.  Their emotional and even physical health is very often compromised on a daily basis by the un-ending personal intrusion, anxiety, and harassment of these callers, particularly the debt collectors who are bent on collection of debts not even belonging to the targeted person.  These calls are truly a new form of elder abuse.").  The U.S. Senate Special Committee on Aging held a hearing on July 10, 2015, concerning the effects of robocalls on senior adults entitled "Ringing Off the Hook: Examining the Proliferation of Unwanted Calls."  *See* http://www.aging.senate.gov/hearings/ringing-off-the-hook_examining-the-proliferation-of-unwanted-calls.

[36] Letter from Sherrod Brown, Ranking Member, United States Senate Committee on Banking, Housing, and Urban Affairs, to Marlene H. Dortch, Secretary, FCC at 2 (Mar. 28, 2016) (on file in CG Docket No. 02-278) (Brown Letter); NCLC Comments at 6.

### III.    DISCUSSION

10.      We adopt rules to implement the Budget Act's amendments to the TCPA, including—based on substantial record support, and in furtherance of the TCPA's consumer-protection goals—restrictions on the number and duration of calls that may be made pursuant to the amendments.  Among other things, we determine who may make covered calls, limit the number of federal debt collection calls[37] that may be made, and determine who may be called.  We also create rules to, among other things:

- Permit calls made by debt collectors when the loan is in delinquency, and by debt servicers following a specific, time-sensitive event affecting the amount or timing of payment due, and in the 30 days before such an event.

- Determine that consumers have a right to stop the autodialed, artificial-voice, and prerecorded-voice servicing and collection calls regarding a federal debt to wireless numbers at any point the consumer wishes.

- Specify that covered calls may be made by the owner of the debt or its contractor, to: (1) the wireless telephone number the debtor provided at the time the debt was incurred; (2) a phone number subsequently provided by the debtor to the owner of the debt or its contractor; and (3) a wireless telephone number the owner of the debt or its contractor has obtained from an independent source, provided that the number actually is the debtor's telephone number.

### A.    Covered Calls

11.      *"Solely to Collect a Debt."*  The Budget Act excepts covered calls from the prior-express-consent requirement when they are "solely to collect a debt owed to or guaranteed by the United States."[38]  We begin by interpreting the statutory phrase "solely to collect a debt" so as to determine whether calls are covered.[39]  Because the statutory term "solely to collect a debt" is ambiguous, the Commission has discretion to reasonably interpret that phrase.

12.      We reject a subjective standard of what a caller may intend when determining whether a call is a covered call and instead look to objective characteristics of the call.  We note that an objective standard is consistent with our approach to other aspects of the TCPA, such as the meaning of "called party" for purposes of reassigned wireless numbers.[40]  Furthermore, a subjective standard would be difficult to administer, while an objective standard enables us to look at actual, measurable characteristics of a call.

13.      In the NPRM, we asked whether covered calls should begin at delinquency or default.  Several commenters support the proposal that covered calls begin at delinquency, stating that calls during delinquency can assist a debtor in determining whether alternative payment plans are an option.[41]  The FTC staff's comments, however, promote default as the starting point for covered calls.  They argue that

---

[37] Throughout this *Order* we refer to robocalls that are subject to the rules we enact, pursuant to the authority granted to us in the Budget Act to "restrict or limit the number and duration of calls made to a telephone number assigned to a cellular telephone service to collect a debt owed to or guaranteed by the United States," Budget Act § 301(a)(2)(C) (adding 47 U.S.C. § 227(b)(2)(H)), as "federal debt collection calls."  "Robocalls" include calls made either with an automatic telephone dialing system ("autodialer") or with a prerecorded or artificial voice.

[38] Budget Act § 301(a)(1)(A) (amending 47 U.S.C. § 227(b)(1)(A)(iii)).

[39] Budget Act § 301(a)(1)(A) (amending 47 U.S.C. § 227(b)(1)(A)(iii)).

[40] *2015 TCPA Declaratory Ruling and Order*, 30 FCC Rcd at 8002-03, para. 78.

[41] *See* Letter from Edward J. Markey et al., United States Senator, to Marlene H. Dortch, Secretary, FCC at 1 (Jun. 8, 2016) (on file in CG Docket No. 02-278) (Markey Jun. 8, 2016 Letter) (signed by 29 members of Congress); QLI Comments at 3; NCLC Comments at 17; *see also* CAC Comments at 2.

the FDCPA uses default as the "touchstone for coverage," and that those collecting debts that were not in default when their agency obtained them are not considered debt collectors under the act.[42]  Because the amended TCPA is not limited to third-party debt collectors, however, this distinction is less important and the reasoning for using default rather than delinquency as an initiating event is likewise less persuasive.

14.     We interpret "solely to collect a debt," and, therefore, calls made pursuant to the exception created in the Budget Act, to be limited to debts that are delinquent[43] at the time the call is made or to debts that are at imminent risk of delinquency as a result of the terms or operation of the loan program itself.  As a practical matter, this means that, at the time the call is made, the debt is delinquent or there is an imminent, non-speculative risk of delinquency due to a specific, time-sensitive event that affects the amount or timing of payments due, such as a deadline to recertify eligibility for an alternative repayment plan or the end of a deferment period.  Many federal loan programs offer various alternate and income-based repayment options for which a debtor might qualify at various times during the life of the debt, and the amount or timing of payments due can vary significantly following expiration of a deferral period or an alternate payment plan.  For example, some income-based repayment plans for student loans allow a debtor to make a monthly payment of zero dollars without being considered delinquent or in default, but higher monthly payments are required automatically if the debtor does not periodically recertify that he continues to qualify for the program.  As such, calls regarding changes in the amount or timing of payments are directly related to the collection of the underlying debt in that they can ensure payments that would likely otherwise would not be made.

15.     Some commenters, argue that the Commission may not limit covered calls to those that are "delinquent" or in "default" because the Budget Act did not include such limiting language.  For example, ACA states: "Congress made absolutely no mention of the [exception] being limited to calls made post delinquency or post-default.  As a result it would be inappropriate for the Commission to read such a limitation into the amendment."[44]  We disagree with regard to our discretion to interpret the statutory language, but note that we are not limiting covered calls only to those made after default or delinquency.  As commenters note, the Supreme Court has confirmed that a person or entity "collects" a debt by attempting to obtain payment on it.[45]  Thus, we believe that covered calls must have a reasonable nexus to seeking to obtain payment and that the calls permitted under our interpretation of "solely to collect" have such a nexus.  In contrast, calls outside the scope of covered calls lack such a nexus because the risk of delinquency would be too speculative and too far removed (*i.e.*, not imminent) from an event affecting the amount or timing of payments due.

16.     Other commenters argue that covered calls should begin before delinquency because calls that occur after delinquency or default are "too late to prevent damage to the consumer's credit profile and fail[] to allow the borrower to receive timely information to choose the repayment plan best suited for the borrower's unique circumstances."[46]  We agree.  Certain calls to service a debt owed to or guaranteed by the government may be so closely tied to an imminent and non-speculative risk of delinquency as to

---

[42] FTC BCP Staff Comments at 5-6.

[43] Because we lack a developed record on the point, we do not formally define "delinquent" or "delinquency." Rather, the terms of a contract or other instrument that created the debt defines when a debt is delinquent.  *See* NCLC Comments at 17; Navient Mar. 29, 2016 Letter at 2; ECMC Comments at 5; ACA Comments at 9; EFC Letter at 2, n.4; Navient Comments at 6; NCHER Comments at 3-4.  For purposes of this order, however, we generally use "delinquent" to refer to debts that are not current on payments per the terms of the debt agreement, and distinguish that from "default," which we generally understand to refer to debts that are significantly delinquent. *See*, *e.g.*, Navient Comments at 6; NCHER Comments at 3-4.

[44] ACA Comments at 9; *see also* ConServe Comments at 3; SLSA Comments at 19.

[45] *See* Navient Comments at 31 (citing *Heintz v. Jenkins*, 115 S.Ct. 1489, 1491 (1995); *Direct Mktg. Ass'n v. Brohl*, 135 S.Ct. 1124, 1130 (2015)); EFC Letter at 4.

[46] NCHER Comments at 2.

also be "solely to collect a debt." These calls pertain to specific, time-sensitive events that affect the amount or timing of payments due. Once these time-sensitive events are sufficiently imminent, calls about these events are no longer just about a debt, but are solely about the collection of a debt. The time-sensitive nature of these calls necessitates that they are "solely to collect a debt" for only a limited time— following the event and in the30 days before such an event. Any earlier and the calls are too speculative and attenuated for the purpose of the call to be "solely to collect a debt."

17.    The record indicates that these debt servicing calls help a debtor avoid delinquency or default, which can preserve the debtor's payment history and credit rating, and help maintain eligibility for future loans.[47] The potential value of these servicing calls to debtors by helping them avoid delinquency or default, and the probability that servicing calls will create conditions that allow debts to be more readily collected by the United States, lead us to determine that certain servicing calls should be included in our interpretation of "solely to collect a debt."[48]

18.    A caller, therefore, need not wait until a debtor is delinquent to begin making certain debt servicing calls. Rather a caller may make debt servicing calls following a specific, time-sensitive event that affects the amount or timing of payments due, such as a recertification deadline or the end of a deferment period, and in the 30 days before such an event.[49] For purposes of the limits on the number of covered calls, no debt servicing calls will be permitted except those regarding an approaching deadline or a change in status (deferment, forbearance, rehabilitation), calls regarding enrollment or reenrollment in income-driven or income-based repayment plans, and calls regarding similar time-sensitive events or deadlines affecting the amount or timing of payments due.[50] While commenters list other pre-delinquency calls they would like the Commission to include in the list of debt servicing calls for purposes of the Budget Act amendments,[51] we decline to do so. This list of calls we are permitting as covered debt servicing calls includes the most-requested debt servicing calls and includes calls both to enroll debtors in consumer-friendly programs and to keep them enrolled in those programs. It also includes calls aimed at alerting debtors when significant events will occur that will change their payment patterns. The list does not include calls regarding routine events, such as reminders about scheduled upcoming payments. We would consider a routine event one that occurs by operation of the contract alone, as contrasted with the events we describe above, which require affirmative steps by the debtor to

---

[47] *See* Dept. of Education Reply Comments at 3; Navient Comments at 7-8; EFC Letter at 3; EFC Comments at 3; *see also* Navient Comments at 2.

[48] *See* EFC Comments at 5 ("between October 2013 and November 2014, nearly 60 percent of borrowers enrolled in IDR programs did not recertify their incomes as required before their deadlines. The data showed that more than one-third of these borrowers faced financial havoc when they forgot to recertify, and their loans went into hardship related forbearance or deferment"); Letter from Mark W. Brennan, Counsel to Navient Corp., to Marlene H. Dortch, Secretary, FCC at 3-4 (Mar. 29, 2016) (on file in CG Docket No. 02-278) (Navient Mar. 29, 2016 Letter); SLSA Comments at 11-12.

[49] NCLC argues in its Comments that the Commission should permit these types of debt servicing calls "if the consumer is delinquent in responding to a requirement to arrange for a payment plan or forbearance program." NCLC Comments at 3. In its Reply Comments, NCLC states that it has altered its argument and supports servicing calls in "the 30-day period before the debtor will be delinquent in maintaining eligibility for payment plan[s]." NCLC Reply Comments at 7. A commenter notes that, for some programs such as income-driven repayment (IDR) plans, "there is a 10-day window between the formal deadline to recertify for IDR and the triggering of adverse consequences, such as interest capitalization and resetting the monthly payment to a much higher amount." SLSA Reply Comments at 8. *See also* Letter from James P. Bergeron, President, National Council of Higher Education Resources, to Marlene H. Dortch, Secretary, FCC at 8 (Jun. 22, 2016) (on file in CG Docket No. 02-278) (NCHER June 22, 2016 Letter).

[50] *See* Dept. of Education Reply Comments at 3; Navient Comments at 32-33; EFC Comments at 4; Nelnet Comments at 7;

[51] *See*, *e.g.*, SLSA Comments at 11-12; NCHER Comments at 5; EFC Comments at 4.

take advantage of the provisions of the debt contract.  These included calls, which often increase the probability that debts will be more readily collected and that a debtor will avoid delinquency, achieve the desired result of enabling the caller to collect a debt owed to or guaranteed by the United States and simultaneously can benefit the debtor.  Our interpretation of covered calls permit no debt servicing calls unless the call follows one of these specific, time-sensitive events, and in the 30 days before such an event.

19.      *"Owed to or guaranteed by the United States."*  We turn next to the types of debts that are included in the phrase "owed to or guaranteed by the United States."[52]  We determine that, for TCPA purposes, this phrase includes only debts for which the United States[53] is currently the owner or guarantor of the debt.[54]  The Budget Act amendments specify that covered calls may be made regarding "debts owed to or guaranteed by the United States."[55]  Because we lack a developed record on the issue, we do not seek to define or determine with particularity exactly which debts are included in or excluded from this phrase; like commenter SLSA, we are cognizant of the "variety of types of debts covered by the provision," and while we do not "believe that the definitions applicable to each specific federal program should be used to [automatically] determine whether debt in that program is considered owed or guaranteed by the United States," we view such definitions—and any agency or judicial interpretations of

---

[52] Budget Act § 301(a)(1)(A) (amending 47 U.S.C. § 227(b)(1)(A)(iii)).

[53] We note that Section 3 of the Communications Act, as amended, defines "United States" to mean "the several States and Territories, the District of Columbia, and the possessions of the United States, but does not include the Canal Zone."  47 U.S.C. § 153(58).  Based on this statutory language, the context of "debts owed to or guaranteed by the United States" as used in the Budget Act amendments, and our consultation with other federal agencies with substantive expertise regarding debtor-creditor relationships, we find and apply a definition of "United States" in this instance that encompasses a narrower scope that only includes debts owed to or guaranteed by the federal government, as opposed to the broader definition of "United States" included in Section 3 of the Communications Act, as amended.  We find this narrower definition more closely comports with the scope intended under the Budget Act.  We also decline to issue regulations to limit the number and duration of robocalls seeking to collect debts owed to or guaranteed by state or local government entities as at least one commenter has requested.  *See* Luster Comments at 1-2.

[54] One commenter asserts that the exception should include debts "insured, guaranteed, coinsured, or reinsured, in whole or in part, by the U.S. government or any agency or instrumentality thereof, directly or indirectly."  ABA/CBA Comments at 3.  We disagree.  Congress specified that the debt should be "owed to or guaranteed by the United States."  Budget Act § 301(a)(1)(A) (amending 47 U.S.C. § 227(b)(1)(A)(iii)).  We, therefore, determine that debts insured by the United States are not included in the language of the Budget Act amendments; only debts owed to or guaranteed by the United States are included in the language of the Budget Act amendments.  Commenters who advocate for including "insured" debts within the language of the Budget Act amendments do not explain how the statutory terms "owed to or guaranteed by" encompasses the term "insured," so we do not included "insured" debts within the scope of the terms "owed to or guaranteed by" in our interpretation of the statutory language.

Commenter Federal Housing Finance Authority (FHFA)—the agency charged with regulating Fannie Mae and Freddie Mac—states in its comments that "the statutory exemption for debts owed to or guaranteed by the United States does not appear applicable to Fannie Mae and Freddie Mac loans."  FHFA Comments at 2.  The Commission will not render a decision on this factual issue, particularly because little in the way of facts has been entered into the record.

FHFA also asks the Commission to grant an exemption to "entities that service 1-4 unit residential mortgage loans from prohibitions against the use of automatic telephone dialing systems or artificial or prerecorded voices when calling a delinquent borrower for the purpose of servicing that borrower's mortgage."  FHFA Comments at 3.  In its request, FHFA cites two different exemption provisions, but fails to provide the factual information necessary for the Commission to determine whether the calls at issue would satisfy the threshold requirements for an exemption, including whether calls to wireless numbers would be without charge to the called party.  *See* 47 U.S.C. § 227(b)(2) (B), (C).  Furthermore, the Commission has no record on which to consider this request for exemption.  As such, it would be premature for the Commission to rule on the exemption request.

[55] Budget Act § 301(a)(1)(A) (amending 47 U.S.C. § 227(b)(1)(A)(iii)).

**Federal Communications Commission**                                    **FCC 16-99**

them—as highly relevant evidence regarding whether a debt is "owed to or guaranteed by the United States."[56]

20.     We clarify that the debt must be *currently* owed to or guaranteed *by the federal government* at the time the call is made.  Debts that have been satisfied are not among the covered debts,[57] and debts that have been sold in their entirety by the federal government are, likewise, not covered.[58]  In these cases, the debt is no longer "owed to . . . the United States."  We note that basic contract principles dictate that when an owner sells an item, it no longer belongs to the original owner, but to the purchaser.[59]  Likewise, the purchaser of a debt is owed the repayment obligation, not the prior obligee.[60]  For example, a debt is not still "owed to . . . the United States" if the right to repayment is transferred in whole to anyone other than the United States, or a collection agency that has acquired ownership of the debt from the federal government collects the funds and then remits to the federal government a percentage of the amount collected.  In such circumstances, the debt is no longer owed to the United States and our rules permit no calls under this exception.[61]

21.     *Who may be called?*  We next turn to the question of who may be called using the exception created by the Budget Act.  We determine that, because calls made pursuant to the exception must be made "solely to collect a debt," the covered calls may only be made to the debtor or another person or entity legally responsible for paying the debt.[62]  Calls are not permitted to other persons listed on the debt paperwork, such as references or witnesses, under our rules.  These persons are not liable for the debt; consequently, calls to these persons cannot be "solely to collect" the debt.[63]  Senators and Members of Congress support our decision to limit covered calls in this way, writing: "The regulations should limit the calls to those made just to the debtors" and "[r]estrict the calls and texts to those made just to debtors—not their family or friends."[64]  Another Senator writes separately, urging: "Calls to

---

[56] SLSA Comments at 21.  Likewise, we do not define what constitutes a "debt" for purposes of the Budget Act amendments to the TCPA, but will assess on a case-by-case basis whether any individual agency's interpretation of "debt" is reasonable.

[57] *See* MFY Comments at 2; AFR Comments at 2; NCLC Comments at 3; YI Comments at 2

[58] *See* Markey Jun. 8, 2016 Letter at 1; Brown Letter at 2; Letter from Margot Saunders, National Consumer Law Center, to Marlene H. Dortch, Secretary, FCC at 4, 19 (Mar. 29, 2016) (on file in CG Docket No. 02-278) (NCLC Letter); ConServe Comments at 3; CAC Comments at 2.

[59] Restatement (Second) of Contracts § 22 (1981) ("The manifestation of mutual assent to an exchange ordinarily takes the form of an offer or proposal by one party followed by an acceptance by the other party or parties."); *id.* § 317(1) ("An assignment of a right is a manifestation of the assignor's intention to transfer it by virtue of which the assignor's right to performance by the obligor is extinguished in whole or in part and the assignee acquires a right to such performance.").

[60] Restatement (Second) of Contracts § 317, Illustration 1 (1981) ("A has a right to $100 against B.  A assigns his right to C.  A's right is thereby extinguished, and C acquires a right against B to receive $100.").

[61] The debt may, however, be guaranteed by the United States after the debt is sold.  In such a case, the debt could be subject to covered calls based on the "or guaranteed by" language of the amended TCPA.  *See* CMC Comments at 11-12.

[62] This includes co-signors on the debt.  Because co-signors are legally responsible for payment of the debt, calls to them may be construed to be for the sole purpose of collecting a debt, absent a showing that the call's true purpose was for marketing or some other purpose specifically disallowed by the TCPA.  The same would be true for representatives of a person or entity liable to pay the debt, such as executors, guardians, administrators, and trustees.

[63] As stated at para. 12, *supra*, we reject a subjective- or intent-based approach.  A call is not solely to collect a debt unless it reaches the debtor.  Regardless of the caller's intent, unless the call is placed to one of the three categories of numbers we specify in paragraph 23, *infra*, the call is unlikely to reach the debtor and result in collection; it, therefore, falls outside the statutory interpretation we establish herein.

[64] Markey Jun. 8, 2016 Letter at 1.

persons who are not the borrower should be eliminated."[65] Consumer groups concur, stating "the only reasonable way to read the phrase 'solely to collect a debt' is to exclude all calls to persons who do not owe the debt."[66] The FTC staff also supports this limitation, stating "FTC staff recommends that covered calls be limited to calls directed at the person or persons obligated to pay the debt."[67]

22.  Other commenters, however, urge the Commission to permit covered calls to persons other than the debtor. Navient, in particular, comments on the need to call the parents, relatives, and references of a borrower in order to locate the borrower.[68] Navient writes: "[C]alling numbers obtained through skip tracing is sometimes the only way to reach a defaulted borrower."[69] It also notes that the Department of Education requires "lenders to contact every 'endorser, relative, reference, individual, and entity' identified in a delinquent borrower's loan file as part of their due diligence efforts."[70] Navient fails to note, however, that there is no requirement to make these contacts via robocall.[71] Navient also makes clear in its comments that its purpose in calling relatives and references is to locate the debtor, not to collect the debt. Because the language of the Budget Act authorizes the Commission to limit calls "solely to collect a debt," our rules permit covered calls only to persons who are responsible for repaying the debt.[72]

23.  *Numbers that May be Called*. Our interpretation of the phrase "solely to collect a debt" permits no covered calls unless the call is made to the debtor or person responsible for paying the debt at one of three categories of wireless telephone numbers. First, calls may be made to the wireless telephone number the debtor provided at the time the debt was incurred, such as on the loan application.[73] Second, covered calls may be made to a wireless phone number subsequently provided by the debtor to the owner of the debt or the owner's contractor.[74] Because the debtor has provided the phone numbers in these first two categories, the caller risks liability for the call after the first call to the number, if the number has been reassigned from the debtor to a third party.[75] Third, covered calls are permitted to a wireless telephone number the owner of the debt or its contractor has obtained from an independent source, provided that the number actually is the debtor's telephone number. Our decision to permit calls to these

---

[65] Brown Letter at 2.

[66] NCLC Comments at 21; *see also* YI Comments at 1; MFY Comments at 2; AFR Comments at 2; ACA Comment at 7.

[67] FTC BCP Staff Comments at 6.

[68] Navient Mar. 29, 2016 Letter at 4.

[69] *Id.*

[70] Navient Comments at 36.

[71] *See* NCLC Comments at 28 ("Industry callers have argued that, because other laws and regulations require contacts at several points in the collection process, the limits imposed on calls covered by the TCPA are inappropriate and require callers to make a Hobson's choice about which laws they will follow. We do not dispute that there are a myriad of other laws and regulations that require callers to contact consumers by phone. The key here is that these are requirements for contact. They do not require contact by robocall. No one has an inalienable right to make robocalls.").

[72] *See* CAC Comment at 2.

[73] The debtor might have incurred the debt through a penalty or fine rather than an application. In such case, the debtor may not have provided a phone number at the time the debt was incurred. There, the caller may make calls to the phone number the debtor provided on the most recent document submitted to the federal government agency holding the debt, such as a tax return or discharge papers.

[74] The debtor need only provide the phone number to the servicer or owner of the debt; the debtor need not provide the phone number in the context of providing consent to receive autodialed, artificial-voice, and prerecorded-voice calls. *See* ACA Comments at 9.

[75] *See* paras. 25-26, *infra*, for a discussion of calls to reassigned numbers.

three categories of numbers is consistent with our interpretation of the phrase "solely to collect a debt," and continues to satisfy the TCPA's consumer protection goals to the extent possible. As the connection between the phone numbers called and the debtor becomes more attenuated, so, too, does the likelihood of reaching the debtor. Beyond these three categories of numbers, persons reached will not likely be the debtor, so calls will not likely result in the collection of a debt owed to or guaranteed by the United States.

24.     We note that the rules we are adopting, which permit calls only if they are to these three categories of numbers, are broader than the proposal in the NPRM. We have included calls to numbers subsequently provided by the debtor to the owner of the debt or the owner's contractor, and to numbers the owner of the debt or its contractor has obtained from an independent source, provided that any such number actually is the debtor's number. These additional categories of numbers should prevent uninvolved consumers from receiving robocalls about debts they do not owe,[76] while mitigating concerns that the phone number provided on the loan application no longer belongs to the debtor when the debt enters repayment.[77]

25.     This limitation we are placing on the number of covered calls, which limits covered calls only to these three categories of numbers, is a determination that robocalls to wrong numbers are not covered by the exception created in the Budget Act amendments. Calls to reassigned wireless numbers may not be made pursuant to the exception either.[78] Wrong numbers, as the Commission used the term in the *2015 Declaratory Ruling and Order*, are "numbers that are misdialed or entered incorrectly into a dialing system, or that for any other reason result in the caller making a call to a number where the called party is different from the party the caller intended to reach or the party who gave consent to be called."[79] We determine that covered calls to reassigned wireless numbers,[80] however, are subject to the one-call window the Commission clarified in the *2015 Declaratory Ruling and Order*.[81] For purposes of this exception, the reassigned wireless number provision would come into play when the caller makes a call to the wireless number provided by the debtor but the number was subsequently reassigned. In this circumstance, the caller would be entitled to the one-call window the Commission previously clarified if the caller did not know of the reassignment.

26.     Numerous parties in the record urge the Commission to apply the same wrong number and reassigned number standards set forth in the *2015 Declaratory Ruling and Order* to these covered calls.[82] Others ask the Commission to abandon or alter the wrong-number and reassigned-number standard so that covered calls are treated differently from other robocalls, but do not set forth a persuasive argument for why a covered call is different from a typical robocall subject to the one-call window.

---

[76] AFR Comments at 2; NCLC Comments at 10-11.

[77] Nelnet Comments at 10; ConServe Comments at 6.

[78] *See* para. 12, *supra* (rejecting a subjective- or intent-based approach).

[79] *2015 TCPA Declaratory Ruling and Order*, 30 FCC Rcd at 7999, para. 72 n. 256.

[80] The reassigned number must have been provided by the debtor.

[81] *See 2015 TCPA Declaratory Ruling and Order*, 30 FCC Rcd at 8006-10, paras. 85-92. As the Commission explained, calls to reassigned wireless numbers are different from calls to wrong numbers. Calls to reassigned numbers, where the caller is unaware of the reassignment at the time the call is made, "would have had the valid prior express consent of the subscriber or customary user but for the reassignment." *Id.* at 30 FCC Rcd at 8000, para. 72 n. 262. Wrong number calls, however, "are not eligible for the opportunity to make one additional call to discover whether the number has been reassigned [because] the caller never had valid prior express consent from the subscriber or customary user to make any call to that misdialed or incorrectly-entered phone number." *Id.*

[82] *See* Letter from Edward J. Markey et al., United States Senator, to Marlene H. Dortch, Secretary, FCC at 1 (Nov. 18, 2016) (on file in CG Docket No. 02-278) (signed by 41 members of Congress); Brown Letter at 2; NCLC Comments at 3; CU Comments at 4; AFR Comments at 2; MFY Comments at 2; YI Comments at 2; CAC Comments at 3.

Several commenters argue for a "reasonable belief" or "actual knowledge" standard.[83]  The Commission, however, rejected those standards in the *2015 Declaratory Ruling and Order*.[84]  And while ABA/CBA argues that separate regulations "mandate[] that calls be made to distressed borrowers at their last known phone number of record,"[85] it does not indicate that the regulations require that those calls be made using an autodialer, artificial voice, or prerecorded voice.  Consequently, ABA/CBA could comply with these separate regulatory requirements by manually dialing the last known phone number of record.

27.     *Who May Make the Calls?*  We next consider who may make the covered calls at issue. We find that a call is made "solely to collect a debt owed to or guaranteed by the United States" only if it is made by the owner of such a debt or its contractor.  The record supports this interpretation.  A number of commenters urge the Commission to determine that covered calls may be made by "creditors and those calling directly on their behalf,"[86] or "creditors and those calling on their behalf, including their agents."[87] Two commenters ask the Commission to broaden the universe of those who may make covered calls, asking that "subcontractors [] be permitted to call, even if the subcontractor is not an agent."[88]  We decline to adopt rules that are as broad as "subcontractor," but limit permitted callers to the owner of the debt or its contractor.  As we have noted above, consumers consistently complain to the Commission, the FTC, and CFPB about abusive and persistent debt-collection robocalls.[89]  In creating the rules limiting the number of covered calls, we seek to balance the goals of increasing the likelihood that debts owed to or guaranteed by the United States will be paid by the debtor and of protecting consumers.  Our rules properly balance these goals by recognizing the practicality that owners of debts might use the services of contractors to make covered calls in a manner that reduces the potential for abuse or causing debtors undue hardship.

28.     *What constitutes a "call made"?*  "Call," for this exception, is consistent with the Commission's previous interpretation of "call" for TCPA purposes.[90]  A call is any initiated call.[91]  The call need not be completed, and need not result in a conversation or voicemail.  While many commenters support this interpretation of "call,"[92] others argue that the definition for purposes of the exception created

---

[83] NCHER Comments at 7; ACA Comments at 11-12.

[84] *See 2015 TCPA Declaratory Ruling and Order*, 30 FCC Rcd at 7999-8010, paras. 71-92.

[85] ABA/CBA Comments at 9.

[86] NCLC Letter at 3.

[87] ACA Comments at 13-14; SLSA Comments at 24.

[88] CMC Comments at 16; *see also* SLSA Comments at 24.

[89] *See* para. 7, *supra*.

[90] The Commission's implementing rule states that no person or entity may "initiate any telephone call" to the specified recipients.  47 C.F.R. § 64.1200(a)(1) (emphasis added).  The Commission, in the 2013 *DISH Declaratory Ruling*, noted that neither the statute nor our rules define "initiate," and determined that "a person or entity 'initiates' a telephone call when it takes the steps necessary to physically place a telephone call."  *DISH Declaratory Ruling*, 28 FCC Rcd at 6583, para. 26.  While *DISH Declaratory Ruling* interpreted and applied section 227(b)(1)(B), the Commission has stated that the same logic that applies to the "initiation" of calls under section 227(b)(1)(B) applies to the "making" of calls under section 227(b)(1)(A).  *See DISH Declaratory Ruling*, 28 FCC Rcd at 6575, 6583, paras. 3, 26; 47 U.S.C. § 227(b)(1).  While some may argue that using call attempts as the basis for determining the permissible number of calls is an arbitrary limitation, our interpretation of the term "call" is consistent for the TCPA as a whole and does not distinguish between calls regarding debts owed to or guaranteed by the United States and calls with other content.

[91] 47 C.F.R. § 64.1200(a)(1).

[92] NCLC Letter at 4; EFC Comments at 7-8; OSLA Comments at 2; NCHER Comments at 12; MFY Comments at 2; AFR Comments at 2; YI Comments at 2; CAC Comments at 2.

by the Budget Act should be "connected calls" or "actual contacts."[93]  The Commission finds no statutory basis to deviate from its existing interpretation of "call" and "made," and finds persuasive one commenter's argument that "[e]very time the phone rings can cause anxiety.  Whether or not the collector leaves a message on voice mail does not assuage this harassment."[94]  Consistent with the text of the TCPA and the Commission's previous clarifications, covered calls may be an autodialed call, a prerecorded- or artificial-voice call, or a text message sent using an autodialer.[95]

29.     *Content of the covered calls.*  The NPRM asked how to ensure that covered calls do not include extraneous material that consumers do not want, such as marketing content.  We agree with the many commenters who argue that content that includes marketing, advertising, or selling products or services, and other irrelevant content is not solely for the purpose of collecting a debt owed to or guaranteed by the United States.[96]  The Commission has previously found that calls solely for the purpose of debt collection do not constitute telemarketing.[97]  Content in these calls that is telemarketing, therefore, transforms the call from one solely for the purpose of debt collection into a telemarketing call.[98]

### B.     Limits on Number and Duration of Federal Debt Collection Calls

30.     *Need for restrictions.*  In considering the need for restrictions on calls to collect debts owed to or guaranteed by the United States, we note the volume of consumer complaints, as set forth above.[99]  These factors, along with Congress' explicit grant of authority to the Commission to "restrict or limit the number and duration of calls made to a telephone number assigned to a cellular telephone service to collect a debt owed to or guaranteed by the United States,"[100] lead us to adopt certain restrictions.

31.     *Scope.*  Section 301(a)(2) of the Budget Act, which enacts a new statutory provision at 47 U.S.C. § 227(b)(2)(H), authorizes the Commission to "restrict or limit the number and duration of calls made to a cellular telephone number to collect a debt owed to or guaranteed by the United States."  The scope of this authority is broader than the scope of the exception from the prior-express-consent requirement, because—unlike the exception—it is not limited to calls made "solely" to collect a covered debt.  Thus, the rules we promulgate under this authority apply to any autodialed, prerecorded-voice, and artificial-voice calls that reasonably relate to the collection of a covered debt and therefore apply even if the calls are not "calls made solely to collect a debt" under 227(b)(1): *e.g.*, as noted above, if the calls also contain other content (such as advertising) or precede the specified time period for calls excepted from the consent requirement.  Moreover, these number and duration rules apply to calls by the federal government (to the extent it is the owner or guarantor of the debt) and its contractors, as explained in the Jurisdiction section below.[101]

---

[93] Navient Mar. 11, 2016 Letter at 2-3; ACA Comments at 16-17; AACC Comments at 2.

[94] NCLC Comments at 26.

[95] *See* 47 U.S.C. § 227(a)(1); *2015 TCPA Declaratory Ruling and Order*, 30 FCC Rcd at 8017, para 107.

[96] *See, e.g.*, FTC BCP staff Comments at 7-8; ACA Comments at 10-11; NCHER Comments at 5; EFC Comments at 4; NCLC Comments at 20.

[97] *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, Request of ACA International for Clarification and Declaratory Ruling*, CG Docket No. 02-278, 23 FCC Rcd 559, 565, para. 11 (2008) (*ACA Declaratory Ruling*).

[98] *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, Report and Order, 18 FCC Rcd 14014, 14097-98, para. 140 (2003).

[99] *See* para. 7, *supra.*

[100] Budget Act § 301(a)(2)(C) (adding 47 U.S.C. § 227(b)(2)(H)).

[101] This does not limit the applicability of the number and duration rules to only calls made by the federal government and its contractors where the debt is owed to or guaranteed by the United States.  Rather, we clarify that

(continued….)

32. *The nature of restrictions, generally.* We determine, based on consumer complaints and on support from the record,[102] that restrictions on the number and duration of federal debt collection calls are appropriate and necessary. In reaching this conclusion, we bear in mind one reasonable interpretation of Congress' action in enacting the amendments: to make it easier for owners of debts owed to or guaranteed by the United States, as well as their contractors, to make calls to collect the debts. We also bear in mind the TCPA's overarching goal to protect the privacy interests of consumers and Congress' express grant of authority to the Commission to place certain restrictions on federal debt collection calls. In seeking to balance these two interests, we limit the number of federal debt collection calls to three in thirty days, with exceptions as noted below; limit the length of calls using an artificial voice or prerecorded voice, and autodialed text messages; and limit the times of day when federal debt collection calls may be made to wireless numbers. As explained more fully below, these limits apply in the aggregate to all calls from a caller to a debtor, regardless of the number of debts of each type the servicer or collector holds for the debtor.[103] This cap of three calls per thirty days is cumulative for debt servicing calls and debt collection calls.[104] Finally, we limit the number of calls in light of a debtor's right to stop federal debt collection calls and to be notified of this right.

33. *Number of calls.* In the NPRM, we proposed to limit the number of federal debt collection calls to three per month, per delinquency, only after delinquency. Several commenters support this number.[105] One commenter reminds the Commission, "it is important to keep in mind that the calls made pursuant to this regulation are without consent, and are likely to comprise only a portion of the many other calls and contacts that debt collectors have with the debtors from whom they are collecting."[106] Other commenters, however, argue for higher limits, stating that "it takes significantly more than three contact attempts to reach the borrower and additional contacts to effectively resolve a borrower's delinquency or default."[107] One commenter asserts that it needs 50 calls over several months to reach the right person and have a conversation.[108] Another states that it takes 14.3 attempts to contact a

(Continued from previous page) ————————————————
the number and duration rules apply to the federal government and its contractors, notwithstanding our recent clarification in the *Broadnet Declaratory Ruling*, as explained in the "Jurisdiction" section, below. *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, Broadnet Teleservices LLC Petition for Declaratory Ruling*, CG Docket No. 02-278, FCC 16-72 (2016) (*Broadnet Declaratory Ruling*). Non-government owners of debt and their contractors, where the debt is guaranteed by the United States, must also comply with the number and duration rules if they wish to make federal debt collection calls pursuant to the Budget Act amendments.

[102] *See, e.g.,* CFPB Comments at 10 ("The Bureau's examinations of debt collectors have also revealed excessive calling and consequent consumer harm. The Bureau therefore believes that a regulatory intervention limiting the number of such calls placed to cell phones by auto-dialers would be a beneficial complement to examination and enforcement to protect consumers from excessive calls from collectors (as well as from creditors and servicers).") (listed in the Commissions comment filing system as filed on May 8, 2016 rather than June 8, 2016).

[103] As explained more fully in para. 45, *infra*, some debtors have multiple debts with the same owner or servicer. *See* NCLC Reply Comments at 7 ("[S]ome servicers collect debts owed to different agencies of the federal government, yet the collection activities devoted to separate agencies are cabined such that it would be difficult for the servicers to coordinate among sections."). Multiple debts owed by one debtor that are serviced or collected by the same entity on behalf of the same loan holder or federal agency shall be considered one debt. This will prevent one debtor with multiple debts of the same type from receiving more than three calls in thirty days, where the debts are owned or serviced by the same caller.

[104] If a caller is making both servicing and collection calls to a wireless number regarding a particular debt, it may make a total of three calls within thirty days; it may not make three servicing calls and three collection calls within a thirty-day period.

[105] *See, e.g.,* Markey Jun. 8, 2016 Letter at 1; NCLC Letter at 3.

[106] NCLC Comments at 27.

[107] ECMC Comments at 6.

[108] Navient Comments at 10.

consumer.[109]  A third commenter states that it needs approximately 50 follow-up calls, but that those calls are consented-to.[110]  Two commenters assert that approximately ten call attempts per month is an appropriate rate at which to contact debtors.[111]  A mortgage servicer states: "By making up to five calls in the two weeks prior to a client becoming 60 days delinquent, we saw approximately 50% more clients become current on the loan when compared to those who weren't called."[112]

34.      As these comments demonstrate, there is no consensus in the record.  The Department of Education states that it "does not believe that allowing loan servicers and [private collection agencies] to make three [federal debt collection calls] per month would measurably increase the likelihood that they would reach a borrower," but that "a higher limit will reasonably allow" them to do so.[113]  Consumer groups generally argue that three calls is the appropriate number for calls pursuant to the Budget Act amendments.  As commenter Navient notes, however, these commenters often "fail to explain why three calls is an appropriate limit."[114]  Additionally, callers filing comments cite statistics and call patterns documenting their perceived need for more calls—but even callers vary widely when advocating for a number on federal debt collection calls.  Congress gave us express authority to limit the number and duration of wireless federal debt collection calls, and the record documents the benefits to consumers of some number of covered calls.  The Commission, therefore, must engage in an exercise in line drawing as we balance the competing interests to determine an appropriate limit on the number of federal debt collection calls.

35.      We determine, subject to the exception below, that a limit of three federal debt collection calls in a thirty-day period is appropriate.  As stated above, a significant number of commenters support this numeric restriction.  Furthermore, the overwhelming majority of individual commenters support our imposing a low limit on the number of calls allowed pursuant to the Budget Act amendments.[115]  Commenters asking for a higher limit have failed to offer a compelling justification for any of the various limits they support.  At the same time, we agree with consumer groups that have noted that callers may make as many calls as they like—they simply need to obtain the consent of the debtor or contact consumers without making a robocall.[116]

36.      We, therefore, conclude that the appropriate limit for the number of federal debt collection calls is three calls within thirty days while the delinquency remains or following a specific, time-sensitive event, with such calls also permitted in the 30 days before such an event (but not before delinquency).  We recognize, however, that some federal agencies, based on their expertise administering their respective statutes and programs, may desire additional calls.[117]  Balancing these needs with the TCPA's goal of protecting consumers from unwanted calls, we note that federal agencies may request a waiver seeking a different limit on the number of autodialed, prerecorded-voice, and artificial-voice calls

---

[109] ECMC Comments at 7.

[110] ConServe Comments at 3.

[111] Nelnet Comments at 14; SLSA Comments at 26.

[112] QLI Comments at 3.

[113] Dept. of Education Reply Comments at 4.

[114] Navient Reply Comments at 10.

[115] *See* para. 9, *supra*.

[116] *See*, *e.g.*, NCHER Comments at 12 (proposing that "[n]othing in the rule limits or prohibits calls or texts requested or agreed upon by the consumer").

[117] *See* Dept. of Education Reply Comments at 4.

that may be made without consent of the called party.[118]  We delegate to the Consumer and Governmental Affairs Bureau the authority to address any such waivers.[119]

37.       We are not persuaded by callers who argue that more calls are needed or that other regulatory or contractual obligations might impose higher limits on the total number of calls.[120]  We are not limiting the total number of calls that may be made; instead, we are exercising our statutory authority and discretion to establish a limit on the number of autodialed, prerecorded-voice, and artificial-voice calls that can be made without the consent of the called party for the limited purpose at issues here.  Thus, we set this limit with the knowledge that callers may make additional autodialed, artificial-voice, and prerecorded-voice calls if they obtain the prior express consent of the called party[121] or if they dial manually.  Robocallers are free, of course, to obtain prior express consent for additional calls and we presume that consumers who find the calls beneficial will provide it.

38.       *Consumer ability to stop federal debt collection calls.*  The Commission has determined that an ability to stop unwanted calls is critical to the TCPA's goal of consumer protection.[122]  That right is likely more important here, where consumers need not consent to the calls in advance in order for a caller to make federal debt collection calls.  As one commenter notes, "[r]equiring calls to stop after the consumer so requests constitutes a limit on the number of calls that can be made, and Congress explicitly authorized the Commission to limit the number of calls."[123]  We agree.  We have stated that one reasonable interpretation of the statute is that Congress intended to make it easier for consumers to obtain useful information about debt repayment, which may be conveyed in these calls.  When a debtor has rejected that presumption and declared that he or she no longer wishes to receive these calls, there is no longer any reason for the calls to continue.  We determine, per our authority to limit the number of federal debt collection calls,[124] that consumers have a right to stop the covered autodialed, artificial-voice, and

---

[118] *See* 47 CFR § 1.3.

[119] Contrary to the claim of one dissent, our decision to adopt a limit of three calls per thirty days does not lack a rational basis.  It is well established that a paramount goal of Congress in adopting the TCPA was to recognize the intrusive nature of robocalls and to limit the burden they impose on consumers.  *See* TCPA, Pub. L. No. 102-243, § 2(9).  Nothing in the Budget Act indicates that Congress intended to depart from this goal.  To the contrary, we believe Congress granted the Commission rulemaking authority in subparagraph (b)(2)(H) precisely to ensure that this law does not inadvertently open the floodgates to unwanted robocalls.  While it is true that some commenters urged us to adopt limits much higher than three per thirty days, against the backdrop of Congress's enduring goal of limiting the intrusiveness of robocalls, we believe prudence counsels in favor of adopting limits at the lower end of the range of proposals in the record at this time.  To the extent that subsequent experience with the waiver process demonstrates that higher limits may be warranted, we can revisit the limits in the future.  One dissent questions the adequacy of the waiver process, particularly given some specific concerns raised in the record about federal laws and rules under the auspices of other agencies.  Because the Commission lacks expertise with respect to such laws and rules (including whether they necessarily require robocalls instead of, say, manual calls), we believe a waiver process is the best way to address any such situations; such a process will allow a full record to be developed regarding the nature of any relevant statutes and rules.  To the extent that it is demonstrated in a waiver proceeding that a genuine conflict exists between our three-per-thirty-days limit and another federal law, we are likely to view that factor as probative of the "good cause" needed to justify a waiver, although we also would consider any countervailing issues raised in the record.

[120] *See, e.g.,* ConServe Comments at 10; MBA Reply Comments at 9; HOPE NOW Reply Comments at 2-3.

[121] *See* 47 U.S.C. § 227(b)(1)(A); 47 CFR § 64.1200(a)(1).

[122] *See 2015 TCPA Declaratory Ruling and Order*, 30 FCC Rcd at 7997, para. 66 ("As we have found above, the most reasonable interpretation of 'prior express consent' in light of the TCPA's consumer protection goals is to permit a right of revocation."); *see also id.* at 7993-99, paras. 55-70 (discussing revocation of consent and a consumer's methods of revoking consent).

[123] NCLC Comments at 28; *but see* EFC Comments at 8; NSC Comments at 13.

[124] Budget Act § 301(a)(2)(C) (adding 47 U.S.C. § 227(b)(2)(H)).

prerecorded-voice servicing and collection calls to wireless numbers at any point the consumer wishes.[125] The debtor may make this request to the caller. Several commenters support this decision and the Commission's ability to make it.[126] If Congress intended these amendments to make it easier for consumers to obtain useful information about debt repayment,[127] then consumers may request that the calls stop if they do not find the calls or the information they contain useful. Our rules, therefore, require that zero federal debt collection calls are permitted once a debtor asks the owner of the debt or its contractor to cease federal debt collection calls. This requirement that callers immediately honor a request to stop calls applies even where the caller has previously obtained prior express consent to make federal debt collection calls.

39.      We also understand that debts may be transferred from one servicer or collector to another. This stop-calling request is specific to the debt and the consumer, and transfers with the debt; once the consumer has asked that the number of federal debt collection calls be reduced to zero, only the consumer can alter that number restriction. Consequently, a stop-calling requests applies to a subsequent collector or servicer of the same debt.[128] In reaching this determination, we reject a commenter's proposal that a stop-calling request be limited to a period of time such as a month, but be renewable.[129] Because the stop-calling request for federal debt collection calls applies for the life of the debt, servicers and collectors must ensure that information regarding the request conveys with the other relevant information regarding the debt when it is sold or transferred between servicers or collectors.[130] The requirement that the stop-call request conveys from one servicer or collector to the next implicates the Paperwork Reduction Act, as indicated in our rules, contained in Appendix A, and in the Final Regulatory Flexibility Act, contained in Appendix C.

40.      Granting consumers a right to request calls stop at any point is only useful if consumers know of this right.[131] We agree with the FTC staff that "[a]n opt-out right [] is only effective if it is well-known"[132] rather than with the commenters who argue that a consumer should be notified of the right only once and in writing,[133] or that notifying consumers of the right within every phone call will "cause a consumer to attach undue significance to such a right."[134] We, therefore, require callers to inform debtors of their right to make such a request.[135] The disclosure of rights must inform the debtor that he or she has

---

[125] The TCPA does not prohibit callers from manually dialing these calls even if the consumer requests that the caller cease making autodialed, artificial-voice, and prerecorded-voice calls. CFPB Comments at 10; SLSA Comments at 30-31; ISL Comments at 2.

[126] See, e.g., Markey Nov. 18, 2016 Letter at 1; MFY Comments at 2; NCLC Comments at 3; AFR Comments at 2; CAC Comments at 2.

[127] See para. 5, supra.

[128] ACA Declaratory Ruling, 23 FCC Rcd at 564-65, paras. 9-10 (discussing calls made "in connection with an existing debt"). While the Commission is not imposing specific record-keeping requirements for stop-calling requests, callers bear the burden of proof should there be any dispute about such requests. Callers, therefore, are advised to maintain a record of such requests and to transfer them to subsequent callers along with other information about the debt.

[129] NCHER Comments at 14.

[130] Compare CMC Comments at 16 with NCLC Comments at 29.

[131] Brown Letter at 2; Markey Jun. 8, 2016 Letter at 1; CFPB Comments at 11.

[132] FTC BCP Staff Comments at 11; see also CAC Comments at 2.

[133] ConServe Comments at 11.

[134] ACA Comments at 19.

[135] See Zauderer v. Office of Disciplinary Counsel, 471 U.S. 626, 651 (1985) (disclosure requirements are consistent with the First Amendment so long as they are "reasonably related to the [government's] interest in preventing deception of consumers"). The disclosure we require here prevents deception because, without the disclosure,

(continued....)

a right to request that no further autodialed, artificial-voice, or prerecorded-voice calls be made to the debtor for the life of the debt, and that such request may be made by any reasonable method. Disclosures must be made in a manner that gives debtors an effective opportunity to stop future calls. Callers must disclose this consumer right within every completed autodialed call with a live caller, whether the caller speaks with the debtor or leaves a voicemail message. Calls using a prerecorded or artificial voice must disclose the right within each message.[136] Covered text messages must disclose the right within each text message or in a separate text message that contains only the disclosure and is sent immediately preceding the first covered text message. If the disclosure is in a separate text message, that message does not count toward the numeric limits we impose in this *Order*.

41.     The Commission has previously determined that consumers may opt out of calls for which prior consent is required, and that they may do so using any reasonable method, including orally or in response to a text message.[137] Here, where the federal debt collection calls do not require consent, but where consumers may request at any time that calls stop, consumers may also make a stop-calling request using any reasonable method, including orally or in response to a text message. We reach this conclusion regarding the methods by which a consumer may make a stop-calling request after considering consumer confusion, standard calling practices, and recordkeeping procedures.[138] We anticipate that confusion will be minimized and calling practices will be streamlined if stop-calling methods and opt-out procedures are consistent. For similar reasons, we determine that federal debt collection calls made using a prerecorded or artificial voice must include an automated, interactive voice- and/or key press-activated opt-out mechanism so that debtors who receive these calls may make a stop-calling request during the call by pressing a single key.[139] When a federal debt collection call using an artificial voice or prerecorded voice leaves a voicemail message, that message must also provide a toll-free number that the debtor may call at a later time to connect directly to the automated, interactive voice and/or key press-activated mechanism and automatically record the stop-calling request. Text message disclosures must include brief explanatory instructions for sending a stop-call request by reply text message and provide a toll-free number that enables the debtor to call back later to make a stop-call request. The requirement that the artificial- and prerecorded-voice calls, as well as text messages, include opt-out instructions and features implicates the Paperwork Reduction Act, as indicated in our rules, contained in Appendix A, and in the Final Regulatory Flexibility Act, contained in Appendix C.

42.     *When may federal debt collection calls be made?*  In order for a federal debt collection call to produce the intended effect of "collect[ing] a debt owed to or guaranteed by the United States,"[140] it must occur close in time to a key event in the life of the debt. As set forth above, calls "solely to collect a debt" may be collection calls or servicing calls because both increase the likelihood of a debt being collected. We have interpreted the statutory phrase "solely to collect a debt" to limit debt collection calls to a period when a debt is delinquent, and to limit debt servicing calls to following a specific, time-sensitive event and in the 30 days before such an event. We here use the authority Congress granted us to limit the number and duration of calls "to collect a debt owed to or guaranteed by the United States."[141]

---

(Continued from previous page) ————————
consumers may be deceived into believing that they must be subject to these federal debt collection calls. *See also Am. Meat Inst. v. U.S. Dep't. of Agric.*, 760 F.3d 18, 27 (D.C. Cir. 2014).

[136] 47 U.S.C. § 227(d)(3).

[137] *See 2015 TCPA Declaratory Ruling and Order*, 30 FCC Rcd at 7996, para. 64.

[138] *See* FTC BCP Staff Comments at 11 ("FTC staff supports expanding the opt-out mechanisms for telemarketing robocalls to the covered debt collection calls due to the similar significant impact on consumer privacy.").

[139] *Cf.* 47 CFR § 64.1200(b)(3); 47 CFR § 64.1200(a)(7)(i)(B); *see also* 16 CFR § 310.4(b)(1)(v)(B)(ii)(A)-(B); FTC BCP Staff Comments at 10; NCLC Comments at 30; NCHER Comments at 15.

[140] Budget Act § 301(a)(2)(C) (adding 47 U.S.C. § 227(b)(2)(H)).

[141] Budget Act § 301(a)(2)(C) (adding 47 U.S.C. § 227(b)(2)(H)).

The rules we enact today state that zero calls are permitted under the Budget Act amendments unless they occur: (1) during the period of delinquency for debt collection calls; and (2) following an enumerated, specific, time-sensitive event and in the 30 days before such an event for debt servicing calls.

43.    *Content of the calls.*  As stated above, our interpretation of the statutory phrase "solely to collect a debt" excludes calls that contain marketing, advertising, or selling products or services.  We here use the authority Congress granted us to limit the number and duration of calls "to collect a debt owed to or guaranteed by the United States."[142]  The rules we enact today state that zero calls are permitted under the Budget Act amendments if the autodialed, prerecorded-voice, or artificial-voice call contains any marketing, advertising, or selling of products or services.  Commenters support this determination.[143]  Our determination regarding calls that contain marketing, advertising, or sales also supports our interpretation of Congress' intent that the calls provide consumers with useful information about repaying their debt, and it is a step in preventing the very real problem that consumers will be subject to fraudulent calls and programs.[144]

44.    *Calls only to the debtor.*  We also here enact rules stating that zero calls are permitted under the Budget Act amendments unless the calls are to the debtor or the person responsible for paying the debt, and the call is made to that person at one of the three categories of numbers specified in the *Order* above.  Our interpretation of the statutory phrase "solely to collect" explains our reasoning for establishing these limits on who may be called and the numbers at which these persons may be called.  We find that the reasoning applies here as well, where Congress has authorized us to limit the number of calls made "to collect a debt."[145]  Calls to persons other than the debtor or other entities responsible for paying the debt are not directly tied to collecting a debt.  In balancing the inconvenience to uninvolved persons against the interests of callers, we determine it is not appropriate to extend federal debt collection calls beyond the debtor and others responsible for paying the debt.  Likewise, calls to numbers other than the three categories of telephone numbers we specified above are unlikely to reach the person responsible for repaying the debt, and so are unlikely to result in collection of the debt.  We, therefore, limit to zero calls made to persons or telephone numbers other than these.

45.    *Call limits are per caller.*  Commenters also ask the Commission to "clarify whether the [limited number of federal debt collection calls] is per debtor (*e.g.*, inclusive of all telephone numbers used by the debtor)"[146] per delinquency,[147] or per servicer or collector.[148]  One consumer advocate states: "[B]ecause many consumers have multiple loans—often eight to ten student loans for each borrower—we recommend that the number of calls or texts permitted to be made without consent should be limited to three calls per servicer or collector.  Without this limitation, consumers who have eight to ten outstanding loans, as many do, could be receiving between twenty-four and thirty robocalls per month to their cell phones."[149]  Because the Commission has set the federal debt collection call limit at three calls per thirty days, that number could rise to twenty-four to thirty robocalls per month if we were to determine that the call limit applied per loan.  In light of the record, and to prevent an excessive number of calls to individual debtors, we determine that the call limit on federal debt collection calls to wireless numbers

---

[142] Budget Act § 301(a)(2)(C) (adding 47 U.S.C. § 227(b)(2)(H)).

[143] *See, e.g.*, FTC BCP Staff Comments at 7-8; ACA Comments at 10-11; NCHER Comments at 5; EFC Comments at 4; NCLC Comments at 20.

[144] *See* FTC BCP Staff Comments at 3; CMC Comments at 17.

[145] Budget Act § 301(a)(2)(C) (adding 47 U.S.C. § 227(b)(2)(H)).

[146] NSC Comments at 8.

[147] EFC Comments at 7.

[148] CU Comments at 4; MFY Comments at 2; AFR Comments at 2; NCLC Comments at 25; YI Comments at 2.

[149] NCLC Comment at 3.

applies for each servicer or collector.[150]  If the servicer or collector has contracts with the United States for more than one type of debt—for example to collect or service student loans and Department of Agriculture loans—the servicer may utilize a three-call in thirty day limit for each type of loan the servicer or collector manages for the debtor.

46.        *Length of federal debt collection calls*.  In the NPRM, we sought comment on the maximum duration of a voice call, and whether we should adopt different duration limits for prerecorded- or artificial-voice calls than for autodialed calls with a live caller.  Commenters generally support the idea of a maximum length for artificial-voice and prerecorded-voice calls, but not a maximum length for autodialed calls with a live caller because this could impinge on a potentially lengthy conversation between a servicer and a debtor.[151]  Commenters who support a maximum length for artificial- and prerecorded-voice calls suggest caps of 30 or 60 seconds.[152]  Some commenters suggest that the time limit include time for any required disclosures, while others ask that required disclosures be outside of any time cap the Commission sets.[153]  In light of the record, we determine that artificial-voice and prerecorded-voice calls may not exceed 60 seconds, exclusive of any required disclosures.  We do not place any cap on the duration of live-caller, autodialed calls made pursuant to the Budget Act exception.

47.        We also asked in the NPRM whether we should impose a limit on the length of text messages, and what that limit should be.  Commenters note that senders of text messages generally keep the messages short because "[a] long text message would get split up into multiple texts and could confuse the borrower."[154]  Other commenters ask that any cap on the length of a text message account for required disclosures.[155]  Text messages are generally limited to 160 characters.[156]  As stated above, any required disclosures may be included within this 160-character limit for a single text message or may be sent as a separate text message that does not count toward the numeric limits we impose herein.

48.        *Time of day restrictions*.  We impose an additional restriction on the number of federal debt collection calls or texts allowed, and determine that no federal debt collection calls or texts are permitted outside the hours of 8:00 a.m. to 9:00 p.m. (local time at the called party's location), which is identical to the rule for telemarketing calls.[157]  Congress stated that federal debt collection calls are intended "to collect a debt," and during these times consumers are likely available to answer calls and receptive to receiving information from callers.  The record supports our determination that consumers

---

[150] CAC Comments at 2.

[151] *See, e.g.*, NCHER Comments at 12-13; CFBP Comments at 11-12; Letter from Timothy M. Fitzgibbon, Senior Vice President, National Council of Higher Education Resources, to Marlene H. Dortch, Secretary, FCC at 3 (Apr. 05, 2016) (on file in CG Docket No. 02-278) (NCHER Letter); NSC Comments at 10-11; ECF Comments at 8; OSLA Comments at 2; NCHER Comments at 13; AFSA Comments at 8; ACA Comments at 20; ConServe Comments at 2; CMC Comments at 15; ISL Comments at 2; ABA/CBA Comments at 11-12; SLSA Comments at 28.

[152] ECF Comments at 8; NCHER Comments at 13; NCLC Comments at 26; SLSA Comments at 29.

[153] CFPB Comments at 11-12; NCLC Comments at 26; SLSA Comments at 29.

[154] AFSA Comments at 8.

[155] CFPB Comments at 12; EF Comments at 8.

[156] *See* https://en.wikipedia.org/wiki/Short_Message_Service.

[157] *See* 47 CFR § 64.1200(c)(1).  One commenter argues that it "cannot determine which time zone the borrower is in."  Nelnet Comments at 15.  Another commenter states that it has adopted operational practices involving ZIP codes to better determine a consumer's likely location rather than relying on area code.  ECMC Comments at 8.  The rule we adopt today is the same as our time-of-day restriction on telemarketing calls and as the FTC's Telemarketing Sales Rule.  This restriction has not proved unworkable, and we do not anticipate that it will be unfeasible here.

are generally comfortable with receiving calls during these times.[158]  Furthermore, FTC staff notes that the FDCPA and the Telemarketing Sales Rule "similarly limit debt collection and telemarketing calls to this same timeframe."[159]  Adding a new category of calls to this generally accepted timeframe will cause less inconvenience and confusion to consumers than if we were to impose a different schedule or no schedule for these calls.  Likewise, call centers that contract with businesses to make calls on their behalf are familiar with these time-of-day restrictions; this restriction should not impose a burden on callers or their contractors making federal debt collection calls.

49.     *Multiple sets of regulations*.  We acknowledge that other statutes and regulations impact debt collection calls, yet we recognize that Congress assigned to the Commission responsibility for crafting rules for autodialed, artificial-voice, and prerecorded-voice debt collection calls where the debt is owed to or guaranteed by the United States.  Because Congress specifically gave the Commission certain authority over these federal debt collection calls, we assume that callers will follow the most restrictive rules for the call being made.  Which rules apply will vary based on a number of factors, such as whether the caller is a debt collector or a debt servicer, the nature of the debt, and the length of delinquency.  Where multiple rules apply to the same call and one of the rules is enacted by the Commission to implement the TCPA, a caller must comply with the most restrictive requirements regarding factors such as frequency, time of day, and so on.  Section 301 affects the TCPA and its implementing regulations but does not affect other laws, including specifically those for which the CFPB or the FTC have responsibility.[160]

## C.    Other Implementation Issues

50.     *Covered Calls to Residential Lines*.  We note that under our current rules, artificial- or prerecorded-voice calls to residential lines that are made for the purpose of collecting a debt are currently not subject to the prior express consent requirement.  Although the TCPA allows for broad coverage of the prior express consent requirement to all non-emergency artificial- and prerecorded-voice calls to residential lines,[161] the Commission has exercised its statutory exemption authority so as to apply the consent requirement only to calls that include or introduce an advertisement or constitute telemarketing.[162]  The Commission has also found that debt collection calls do not constitute telemarketing.[163]

51.     Congress, in authorizing the Commission to enact rules implementing the Budget Act's amendments, stated that the Commission could "restrict or limit the number and duration of calls made to a telephone number assigned to a cellular telephone service."[164]  Congress, by omission, did not authorize the Commission to enact rules to limit the number and duration of calls made to a telephone number assigned to a residential telephone line.  Commenters support this understanding of the Budget Act amendment with regard to calls to numbers assigned to residential lines, stating: "Congress did not grant the Commission the authority to restrict or limit" these calls.[165]  Consequently, the Commission's current rules regarding non-telemarketing autodialed, prerecorded-voice, and artificial-voice calls to residential

---

[158] *See*, *e.g.*, Markey June 8, 2016 Letter at 1; EFC Comments at 8; NCHER Comments at 12; NCLC Comments at 3; ACA Comments at 9-20; CAC Comments at 2.

[159] FTC BCP Staff Comments at 9-10.

[160] *See* CFPB Comments at 4; FTC BCP Staff Comments at 1.

[161] 47 U.S.C. § 227(b)(1)(B) (requiring prior express consent for all non-emergency artificial- or prerecorded-voice calls to residential lines unless exempted by the Commission).

[162] 47 CFR § 64.1200(a)(3); *1992 TCPA Order*, 7 FCC Rcd at 8755, para. 5

[163] *ACA Declaratory Ruling*, 23 FCC Rcd at 565, para. 11.

[164] Budget Act § 301(a)(2)(C) (adding 47 U.S.C. § 227(b)(2)(H)).

[165] ABA/CBA Comments at 9; *see also* Navient Comments at 15-16; NCHER Comments at 15; ConServe Comments at 12; ECMC Comments at 11; SLSA Comments at 32.

numbers are not altered by the Budget Act amendments.  The Commission is not imposing restrictions on these calls.  Callers may, however, be subject to restrictions under other applicable statutes and regulations, such as the Fair Debt Collection Practices Act.

52.      *Restrictions on Calls to Cellular Telephone Service.*  Congress authorized the Commission to "restrict or limit the number and duration of calls made to a telephone number assigned to a cellular telephone service to collect a debt owed to or guaranteed by the United States."[166]  Yet, the amendment to the TCPA, authorizing calls made to collect a debt owed to or guaranteed by the United States, is broader, applying to "any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call."[167]  Considering the identical language in the prior delegation of authority in Section 227(b)(2)(C), we conclude that Congress delegated the Commission authority to limit the number and duration of all calls made pursuant to the debt collection exception in section 227(b)(1)(A)(iii).

53.      Congress, in granting the Commission authority to limit the number and duration of calls, used identical language to the language it used in the separate delegation of authority in Section 227(b)(2)(C).[168]  The identical language in these two delegations of authority indicates that Congress intended the two provisions to apply to the same services.[169]

54.      The Commission has interpreted Section 227(b)(2)(C) to apply to all services mentioned in Section 227(b)(1)(A)(iii).  In so doing, it has interpreted "cellular telephone service" by asking whether services are functionally equivalent from the consumer perspective rather than on technical or regulatory differences, such as which spectrum block is used to provide the service.[170]  This avoids, for example, consumers receiving wireless voice service from being treated differently depending on which spectrum block their carriers use and callers having to determine which spectrum block is used for a particular consumer's service in order to know which requirements apply.

55.      Applying the canon of statutory construction that Congress knows the law, including relevant agency interpretations, at the time it adopts a statute, we presume that Congress knew of the Commission's interpretation of this key language.[171]  Congress used the same language in the recent delegation of authority without taking any action to alter the Commission's interpretation of identical language elsewhere in the same statute.  We therefore conclude that the authority delegated to us in the new Section 227(b)(2)(H) added by the Budget Act applies to all services to which amended Section 227(b)(1)(A)(iii) applies.

56.      *Application of Other TCPA Restrictions to Covered Calls.*  We believe the most reasonable interpretation of the Budget Act amendments is that they except covered calls from the requirement to obtain the consent of the called party, and that calls must in every other respect comply

---

[166] Budget Act § 301(a)(2)(C) (adding 47 U.S.C. § 227(b)(2)(H)).

[167] Budget Act § 301(a)(1)(A) (amending 47 U.S.C. § 227(b)(1)(A)(iii)).

[168] 47 U.S.C. § 227(b)(2)(C) (authorizing the Commission to exempt certain calls made "to a number assigned to a cellular telephone service" from the requirements of Section 227(b)(1)(A)(iii)).

[169] *See, e.g.*, *Vonage Holdings Corp. v. FCC*, 489 F.3d 1232, 1240 (D.C. Cir. 2007).

[170] *See 2015 TCPA Declaratory Ruling and Order*, 30 FCC Rcd at 7988, para. 43 n.174.  The Commission also has taken a similar consumer-oriented approach to wireless services in other contexts.  *See also Implementation of Section 6002(b) of the Omnibus Budget Reconciliation Act of 1993, Annual Report and Analysis of Competitive Market Conditions With Respect to Mobile Wireless, Including Commercial Mobile Services*, WT Docket No. 13-135, Seventeenth Report, 29 FCC Rcd 15311, 15314, para. 3 (WTB 2014) ("Similar to previous reports, the analysis in this *Report* is based on a consumer-oriented view of mobile services, with a focus on specific product categories regardless of their regulatory classification.").

[171] *See, e.g.*, *Washington Legal Foundation v. U.S. Sentencing Commission*, 17 F.3d 1446, 1450 (D.C. Cir. 1994).

with the TCPA unless compliance with a requirement of the TCPA is prohibited by a separate regulation pertaining to debt collection calls generally.  The Budget Act amendments apply to the consent requirement of Section (b)(1), but other sections of the TCPA are left unaffected.  For example, the identification requirements of section 64.1200(b)(1)-(2) apply to both excepted calls and other calls made using an autodialer, a prerecorded voice, and an artificial voice.  The exception Congress created in the Budget Act amendments is not an exception to compliance with the TCPA as a whole, but only with the requirement to obtain the consent of the called party to make the call.  The Commission will resolve conflicts on a case-by-case basis.

57.     *Other Issues*.  Commenters in the record raise other arguments for the Commission's consideration in enacting rules for the Budget Act amendments.  For example, one commenter asks the Commission to state that "no debt collection calls [may be made to] people receiving Supplemental Security Income (SSI) benefits on the basis of old age or disability, and that Treasury not pass along information on debts owed by SSI recipients to debt collectors."[172]  Another commenter asks the Commission to develop "a separate set of rules to assist federal student loan borrowers."[173]  A separate commenter asks the Commission to create a certification system that authorizes callers to use autodialers for purposes of making covered calls and only renews the certification if the caller's yearly performance meets standards established by the Commission and the Department of Education.[174]  The Commission declines to address these and other ancillary issues and arguments raised in the record as they are outside the scope of this proceeding.  Moreover, these issues are not fully developed in the record and we would need more facts to meaningfully and cogently address these issues.

**D.     Severability**

58.     All of the rules that are adopted in this *Order* are designed to ensure a caller's ability to make calls pursuant to the Budget Act amendments and a debtor's ability to control the calls he or she receives.  Each of the determinations we undertake in this *Order* serve a particular function toward this goal.  Therefore, it is our intent that each of the rules and regulations adopted herein shall be severable.  We believe that debtors will benefit from the information they may receive from callers and will also benefit from the ability to ask that calls be stopped.  If any of the rules or regulations, or portions thereof, are declared invalid or unenforceable for any reason, it is our intent that the remaining rules shall be in full force and effect.

**E.     Effective Date**

59.     As noted in the discussion above, two portions of our rules implicate the Paperwork Reduction Act (PRA).  These portions involve the rules for the recording of a debtor's request to stop receiving autodialed, artificial-voice, and prerecorded-voice calls to collect a debt owed to or guaranteed by the United States, and rules for the conveyance of that stop-call request from one servicer or collector to another.  Because these portions of our rules implicate the PRA, they will not become effective until 60 days after the Commission publishes a Notice in the Federal Register indicating approval of the information collection by the Office of Management and Budget (OMB).

60.     The remaining rules will not become effective until the rules requiring OMB approval become effective.  While these remaining rules do not require OMB approval and could become effective immediately upon release of this *Order*, we determine that the consumer-protection rules regarding stop-call requests and conveyance of those requests are so integral to this regulatory scheme that the remaining rules should not become effective until the consumer-protection rules are in place.  The rules that could become effective immediately permit a caller to make calls—they specify how many calls may be made, who may make the calls, when the calls can be made, and to which numbers the calls may be made,

---

[172] NCLC Comments at 16.

[173] AACC Comments at 2.

[174] UNCF Comments at 2.

among other things.  These rules give effect to one of the reasonable interpretations we have identified for Congress' passage of the Budget amendments: to make it easier for owners of debts owed to or guaranteed by the United States and their contractors to make calls to collect debts.  But the second reasonable interpretation—to make it easier for consumers to obtain useful information about debt repayment—carries with it a consumer's prerogative to determine that the debtor does not want the information conveyed in the calls and to ask that the calls stop.  The rules that give effect to this interpretation of Congress' intent are delayed by PRA requirements and OMB approval.  We determine that the regulatory scheme we implement today must include both the ability for callers to make calls and the right of debtors to ask that calls stop—and that both portions of the regulatory scheme become effective simultaneously.  To do otherwise would be to allow callers to make calls but to leave debtors with no consumer protections until OMB approval is complete.  We determine that both portions of the rules must become effective for the regulatory scheme to be effective.

## IV.    JURISDICTION

61.    In section 301 of the Budget Act, Congress amended section 227 of the Communications Act by, *inter alia*, adding subparagraph (b)(2)(H), which grants the Commission authority to "restrict or limit the number and duration of calls made to a telephone number assigned to a cellular telephone service to collect a debt owed to or guaranteed by the United States."[175]  Section 301 also directed the Commission to "prescribe regulations to implement the amendments made by this section."[176]  With this *Order*, we exercise these grants of authority by adopting regulations that limit both the number and duration of calls covered by subparagraph (b)(2)(H).  These limitations apply irrespective of the identity of the caller and thus encompass wireless debt-collection calls placed by the owner of the debt or its contractors.  We find that this approach—which focuses on the type of "calls made" to a cellular number and not the identity of the caller—is consistent both with the Budget Act and with the *Broadnet Declaratory Ruling* in which we recently found that the federal government and its agents are not "persons" covered by section 227(b)(1).

62.    By its express terms, new subparagraph (b)(2)(H) authorizes the Commission to regulate the frequency and duration of government-debt-collection "calls made" to cellular numbers, even though those calls are excepted from the TCPA's separate prior-express-consent requirement by virtue of the Budget Act's amendment of section 227(b)(1)(A)(iii).[177]  Given that the same section of the Budget Act *both* excepts these calls from the prior-express-consent requirement *and* authorizes the FCC to regulate their frequency and duration, it seems clear that Congress's goal in adding section 227(b)(2)(H) was to protect consumers by ensuring that calls that are excepted from the consent requirement are nonetheless regulated in other respects.[178]  Moreover, whereas the prior-express-consent requirement applies only to "persons"—which the Commission has interpreted to exclude the federal government and its agents[179]—section 227(b)(2)(H) contains no such limitation on the Commission's authority to regulate the frequency and duration of government-debt-collection "calls."  Thus, although we have ruled that calls by the federal government and its agents are excepted from the prior-express-consent requirement of section

---

[175] Budget Act § 301(a)(2)(C) (adding 47 U.S.C. § 227(b)(2)(H)).

[176] Budget Act § 301(b).

[177] Budget Act § 301(a)(1)(A) (amending 47 U.S.C. § 227(b)(1)(A)(iii)).

[178] We find no support for the claim in one dissent that "[t]he Budget Act exemption was designed to protect federal agencies and their contractors from liability when they make calls without consent of the called party," or that the "intent of the law . . . was to enable lenders to use modern dialing equipment as part of their efforts to collect debt." No legislative history is cited for these assertions, nor does any appear to exist.  Further, had Congress wanted callers to be wholly exempt from liability, or never to manually place calls, it would not have granted the Commission express authority to adopt rules limiting the number and duration of debt-collection robocalls.

[179] *Broadnet Declaratory Ruling*, FCC 16-72 at para. 10.

227(b)(1),[180] we conclude that calls by the federal government and its contractors *are* subject to the regulations we promulgate in this order pursuant to our authority to regulate the frequency and duration of calls under section 227(b)(2)(H).[181]

63.     This conclusion is further supported by the timing of the Budget Act.  In particular, when Congress passed that legislation, the Commission had not yet resolved whether the federal government or its contractors are "person[s]" subject to the prior-express-consent requirement of section 227(b)(1)(A)(iii).  Against this backdrop (of which Congress presumptively was aware[182]), Congress wrote subsection (b)(2)(H) in language that does *not* limit the Commission's regulatory authority under this new subparagraph to "persons."  This decision indicates that Congress intended the regulations adopted under this new subsection to apply to all callers, not just those who qualify as "person[s]" under the statute, and thus to apply to the federal government and government contractors even if the Commission were to find (as it later did) that those entities do not qualify as "persons" under subsection (b)(1)(A)(iii).[183]  (This inference is also consistent with the view, articulated in the previous paragraph, that Congress intended to protect consumers by authorizing frequency and duration limits as a substitute for the prior-express-consent requirement for calls that are no longer covered by the latter requirement.)  If, on the other hand, Congress had wanted to exclude the federal government or government contractors from the frequency and duration limits, it naturally could have done so by adding language to that effect.  For instance, Congress easily could have added a proviso at the end of subparagraph (b)(2)(H) along the following lines: "[The Commission] may restrict or limit the number and duration of calls made to a telephone number assigned to a cellular telephone service to collect a debt owed to or guaranteed by the United States, except that the Commission may not so restrict or limit any call made by the federal government or its contractors."  That Congress opted not to include such a proviso supports our conclusion that Congress's intent in adopting section 301 was to authorize the Commission to limit the frequency and duration of *any* debt collection call that meets the parameters of section 227(b)(2)(H), without regard to the identity of the caller.

64.     We reject arguments in both dissents that the prefatory reference to "person" in section 227(b)(1) necessarily means that any rules adopted under subparagraph (b)(2)(H) must extend only to "persons."  In addition to the reasons cited above, we believe a broader interpretation of (b)(2)(H) is at least rendered permissible by the literal language of section 227(b)(2).  That paragraph directs the Commission to prescribe regulations to implement the requirements "of this subsection."  The term "this subsection" refers to the *entirety* of subsection (b).  While one of the requirements in subsection (b) is set forth in paragraph (b)(1), which hinges on whether the caller is a "person," another requirement in subsection (b) appears in new subparagraph (b)(2)(H).  There, no mention whatsoever is made of "persons"; rather, the clear focus is on the nature of the call—namely, whether it is "made" to a cellular

---

[180] *See id.*

[181] In reaching this conclusion, we note that the Budget Act amendments to the TCPA were enacted some 25 years after the statute first became law.

[182] *See, e.g., Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 527-233 (1994), *citing Lorillard v. Pons*, 434 U.S. 575, 580 (1978) (Congress is presumed to be aware of an administrative or judicial interpretation of a statute); *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 184 (1988) (Congress is presumed to know the existing law pertinent to the legislation it enacts); *Hernstadt v. FCC*, 677 F.2d 893, n.22 (D.C. Cir. 1980) ("Congress is presumed to be cognizant of, and legislate against the background of, existing interpretations of law."); Letter from Robert E. Latta, United States Congress, to Marlene H. Dortch, Secretary, FCC at 1 (July 8, 2015) (on file in CG Docket No. 02-278) (writing in support of petitions filed by Broadnet Teleservices, LLC, and RTI International, Inc., seeking clarification that the "Commission's TCPA rules do not apply to calls made by or on behalf of local, state and federal governments").

[183] To be clear, in the *Broadnet Declaratory Ruling* the Commission found that the federal government and its agents are not persons under section 227(b)(1).  *See Broadnet Declaratory Ruling*, FCC 16-72 at para. 10.

number "to collect a debt owed to or guaranteed by the United States."[184]  Thus, under a literal reading of the statute, the Commission has clear authority to adopt number-and-duration limits that apply to all government debt collection calls, irrespective of whether they were made by a "person."  In addition, we do not think that our authority under section 227(b)(2)(H) is necessarily limited by section 227(b)(1), given that section 227(b)(2)(H) grants us authority to regulate a class of calls (those to collect certain government-backed debts) that, by definition, are not subject to section 227(b)(1).

65.     For similar reasons, we reject the argument of one dissenter that our interpretation of subparagraph (b)(2)(H) is impermissible because federal law does not apply to the sovereign absent "some affirmative showing of statutory intent to the contrary."[185]  Here, Congress has provided the requisite affirmative showing by carefully structuring[186] subsection (b) such that paragraph (b)(2) empowers the FCC to prescribe regulations to implement *any* requirement in the entire "subsection," whether located in (b)(1) or (b)(2).  We see no reason to effectively rewrite this directive by restricting our rulemaking authority solely to requirements set forth in (b)(1).  Finally, the "settled propositio[n]" that waiver of the United States' sovereign immunity "cannot be implied" is simply not relevant here.  This item simply does not address sovereign immunity, which is an issue for the courts to decide, as one dissenter has previously emphasized.[187]  This item simply interprets what we understand the TCPA itself to require, and if a defendant facing claims for violating the TCPA wants to raise a sovereign immunity defense, it remains free to do so, and the court can then address whether these TCPA requirements constitute a waiver of sovereign immunity.

66.     Finally, there is no merit to the claim of one dissenter that the Commission failed to provide adequate notice "to non-persons such as the federal government."  In the NPRM, the Commission expressly raised the issue of the government's personhood, noting that "petitions pending before the Commission seek clarification regarding the meaning of 'persons' and whether the federal government or its agents are persons for purposes of the TCPA, among other things."[188]  Against that backdrop of uncertainty regarding the government's personhood, the Commission sought comment on "what types of number and duration restrictions we should adopt for the covered calls" and "how we should restrict or limit the number and duration of covered calls," and then proceeded to "propose that the limit on the number of [covered] calls should be for *any* initiated calls," provided those calls were "autodialed, prerecorded, or artificial voice calls to wireless numbers."[189]  The expansive nature of this proposal, which would cover "any" initiated call, should have made clear the Commission was at least contemplating applying number-and-duration limits to all debt-collection calls to wireless numbers, regardless of the identity of the caller.  At a minimum, therefore, this outcome qualifies as a logical outgrowth of the NPRM.[190]

---

[184] 47 U.S.C. § 227(b)(2)(H).

[185] *See Vermont Agency of Natural Resources v. Unites States ex rel. Stevens*, 529 U.S. 765, 781 (2000).

[186] In this regard, we agree with the statement in one dissent that "[t]he structure is key" when interpreting paragraph (b)(2).  We see no relevance, however, to the fact that the FCC has not previously found relevant the omission of the word "person" in subparagraphs other than (b)(2)(H).  The agency's prior silence in this regard has no bearing on the issues now before us, and should not be read as some kind of implicit endorsement of a view contrary to the one we now adopt.

[187] *See* Statement of Commissioner Pai to Broadnet Declaratory Ruling (stating that "[t]he federal common law of immunity is a general body of law that covers numerous agencies," and the FCC "cannot opine . . . on its scope or meaning").

[188] NPRM at para. 16.

[189] NPRM at para. 18 (emphasis added).

[190] *See, e.g.*, *United States Telecom. Ass'n v. FCC*, 2016 WL 3251234, *10 (2016) ("An <u>NPRM</u> satisfies the logical outgrowth test if it "expressly ask[s] for comments on a particular issue or otherwise ma[kes] clear that

(continued….)

## V. PROCEDURAL MATTERS

### 1. Regulatory Flexibility Act Analysis

67. Pursuant to the Regulatory Flexibility Act of 1980, as amended,[191] the Commission's Final Regulatory Flexibility Analysis in this *Order* is attached as Appendix C.

### 2. Paperwork Reduction Act

68. The *Order* contains either new or modified information collection requirements subject to the Paperwork Reduction Act of 1995 (PRA).[192] It will be submitted to the Office of Management and Budget (OMB) for review under Section 3507(d) of the PRA. OMB, the general public, and other federal agencies are invited to comment on the new or modified information collection requirements contained in this proceeding.

### 3. Congressional Review Act

69. The Commission will send a copy of this *Report and Order* to Congress and the Government Accountability Office pursuant to the Congressional Review Act, *see* 5 U.S.C. § 801(a)(1)(A).

### 4. Late-Filed Comments

70. We note that there were comments filed late in this proceeding. In the interest of having as complete and accurate a records as possible, and because we would be free to consider the substance of those filings as part of the record in this proceeding in any event,[193] we will accept the late-filed comments and waive the requirements of 47 CFR § 1.46(b), and have considered them in this I *Order*.

### 5. Materials in Accessible Formats

71. To request materials in accessible formats for people with disabilities (braille, large print, electronic files, audio format), send an e-mail to fcc504@fcc.gov or call the Consumer & Governmental Affairs Bureau at 202-418-0530 (voice), 202-418-0432 (tty). This *Report and Order* can also be downloaded in Text and ASCII formats at: https://www.fcc.gov/general/telemarketing-and-robocalls.

## VI. ORDERING CLAUSES

72. **IT IS ORDERED**, pursuant to the authority contained in sections 1-4, 227, and 303(r) of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151-154, 227, 303(r); and the Telephone Consumer Protection Act as amended by the Bipartisan Budget Act of 2015, Public Law 114-74, 129 Stat. 584, that this *Report and Order* **IS ADOPTED** and that Part 64 of the Commission's rules, 47 CFR 64.1200, is amended as set forth in Appendix A. The requirements of this *Report and Order* shall become effective 60 days after the Commission's publication of a notice in the *Federal Register*, which will announce approval of portions of the rules requiring approval by OMB under the PRA.

73. **IT IS FURTHER ORDERED** that the Commission's Consumer & Governmental Affairs Bureau, Reference Information Center, **SHALL SEND** a copy of this *Report and Order* to Congress and the Government Accountability Office pursuant to the Congressional Review Act, *see* 5 U.S.C. § 801(a)(1)(A).

---

(Continued from previous page) ─────────────
the agency [is] contemplating a particular change." (quoting *CSX Transportation, Inc. v. Surface Transportation Board*, 584 F.3d 1076, 1081 (D.C. Cir. 2009)).

[191] *See* 5 U.S.C. § 603.

[192] Pub. L. No. 104-13.

[193] *See* 47 CFR § 1.1206 (discussing *ex parte* filings in permit-but-disclose proceedings).

Federal Communications Commission                                           FCC 16-99

74.        **IT IS FURTHER ORDERED** that the Commission's Consumer and Governmental Affairs Bureau, Reference Information Center, **SHALL SEND** a copy of this *Report and Order*, including the Regulatory Flexibility Analysis, to the Chief Counsel for Advocacy of the Small Business Administration.

                                        FEDERAL COMMUNICATIONS COMMISSION




                                        Marlene H. Dortch
                                        Secretary

## APPENDIX A

### Final Rules

The Federal Communications Commission amends part 64 of Title 47 of the Code of Federal Regulations (CFR) as follows

## PART 64 – MISCELLANEOUS RULES RELATING TO COMMON CARRIERS

1. The authority citation for part 64 is amended to read as follows:
**Authority:** 47 U.S.C. § 154, 254(k); 403(b)(2)(B), (c), Pub. L. 104-104, 110 Stat. 56.  Interp. or apply 47 U.S.C. 201, 218, 222, 225, 226, 227, 228, 254(k), 616, 620, the Middle Class Tax Relief and Job Creation Act of 2012, Pub. L. 112-96, and the Bipartisan Budget Act of 2015, Pub. L. 114-74, 129 Stat. 584 unless otherwise noted.

2. Amend section 64.1200 by revising paragraphs (a)(1)(iii) and (a)(3)(iv), (v), and (vi); by adding paragraphs (f)(17), (i), and (j) to read as follows:

### § 64.1200 Delivery restrictions.

(a) * * *

(1) * * *

(iii) To any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call, unless such call is made solely to collect a debt owed to or guaranteed by the federal government of the United States.

* * *

(3) * * *


(iv) Is made by or on behalf of a tax-exempt nonprofit organization;

(v) Delivers a "health care" message made by, or on behalf of, a "covered entity" or its "business associate," as those terms are defined in the HIPAA Privacy Rule, 15 CFR 160.103; or

(vi) Is made solely pursuant to the collection of a debt owed to or guaranteed by the federal government of the United States.

 * * *

(f) * * *

(17) The term debtor for paragraphs (i) and (j) of this section means the debtor; a co-signor or other person or entity legally obligated to pay the debt; and an executor, guardian, administrator, receiver, trustee, or similar legal representative of the debtor or of another person or entity legally obligated to pay the debt.

***

(i) A telephone call is made "solely to collect a debt owed to or guaranteed by the United States" for purposes of paragraph (a)(1)(iii) of this section only if:
(1) the telephone call has as its exclusive subject a debt that, at the time of the call, is owed to or guaranteed by the federal government of the United States and contains no marketing, advertising, or sales information;

(2) the telephone call is made by the owner of the debt, or its contractor, to the debtor and the entire content of the call is directly and reasonably related either to:

(A) collecting payment of a delinquent amount in order to cure such delinquency or resolve the debt either by obtaining payment of such delinquent amount or by entering into an alternative payment arrangement that will cure such delinquency or resolve the debt, during a time period when a delinquency exists, or

(B) collecting payment of the debt by providing information about changes to the amount or timing of payments following the end of, or in the 30 days before: a grace, deferment, or forbearance period; expiration of an alternative payment arrangement; or occurrence of a similar time-sensitive event or deadline affecting the amount or timing of payments due; and

(3) the telephone call is made to the debtor at:

(A) the wireless telephone number the debtor provided at the time the debt was incurred,

(B) a wireless telephone number subsequently provided by the debtor to the owner of the debt or the owner's contractor, or

(C) a wireless telephone number the owner of the debt or its contractor has obtained from an independent source, provided that the number actually is the debtor's telephone number.


(j) A telephone call made using an autodialer or a prerecorded or artificial voice "to collect a debt owed to or guaranteed by the United States" must comply with the following limits on the number and duration of such calls:

(1) The maximum number of telephone calls that may be made to a debtor is:

(A) three telephone calls within a thirty-day period, and

(B) zero telephone calls following a request by the debtor for no further telephone calls.

These limits apply in the aggregate as follows:  Where the owner of the debt makes the telephone calls itself, this limit applies to all telephone calls made by the owner of the debt to the debtor.  Where a contractor of the owner(s) makes telephone calls, multiple debts owed by one debtor shall be considered one debt if the agent or contractor is servicing or collecting those debts on behalf of the same owner under the same contractual or agency relationship.  The limit in (j)(1)(B) applies for the life of the debt; the limit in (j)(1)(A) applies during each time period in which telephone calls may be made pursuant to paragraph (i)(2) of this section.

(2) Artificial-voice and prerecorded-voice telephone calls may not exceed 60 seconds in length, excluding any required disclosures and stop-calling instructions.  Text messages are limited to 160 characters in length.

(3) Telephone calls must include a disclosure that the debtor has a right to request that no further autodialed, artificial-voice, or prerecorded-voice telephone calls be made to the debtor for the life of the debt and that such requests can be made by any reasonable method.  Disclosures must be made in a manner that gives debtors an effective opportunity to stop future calls.  For voice telephone calls, the disclosure must be made within each telephone call.  For text messages, the disclosure must be within each text message or in a separate text message that contains only the disclosure and that is sent immediately preceding the first text message permitted in paragraph (j)(2).  When the disclosure is made in a separate text message, the text message containing the disclosure does not count toward the limits in paragraph (j)(2).

(4) A debtor may request to the owner of the debt or its contractor that no further telephone calls be made to the debtor for the life of the debt by any reasonable method, including orally and by reply text message. No autodialed, prerecorded-voice, or artificial-voice federal debt collection calls are permitted after the stop-call request.  Telephone calls using an artificial or prerecorded voice must include an automated, interactive voice- and/or key press-activated opt-out mechanism that enables the debtor to make a stop-calling request prior to terminating the call, including brief explanatory instructions on how to use such mechanism. When a debtor elects to make a stop-calling request using such mechanism, the mechanism must automatically record the request and immediately terminate the call. When a telephone call using an artificial or prerecorded voice leaves a message on an answering machine or a voice mail service, such message must also provide a toll free number that enables the debtor to call back at a later time and connect directly to the automated, interactive voice- and/or key press-activated opt-out mechanism and

**Federal Communications Commission**                    **FCC 16-99**

automatically record the stop-calling request.  Text messages containing the disclosure required in paragraph (j)(3) of this section must include brief explanatory instructions for sending a stop-calling request by reply text message and provide a toll free number that enables the debtor to call back later to make a stop-calling request.

(5) No telephone calls shall be made before 8:00 a.m. or after 9:00 p.m. local time at the debtor's location.

(6) No calls are permitted if the call contains marketing, advertising, or sales information.

(7) No calls are permitted except to the debtor at:

(A) the wireless telephone number the debtor provided at the time the debt was incurred,

(B) a wireless telephone number subsequently provided by the debtor to the owner of the debt or the owner's contractor, or

(C) a wireless telephone number the owner of the debt or its contractor has obtained from an independent source, provided that the number actually is the debtor's telephone number.

(8) No calls are permitted except:

(A) during a time period when a delinquency exists, or

(B) following, or in the 30 days before: the end of a grace, deferment, or forbearance period; expiration of an alternative payment arrangement; or occurrence of a similar time-sensitive event or deadline affecting the amount or timing of payments due.

(9) Notwithstanding anything to the contrary, the number and duration rules in this paragraph apply to all autodialed, artificial-voice, and prerecorded-voice calls made to a wireless number to collect a debt owed to or guaranteed by the United States, including, for example, calls by any governmental entity or its agent.

Federal Communications Commission                    FCC 16-99

**APPENDIX B**

**Comments Filed**

| Commenter | Abbreviation |
|---|---|
| ACA International | ACA |
| American Association of Community Colleges | AACC |
| American Bankers Association and Consumer Bankers Association | ABA/CBA |
| American Financial Services Association | AFSA |
| Americans for Financial Reform | AFR |
| **Association of Community College Trustees** | **ACCT** |
| California and Nevada Credit Union Leagues | CNCUL |
| **College Foundation, Inc.** | **CFI** |
| **Connecticut Legal Services, Inc.** | **CLSI** |
| Consumer Financial Protection Bureau | CFPB |
| Consumer Mortgage Coalition* | CMC |
| Consumers Union | CU |
| Continental Service Group | ConServe |
| Credit Union Association of the Dakotas | CUAD |
| Credit Union Nation Association | CUNA |
| **Department of Education** | **Dept. of Education** |
| **Edfinancial Services, LLC** | **Edfinancial** |
| Education Finance Council | EFC |
| Educational Credit Management Corporation | ECMC |
| **Educational Funding of the South, Inc.** | **EFS** |
| **FCC Consumer Advisory Committee** | **CAC** |
| Federal Housing Finance Agency | FHFA |
| Federal Trade Commission Bureau of Consumer Protection Staff | FTC BCP Staff |
| **Finance Authority of Maine** | **FAME** |
| Frederick Luster | Luster |
| **GuidEd Solutions** | **GuidEd** |
| **HOPE NOW Alliance** | **HOPE** |
| Iowa Student Loan | ISL |
| MFY Legal Services, Inc. | MFY |
| **Mortgage Bankers Association** | **MBA** |
| **National Association of College and University Business Officers** | **NACUBO** |
| **National Association of Student Financial Aid Administrators** | **NASFAA** |
| National Consumer Law Center* | NCLC |
| National Council of Higher Education Resources* | NCHER |
| **National Student Loan Program** | **NSLP** |
| Navient Corporation* | Navient |
| Nelnet, Inc.* | Nelnet |
| **NHHEAF Network Organizations** | **NHHEAF** |
| Noble Systems Corporation | NSC |
| Oklahoma Student Loan Authority | OSLA |
| **Pinnacle Recovery, Inc.** | **Pinnacle** |
| **Progressive Financial Services, Inc.** | **Progressive** |
| Quicken Loans Inc. | QLI |
| **Robert Biggerstaff** | **Biggerstaff** |
| Senator Edward J. Markey et al.* | Markey |
| Senator Sherrod Brown | Brown |
| Student Loan Servicing Alliance* | SLSA |
| The Institute for College Access & Success | TICAS |
| **Transworld Systems Inc.** | **Transworld** |

**Federal Communications Commission**                    **FCC 16-99**

| | |
|---|---|
| United Negro College Fund | UNCF |
| **Utah Higher Education Assistance Authority** | **Utah** |
| **Vermont Student Assistance Corporation** | **Vermont** |
| Vincent Lucas* | Lucas |
| Young Invincibles | YI |

Over 15,700 individuals filed comments directly in the record.  Over 12,500 of those comments expressed a general dislike for robocalls, while approximately 2,500 included more pointed comments regarding debt collection and calls by the federal government.  In addition to the 15,700 individual comments, Consumer's Union submitted a petition containing 4,800 signatures asking the FCC to stop robocalls to cellphones and Americans for Financial Reform submitted a petition containing 5,346 comments from members in support of the FCC's proposed limitations on calls.

* filing both comments and reply comment (bold - reply comments only).

Federal Communications Commission                                    FCC 16-99

## APPENDIX C

### Final Regulatory Flexibility Analysis

1.      As required by the Regulatory Flexibility Act of 1980 (RFA),[1] as amended, an Initial Regulatory Flexibility Analyses (IRFA) was incorporated into the *Notice of Proposed Rule Making* (*NRPM*).[2]  The Commission sought written public comment on the proposals in the *NRPM*, including comment on the IRFA.  The comments received are discussed below.  This Final Regulatory Flexibility Analysis (FRFA) conforms to the RFA.[3]

A.      **Need for, and Objectives of, the Order**

2.      This *Report and Order* (*Order*) promulgates rules to implement Section 301 of the Bipartisan Budget Act of 2015,[4] which amends the Telephone Consumer Protection Act[5] by excepting from that Act's consent requirement robocalls to wireless numbers "made solely to collect a debt owed to or guaranteed by the United States"[6] and authorizing the Commission to adopt rules to "restrict or limit the number and duration" of any calls to wireless numbers "to collect a debt owed to or guaranteed by the United States."[7]  The Budget Act requires the Commission, in consultation with the Department of the Treasury, to "prescribe regulations to implement the amendments made" by Section 301 within nine months of enactment.[8]  In implementing these provisions, we recognize and seek to balance the importance of collecting debt owed to or guaranteed by the United States and the consumer protections inherent in the TCPA.  In adopting these rules today, the Commission fulfills the statutory requirement to prescribe rules to implement the amendments to the TCPA.

3.      *Covered Calls*.  In paragraphs 11 through 18 of the *Order*, we interpret "solely to collect a debt" and, therefore, calls made pursuant to the exception created by Section 301 of the Budget Act, to be limited to 1) debts that are delinquent at the time the calls are made, and 2) debts for which there is an imminent, non-speculative risk of delinquency due to a specific, time-sensitive event that affects the amount or timing of payments due, such as a deadline to recertify eligibility for an alternative payment

---

[1] 5 U.S.C. § 603.  The RFA, 5 U.S.C. §§ 601-612 has been amended by the Contract With America Advancement Act of 1996, Public Law No. 104-121, 110 Stat. 847 (1996) (CWAAA).  Title II of the CWAAA is the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA).

[2] *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, Notice of Proposed Rulemaking, FCC 16-57 (May 6, 2016) (*NPRM*).

[3] *See* 5 U.S.C. § 604.

[4] Bipartisan Budget Act of 2015, Pub. L. No. 114-74, 129 Stat. 584 (Budget Act).

[5] The Telephone Consumer Protection Act (TCPA) is codified at section 227 of the Communications Act of 1934, as amended.  *See* 47 U.S.C. § 227.

[6] Budget Act § 301(a)(1)(A) (amending 47 U.S.C. § 227(b)(1)(A)); *see also id.* § 301(a)(1)(B) (amending 47 U.S.C. § 227(b)(1)(B) to read, in part, that artificial- or prerecorded-voice calls cannot be made to a residential telephone line without the consent of the called party unless the call is "made solely pursuant to the collection of a debt owed to or guaranteed by the United States").  "Robocalls" include calls made either with an automatic telephone dialing system ("autodialer") or with a prerecorded or artificial voice.  *See Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, Declaratory Ruling and Order, 30 FCC Rcd 7961, 7694, para. 1 n.1 (2015) (*2015 TCPA Declaratory Ruling and Order*).  The Commission has interpreted the TCPA to apply both to voice calls and to text messages.  *Id.* at 8016-17, para. 107.  Throughout this *Order* we refer to robocalls that are subject to the Budget Act's consent exception as "covered calls."

"Calls," for this exception, include any initiated call; this is consistent with the Commission's previous interpretation of "call" for TCPA purposes.

[7] Budget Act § 301(a)(2) (amending 47 U.S.C. § 227(b)(2)).

[8] Budget Act § 301(b).

plan or the end of a deferment period.  In paragraphs 19 through 20 of the *Order*, we interpret "owed to or guaranteed by the United States" to include only debts that are owed to or guaranteed by the federal government at the time the call is made.

4.      In paragraphs 21 through 22 of the *Order*, we determine that, because calls made pursuant to the exception must be made "solely to collect a debt," the covered calls may only be made to the debtor or another person or entity legally responsible for paying the debt.  We further determine that covered calls may only be made to the wireless telephone number the debtor provided at the time the debt was incurred, such as on the loan application; to a wireless phone number subsequently provided by the debtor; or to a wireless number that the owner of the debt or its contractor has obtained from an independent source, provided that the number actually is the debtor's telephone number.

5.      In paragraphs 25 through 26 of the *Order*, we determine that robocalls to wrong numbers are not covered by the exception created in the Budget Act amendments.  Calls to reassigned wireless numbers may not be made pursuant to the amendment either, but they are subject to the 1-call window the Commission clarified in the 2015 Declaratory Ruling and Order.[9]

6.      In paragraph 27 of the *Order*, we limit eligible callers to the owner of the debt or its contractor.  In paragraph 28 of the *Order*, we determine that a "call," for this exception, includes any initiated call, including a text message.  In paragraph 29 of the *Order*, we determine that the excepted calls are limited in content to debt collection and servicing; they may not include any marketing, advertising, or selling products or services, or other irrelevant content.

7.      *Limits on Number and Duration of Federal Debt Collection Calls*.  In paragraphs 33 through 37 of the *Order*, we limit the number of federal debt collection calls to three calls within a thirty-day period while the delinquency remains or following a specific, time-sensitive event, and in the 30 days before such an event.  In paragraphs 38 through 41 of the *Order*, we determine that consumers have a right to stop autodialed, artificial-voice, and prerecorded-voice servicing and collection calls to wireless numbers at any point the consumer wishes.  Callers must inform debtors of their right to make such a request.  In paragraph 42 of the *Order*, we limit federal debt collection calls so that zero calls are permitted unless they occur: (1) during the period of delinquency for debt collection calls; and (2) following an enumerated, specific, time-sensitive event for debt servicing calls, and in the 30 days before such an event.

8.      In paragraphs 46 through 47 of the *Order*, we determine that artificial-voice and prerecorded-voice calls may not exceed 60 seconds, excluding any required disclosures.  We do not place any cap on the duration of live-caller, autodialed calls.  We limit text messages to 160 characters.  Any required disclosures may be included within these 160 characters or may be sent as a separate text message that does not count toward the numeric limits we impose.  In paragraph 48 of the *Order*, we determine that no federal debt collection calls or texts are permitted outside the hours of 8:00 a.m. to 9:00 p.m. (local time at the called party's location).  In paragraph 49 of the *Order*, we determine that if multiple rules apply to the same call and one of the rules is enacted by the Commission to implement the TCPA, a caller must comply with the most restrictive requirements regarding factors such as frequency, time of day, and so on.

9.      *Other Implementation Issues*.  In paragraphs 50 through 55 of the *Order*, we interpret Section 227(b)(2)(C) to apply to all services mentioned in Section 227(b)(1)(A)(iii), which excludes residential lines.

---

[9] *See 2015 TCPA Declaratory Ruling and Order*, 30 FCC Rcd at 8006-10, paras. 85-92.

B.      **Summary of Significant Issues Raised by Public Comments in Response to the IRFA**

10.     In the *NPRM*, we solicited comments on how to minimize the economic impact of our proposals on small businesses.  We received three comments directly addressing the IRFA.[10]  Two of the comments addressed the area of duplicate, overlapping, or conflicting rules, and one addressed coordination with the ongoing Consumer Financial Protection Bureau (CFPB) rulemaking.  In addition, we received six consumer comments that were against robocalls, where the filer mentioned being the owner of a small business.[11]  None of the comments pointed out any areas where small businesses would incur a particular hardship in complying with the rules.

11.     *Duplicate, Overlapping, or Conflicting Rules*.  Both CMC and NSC claim that the Commission failed to identify rules that "duplicate, overlap or conflict with the proposed rule" as required by the Regulatory Flexibility Act.[12]  In paragraph 49 of the *Order*, we acknowledge that other statutes and regulations impact debt collection calls.  The TCPA regulates autodialed, prerecorded-voice, and artificial-voice calls.  The rules we adopt today are concerned only with regulating that subset of autodialed, artificial-voice, and prerecorded-voice calls that are made to wireless numbers and to collect a debt that is owed to or guaranteed by the United States.  The TCPA amendments and these implementing rules change only the specific conditions under which a caller can use an autodialer, prerecorded voice, and artificial voice to make calls to a wireless number without the prior express consent of the called party and the limitations that apply to autodialed, prerecorded-voice, or artificial-voice calls to a wireless number made to collect a debt owed to or guaranteed by the United States.

12.     CMC suggests that the rules conflict with "longstanding federal and state foreclosure prevention efforts and policies"; "several federal requirements to call mortgage borrowers by telephone to try to prevent foreclosures"; "any new FCC rule permitting consumers to block calls"; "[t]he FDCPA prohibit[ion of] unfair practices by debt collectors in attempting to collect a debt"; and "[t]he Dodd-Frank Act prohibit[ion of] unfair, deceptive, or abusive acts or practices by covered persons or service providers, including consumer mortgage servicers."[13]  However, none of the rules cited by CMC require that calls to wireless numbers be autodialed, artificial-voice, or prerecorded-voice calls.  The TCPA, with or without the amendments, does not regulate whether or when a debt collector can make a debt collection call, nor does it in any way prohibit a mortgage servicer from making a call in compliance with foreclosure requirements.  Debt collectors and mortgage servicers continue to be free to make calls in compliance with non-TCPA law.  The rules we adopt today apply only to autodialed, prerecorded-voice, and artificial-voice calls.  Therefore the rules cited by CMC do not "duplicate, overlap or conflict with" the proposed rule.

13.     *Coordination with the CFPB*.  ACA notes that the CFPB "will convene one or more panels under the Small Business Regulatory Enforcement Fairness Act to assess the potential impact of its debt collection proposals under consideration on affected small business, including by obtaining feedback from small entity representatives."[14]  ACA suggests that we wait for the results of the CFPB's analysis, particularly since "the substantial majority of collection agencies are 'small' under the Small Business Administration's size standard."[15]  We decline to do so for two reasons.  First, the deadline of August 2nd

---

[10] ACA International Comments at 21-22 (ACA Comments); Consumer Mortgage Coalition Comments at 17 (CMC Comments); Noble Systems Corporation Comments at 6 (NSC Comments).

[11] Robert Minor Comments at 1; Dan O'Brien Comments at 1, Deborah Hamilton Comments at 1, Jan Reyes Comments at 1; John Nowosielski Comments at 1; Wayne Paquette Comments at 1.

[12] CMC Comments at 17; NSC Comments at 6.

[13] CMC Comments at 17.

[14] ACA Comments at 21-22.

[15] ACA Comments at 21.

imposed by Congress prohibits us from delaying this rulemaking.[16]  Second, the CFPB is analyzing overall debt collection rules and policies, a much wider scope than the narrow area covered by these rules, which are limited to regulating autodialed, artificial-voice, and prerecorded-voice calls to wireless numbers to collect a debt owed to or guaranteed by the United States.  It is unlikely that the CFPB panels will provide more information than we have already received through the notice and comment process that began with the *NPRM*.

14.     *Cost Analysis*.  CMC recommends that we "consider the costs of mortgage delinquencies and foreclosures and mortgage 'rescue' scams that telephone calls could have prevented or mitigated" as part of the cost analysis.[17]  We have considered comments asserting the potential benefits to debtors of receiving the autodialed, pre-recorded voice, and artificial-voice calls at issue in developing the rules we adopt today, including in balancing the importance of collecting debt owed to or guaranteed by the United States and the consumer protections inherent in the TCPA.  Such costs as CMC mentions would not be incurred by regulated entities and, in this context, would be both hypothetical and highly speculative. As a result, we do not attempt to quantify the costs raised by CMC in the Description of Projected Reporting, Recordkeeping, and Other Compliance Requirements for Small Entities section below.

### C.     Response to Comments by the Chief Counsel for Advocacy of the Small Business Administration

15.     Pursuant to the Small Business Jobs Act of 2010, which amended the RFA, the Commission is required to respond to any comments filed by the Chief Counsel for Advocacy of the Small Business Administration (SBA), and to provide a detailed statement of any change made to the proposed rules as a result of those comments.[18]  The Chief Counsel did not file any comments in response to the proposed rules in this proceeding.

### D.     Description and Estimate of the Number of Small Entities to Which Rules Will Apply

16.     The RFA directs agencies to provide a description of, and where feasible, an estimate of the number of small entities that may be affected by the rules adopted herein.[19]  The RFA generally defines the term "small entity" as having the same meaning as the terms "small business," "small organization," and "small governmental jurisdiction."[20]  In addition, the term "small business" has the same meaning as the term "small-business concern" under the Small Business Act.[21]  A "small-business concern" is one which:  (1) is independently owned and operated; (2) is not dominant in its field of operation; and (3) satisfies any additional criteria established by the SBA.[22]

17.     The Commission's rules restricting autodialed, artificial-voice, and prerecorded-voice calls to wireless numbers apply to all entities that make such calls or texts to wireless telephone numbers to collect debts owed to or guaranteed by the United States.  Thus, the rules set forth in this proceeding are likely to have an impact on a substantial number of small entities in several categories.

---

[16] Budget Act § 301(b).

[17] CMC Comments at 17.

[18] 5 U.S.C. sec 604 (a)(3).

[19] *See* 5 U.S.C. § 603(b)(3).

[20] *See* 5 U.S.C. § 601(6).

[21] *See* 5 U.S.C. § 601(3) (incorporating by reference the definition of "small-business concern" in the Small Business Act, 15 U.S.C. § 632).  Pursuant to 5 U.S.C. § 601(3), the statutory definition of a small business applies "unless an agency, after consultation with the Office of Advocacy of the Small Business Administration and after opportunity for public comment, establishes one or more definitions of such term which are appropriate to the activities of the agency and publishes such definition(s) in the Federal Register."

[22] *See* 15 U.S.C. § 632.

18.    *Collection Agencies*.  This industry comprises establishments primarily engaged in collecting payments for claims and remitting payments collected to their clients.[23]  The SBA has determined that Collection Agencies with $15 million or less in annual receipts qualify as small businesses.[24]  Census data for 2012 indicate that 3,361 firms in this category operated throughout that year.  Of those, 3,166 firms operated with annual receipts of less than $10 million.[25]  We conclude that a substantial majority of businesses in this category are small under the SBA standard.

19.    *Telemarketing Bureaus and Other Contact Centers*.  This U.S. industry comprises establishments primarily engaged in operating call centers that initiate or receive communications for others—via telephone, facsimile, email, or other communication modes—for purposes such as (1) promoting clients products or services, (2) taking orders for clients, (3) soliciting contributions for a client, and (4) providing information or assistance regarding a client's products or services.  These establishments do not own the product or provide the services they are representing on behalf of clients.[26]  The SBA has determined that Telemarketing Bureaus and other Contact Centers with $15 million or less in annual receipts qualify as small businesses.[27]  U.S. Census data for 2012 indicate that 2,251 firms in this category operated throughout that year.  Of those, 2,014 operated with annual receipts of less than $10 million.[28]  We conclude that a substantial majority of businesses in this category are small under the SBA standard.

20.    *Commercial Banks and Savings Institutions*.  Commercial banks are establishments primarily engaged in accepting demand and other deposits and making commercial, industrial, and consumer loans.  Commercial banks and branches of foreign banks are included in this industry.[29]  Savings institutions are establishments primarily engaged in accepting time deposits, making mortgage and real estate loans, and investing in high-grade securities.  Savings and loan associations and savings banks are included in this industry.[30]  The SBA has determined that Commercial Banks and Savings Institutions with $500 million or less in assets qualify as small businesses.[31]  December 2013 Call Report data compiled by SNL Financial indicate that 6,877 firms in this category operated throughout that year.[32]

---

[23] U.S. Census Bureau, *2012 NAICS Definitions, 561440 Collection Agencies*, http://www.census.gov/cgi-bin/sssd/naics/naicsrch (last visited July 6, 2016).

[24] 13 CFR § 121.201; 2012 NAICS code 561440.

[25] 2012 U.S. Economic Census, NAICs Code 516440, at http://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=ECN_2007_US_56SSSZ4&prodType=table.

[26] U.S. Census Bureau, *2012 NAICS Definitions, 561422 Telemarketing Bureaus and Other Contact Centers*, http://www.census.gov/cgi-bin/sssd/naics/naicsrch (last visited July 6, 2016).

[27] 13 CFR § 121.201; 2012 NAICS code 561422.

[28] 2007 U.S. Economic Census, NAICs Code 561422, at http://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=ECN_2007_US_56SSSZ4&prodType=table.

[29] U.S. Census Bureau, *2012 NAICS Definitions, 522110 Commercial Banks*, http://www.census.gov/cgi-bin/sssd/naics/naicsrch (last visited July 6, 2016).

[30] U.S. Census Bureau, *2012 NAICS Definitions, 522120 Savings Institutions*, http://www.census.gov/cgi-bin/sssd/naics/naicsrch (last visited July 6, 2016).

[31] 13 CFR § 121.201; 2012 NAICS code 522110 and 2012 NAICS code 522120.  A financial institution's assets are determined by averaging the assets reported on its four quarterly financial statements for the preceding year.  "Assets" means the assets defined according to the Federal Financial Institutions Examination Council 041 call report form for NAICS Codes 522110, 522120, 522190, and 522210 and the National Credit Union Administration 5300 call report form for NAICS code 522130.

[32] Bureau of Consumer Financial Protection, Home Mortgage Disclosure (Regulation C), Final Rule, 80 Fed. Reg. 66128, 66301 (Oct. 28, 2015) (CFPD Rule) (citing December 2013 Call Report data as compiled by SNL Financial).

Of those, 5,533 qualify as small entities.[33]  Based on this data, we conclude that a substantial number of businesses in this category are small under the SBA standard.[34]

21.      *Credit Unions.*  This industry comprises establishments primarily engaged in accepting members' share deposits in cooperatives that are organized to offer consumer loans to their members.[35] The SBA has determined that Credit Unions with $550 million or less in assets qualify as small businesses.[36]  The December 2013 National Credit Union Administration Call Report data indicate that 6,687 firms in this category operated throughout that year.[37]  Of those, 6,252 qualify as small entities.[38] Based on this data, we conclude that a substantial number of businesses in this category are small under the SBA standard.[39]

22.      *Other Depository Credit Intermediation.*  This industry comprises establishments primarily engaged in accepting deposits and lending funds (except commercial banking, savings institutions, and credit unions).  Establishments known as industrial banks or Morris Plans and primarily engaged in accepting deposits, and private banks (*i.e.*, unincorporated banks) are included in this industry.[40]  The SBA has determined that Other Depository Credit Intermediation entities with $550 million or less in assets qualify as small businesses.[41]  Census data for 2012 indicate that 6 firms in this category operated throughout that year.[42]  Due to the nature of this category, we conclude that a substantial number of businesses in this category are small under the SBA standard.

23.      *Sales Financing.*  This industry comprises establishments primarily engaged in sales financing or sales financing in combination with leasing.  Sales financing establishments are primarily engaged in lending money for the purpose of providing collateralized goods through a contractual installment sales agreement, either directly from or through arrangements with dealers.[43]  The SBA has determined that Sales Financing entities with $38.5 million or less in annual receipts qualify as small

---

[33] *Id.*

[34] Note that the 2012 U.S. Census Economic Data does not include information on assets.

[35] U.S. Census Bureau, *2012 NAICS Definitions, 522130 Credit Unions*, http://www.census.gov/cgi-bin/sssd/naics/naicsrch?code=522130&search=2012%20NAICS%20Search (last visited July 6, 2016).

[36] 13 CFR § 121.201; 2012 NAICS code 522130.  A financial institution's assets are determined by averaging the assets reported on its four quarterly financial statements for the preceding year.  "Assets" means the assets defined according to the Federal Financial Institutions Examination Council 041 call report form for NAICS Codes 522110, 522120, 522190, and 522210 and the National Credit Union Administration 5300 call report form for NAICS code 522130.

[37] CFPD Rule at 66301 (citing National Credit Union Administration 5300 call report form).

[38] *Id.*

[39] Note that the 2012 U.S. Census Economic Data does not include information on assets.

[40] U.S. Census Bureau, *2012 NAICS Definitions, 522190 Other Depository Credit Intermediation*, http://www.census.gov/cgi-bin/sssd/naics/naicsrch (last visited July 6, 2016).

[41] 13 CFR § 121.201;  2007 NAICS code 522190.  A financial institution's assets are determined by averaging the assets reported on its four quarterly financial statements for the preceding year.  "Assets" means the assets defined according to the Federal Financial Institutions Examination Council 041 call report form for NAICS Codes 522110, 522120, 522190, and 522210 and the National Credit Union Administration 5300 call report form for NAICS code 522130.

[42] 2012 U.S. Economic Census, NAICs Code 522190, at http://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=ECN_2007_US_52SSSZ4&prodType=table.

[43] U.S. Census Bureau, *2012 NAICS Definitions, 522220 Sales Financing*, http://www.census.gov/cgi-bin/sssd/naics/naicsrch (last visited July 6, 2016).

businesses.[44]  Census data for 2012 indicate that 2,093 firms in this category operated throughout that year.  Of those, 1,950 operated with annual receipts of less than $25 million.[45]  We conclude that a substantial majority of businesses in this category are small under the SBA standard.

24.     *Consumer Lending.*  This U.S. industry comprises establishments primarily engaged in making unsecured cash loans to consumers.[46]  The SBA has determined that Consumer Lending entities with $38.5 million or less in annual receipts qualify as small businesses.[47]  Census data for 2012 indicate that 2,768 firms in this category operated throughout that year.  Of those, 2,702 operated with annual receipts of less than $25 million.[48]  We conclude that a substantial majority of businesses in this category are small under the SBA standard.

25.     *Real Estate Credit.*  This U.S. industry comprises establishments primarily engaged in lending funds with real estate as collateral.[49]  The SBA has determined that Real Estate Credit entities with $38.5 million or less in annual receipts qualify as small businesses.[50]  Census data for 2012 indicate that 2,535 firms in this category operated throughout that year.  Of those, 2,223 operated with annual receipts of less than $25 million.[51]  We conclude that a substantial majority of businesses in this category are small under the SBA standard.

26.     *International Trade Financing.*  This U.S. industry comprises establishments primarily engaged in providing one or more of the following:  (1) working capital funds to U.S. exporters; (2) lending funds to foreign buyers of U.S. goods; and/or (3) lending funds to domestic buyers of imported goods.[52]  The SBA has determined that International Trade Financing entities with $38.5 million or less in annual receipts qualify as small businesses.[53]  Census data for 2012 indicate that 126 firms in this category operated throughout that year.  Of those, 120 operated with annual receipts of less than $25 million.[54]  We conclude that a substantial majority of businesses in this category are small under the SBA standard.

---

[44] 13 CFR § 121.201; 2012 NAICS code 522220.

[45] 2012 U.S. Economic Census, NAICs Code 522220, at http://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=ECN_2007_US_52SSSZ4&prodType=table.

[46] U.S. Census Bureau, *2012 NAICS Definitions, 522291 Consumer Lending*, http://www.census.gov/cgi-bin/sssd/naics/naicsrch (last visited July 6, 2016).

[47] 13 CFR § 121.201; 2012 NAICS code 522291.

[48] 2012 U.S. Economic Census, NAICs Code 522291, at http://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=ECN_2007_US_52SSSZ4&prodType=table.

[49] U.S. Census Bureau, *2012 NAICS Definitions, 522292 Real Estate Credit*, http://www.census.gov/cgi-bin/sssd/naics/naicsrch (last visited July 6, 2016).

[50] 13 CFR § 121.201; 2007 NAICS code 522292.

[51] 2012 U.S. Economic Census, NAICs Code 522292, at http://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=ECN_2007_US_52SSSZ4&prodType=table.

[52] U.S. Census Bureau, *2012 NAICS Definitions, 522293 International Trade Financing*, http://www.census.gov/cgi-bin/sssd/naics/naicsrch (last visited July 6, 2016).

[53] 13 CFR § 121.201; 2012 NAICS code 522293.

[54] U.S. Economic Census, 2012 NAICs Code 522293, at http://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=ECN_2007_US_52SSSZ4&prodType=table.

27.    *Secondary Market Financing*.  This U.S. industry comprises establishments primarily engaged in buying, pooling, and repackaging loans for sale to others on the secondary market.[55]  The SBA has determined that Secondary Market Financing entities with $38.5 million or less in annual receipts qualify as small businesses.[56]  Census data for 2012 indicate that 89 firms in this category operated throughout that year.  Of those, 78 operated with annual receipts of less than $25 million.[57]  We conclude that a substantial majority of businesses in this category are small under the SBA standard.

28.    *All Other Nondepository Credit Intermediation*.  This U.S. industry comprises establishments primarily engaged in providing nondepository credit (except credit card issuing, sales financing, consumer lending, real estate credit, international trade financing, and secondary market financing).[58]  Examples of types of lending in this industry are:  short-term inventory credit, agricultural lending (except real estate and sales financing), and consumer cash lending secured by personal property.[59]  The SBA has determined that All Other Nondepository Credit Intermediation entities with $38.5 million or less in annual receipts qualify as small businesses.[60]  Census data for 2012 indicate that 4,960 firms in this category operated throughout that year.  Of those, 4,872 operated with annual receipts of less than $25 million.[61]  We conclude that a substantial majority of businesses in this category are small under the SBA standard.

29.    *Mortgage and Nonmortgage Loan Brokers*.  This industry comprises establishments primarily engaged in arranging loans by bringing borrowers and lenders together on a commission or fee basis.[62]  The SBA has determined that Mortgage and Nonmortgage Loan Brokers with $7.5 million or less in annual receipts qualify as small businesses.[63]  Census data for 2012 indicate that 6,157 firms in this category operated throughout that year.  Of those, 5,939 operated with annual receipts of less than $5 million.[64]  We conclude that a substantial majority of businesses in this category are small under the SBA standard.

30.    *Other Activities Related to Credit Intermediation*.  This industry comprises establishments primarily engaged in facilitating credit intermediation (except mortgage and loan

---

[55] U.S. Census Bureau, *2012 NAICS Definitions, 522294 Secondary Market Financing*, http://www.census.gov/cgi-bin/sssd/naics/naicsrch (last visited July 6, 2016).

[56] 13 CFR § 121.201; 2012 NAICS code 522294.

[57] 2012 U.S. Economic Census, NAICs Code 522294, at http://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=ECN_2007_US_52SSSZ4&prodType=table.

[58] U.S. Census Bureau, *2012 NAICS Definitions, 522298 All Other Nondepository Credit Intermediation*, http://www.census.gov/cgi-bin/sssd/naics/naicsrch (last visited July 6, 2016).

[59] *Id.*

[60] 13 CFR § 121.201; 2012 NAICS code 522298.

[61] 2012 U.S. Economic Census, NAICs Code 522298, at http://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=ECN_2007_US_52SSSZ4&prodType=table.

[62] U.S. Census Bureau, 2012 *NAICS Definitions, 522310 Mortgage and Nonmortgage Loan Brokers*, http://www.census.gov/cgi-bin/sssd/naics/naicsrch (last visited July 6, 2016).

[63] 13 CFR § 121.201; 2012 NAICS code 522310.

[64] 2012 U.S. Economic Census, NAICs Code 522310, at http://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=ECN_2007_US_52SSSZ4&prodType=table.

brokerage; and financial transactions processing, reserve, and clearinghouse activities).[65]  The SBA has determined that Other Activities Related to Credit Intermediation entities with $20.5 million or less in annual receipts qualify as small businesses.[66]  Census data for 2012 indicate that 3,989 firms in this category operated throughout that year.  Of those, 3,860 operated with annual receipts of less than $20.5 million.[67]  We conclude that a substantial majority of businesses in this category are small under the SBA standard.

> E.    **Description of Projected Reporting, Recordkeeping, and Other Compliance Requirements for Small Entities**

31.    This *Order* amends the Commission's rules implementing the TCPA to align them with the amended statutory language of the TCPA enacted by Congress in the 2015 Budget Act, creating an exception that allows the use of an autodialer, prerecorded-voice, and artificial-voice when making calls to wireless telephone numbers without the prior express consent of the called party when such calls are made solely to collect a debt owed to or guaranteed by the United States, and imposing limitations on autodialed, prerecorded-voice, and artificial-voice calls  to collect a debt owed to or guaranteed by the United States.  The *Order* will likely impose a one-time cost on some entities to set up new recordkeeping and other compliance requirements.  These changes affect small and large companies equally, and apply equally to all of the classes of regulated entities identified above.

32.    To comply with the right of the consumer to stop autodialed, artificial-voice, and prerecorded-voice federal debt collection calls to wireless numbers without consent, regulated entities must keep a record of any request made by a consumer for the cessation of the calls, and must pass that information to any subsequent collector or servicer of the debt if the debt is transferred.  This rule obligates callers to retain records of consumers opting out of receiving these autodialed or prerecorded federal debt collection messages.  Because autodialed, artificial-voice, and prerecorded-voice federal debt collection calls to wireless numbers required consent prior to these amendments, we assume calling entities have systems and procedures already in place to record consent and that the current way of doing business will be sufficient for tracking revocation of consent and will not impose new costs.  However, the requirement to inform subsequent collectors or servicers of the revocation of consent might be new for some calling entities, and could impose a small initial cost to modify systems or procedures.  This provision does not impose a significant economic impact on small businesses.  We did not receive any comments stating that this rule would cause a significant economic impact on small businesses.  The Commission does not require a particular form or format to be used in conveying the revocation of consent to subsequent collectors or servicers when a debt is transferred.

33.    Federal debt collection calls made using a prerecorded or artificial voice must include an automated, interactive voice- and/or key press-activated opt-out mechanism so that debtors who receive these calls may make a stop-calling request during the call by pressing a single key.  When a federal debt collection call using an artificial voice or prerecorded voice leaves a voicemail message, that message must also provide a toll-free number that the debtor may call at a later time to connect directly to the automated, interactive voice and/or key press-activated mechanism and automatically record the stop-calling request.  Text message disclosures must include brief explanatory instructions for sending a stop-call request by reply text message and provide a toll-free number that enables the debtor to call back later to make a stop-call request.  This rule obligates callers to modify their systems to produce the message, maintain toll-free numbers, and record any stop-call requests.  Such records should demonstrate the

---

[65] 2012 U.S. Census Bureau, *2012 NAICS Definitions, 522390 Other Activities Related to Credit Intermediation*, http://www.census.gov/cgi-bin/sssd/naics/naicsrch.

[66] 13 CFR § 121.201; 2012 NAICS code 522390.

[67] 2007 U.S. Economic Census, NAICs Code 522390, at http://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=ECN_2007_US_52SSSZ4&prodType=table.

caller's compliance with the provision and utilization of the automated, interactive opt-out feature.  The Commission allows the calling entities the flexibility to determine how to implement the mechanism.  The Commission does not require a particular form or format evidencing this mechanism or its implementation.  This provision does not impose a significant economic impact on small businesses.  We did not receive any comments stating that this rule would cause a significant economic impact on small businesses.

      **F.**      **Steps Taken to Minimize the Significant Economic Impact on Small Entities, and Significant Alternatives Considered**

      34.      The RFA requires an agency to describe any significant alternatives that it has considered in reaching its approach, which may include the following four alternatives, among others: (1) the establishment of differing compliance or reporting requirements or timetables that take into account the resources available to small entities; (2) the clarification, consolidation, or simplification of compliance or reporting requirements under the rule for small entities; (3) the use of performance, rather than design, standards; and (4) an exemption from coverage of the rule, or any part thereof, for small entities.[68]

      35.      The amendments to the rules change the specific conditions under which a caller can use an autodialer, prerecorded voice, and artificial voice to make calls to a wireless number without the prior express consent of the called party and the limitations that apply to autodialed, prerecorded-voice, and artificial-voice calls to a wireless number made to collect a debt owed to or guaranteed by the United States.  The limitations balance the importance of collecting debt owed to the United States and the consumer protections inherent in the TCPA.  In paragraph 27 of the *Order*, the Commission interprets the amendments as allowing such calls to be made by the federal government, owners of debt guaranteed by the federal government, and by their respective contractors. The amendments therefore benefit the federal government, owners of debt guaranteed by the federal government, and their respective contractors.  Although the federal government is not a small business, many of the owners of debt guaranteed by the federal government and the contractors who make these calls are small businesses.  Thus, the Commission considered the needs of small businesses in reaching its approach.

      36.      Automated dialers and artificial-voice, and prerecorded-voice calling systems can be used to make thousands of calls without requiring commensurate staffing.  By automating the process of making calls and texts, small businesses can make as many calls as large businesses.  The volume of calls is not limited by the size of the business.  Therefore limitations designed to protect consumer interests must apply to both large and small calling entities to be effective.  The Commission believes that any economic burden these proposed rules may have on callers is outweighed by the benefits to consumers.

      37.      *Feedback*.  The Commission considered feedback from the NPRM in crafting the final order.  Although none of the comments offered suggestions of ways to make the rules more friendly to small businesses, there were many comments from regulated callers with suggestions to make compliance easier for all, large and small.  We evaluated the comments in light of balancing the need to collect the debt with the need to protect consumer interests, and modified the proposed rules in several ways.  For example, in paragraphs 11 through 18 of the *Order*, the Commission expanded the definition of the types of calls permitted to include debt servicing calls made following a specific, time-sensitive events such as a recertification deadline or the end of a deferment period, and in the 30 days before such an event, rather than limiting the exception to calls made when the debt is delinquent or in default.  Similarly, in paragraphs 23 through 26 of the *Order*, we expanded the reach of the exception by allowing covered calls to be made to a phone number subsequently provided by the debtor to the servicer or owner of the debt, or a number obtained from an independent source, rather than limiting calls to the number provided on the loan application.  These changes benefit regulated entities of all sizes.

      38.      *Timetables*.  The Commission does not see a need to establish a special timetable for

---

[68] 5 U.S.C. § 603.

small entities to reach compliance with the modification to the rules.  No small business has asked for a delay in implementing the rules.

41.     *Reporting requirements; performance standards*.  Since the rule does not impose reporting requirements, there is no need to establish less burdensome reporting requirements for small businesses.  Similarly, there are no design standards or performance standards to consider in this rulemaking.

40.     *Exemption*.  The Commission does not see a need to consider an exemption for small businesses from the modified rules.  No small business has asked for such an exception.

### G.     Report to Congress

41.     The Commission will send a copy of the *Order*, including this FRFA, in a report to be sent to Congress and the Government Accountability Office pursuant to the Congressional Review Act.[69]  In addition, the Commission will send a copy of the *Order*, including this FRFA, to the Chief Counsel for Advocacy of the Small Business Administration.  A copy of the *Order* (or summaries thereof) will also be published in the Federal Register.[70]

---

[69] 5 U.S.C. § 801(a)(1)(A).

[70] *See id*. § 604(b).

Federal Communications Commission                                    FCC 16-99

# STATEMENT OF
# CHAIRMAN TOM WHEELER

**Re:  *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278**

Unwanted calls continue to be the top consumer complaint we receive at the Commission.  It is vital that we continue to use all the tools at our disposal to help protect consumers against unwanted calls.

Consumers want and deserve control over the calls and text messages they receive.  To that end, we continue to push carriers and other providers to offer consumers robocall filtering tools.  Last year, in our Omnibus ruling, we reinforced and further clarified our robocall restrictions, including placing limits on calls to reassigned numbers.

Today's action complies with a specific directive from Congress while taking steps to protect consumers.

In its passage of the Bipartisan Budget Act of 2015, Congress directed that robocalls to help collect federally-backed debt, such as some mortgages and student loans, must be allowed without prior consent.  At the same time, Congress empowered the Commission to set limits on such calls.  That is what we are doing in the order released today.

With this Report and Order, the Commission is establishing strong, pro-consumer limits on robocalls to collect federal debt.  Wherever possible, the Commission has sought to limit the number of unwanted robocalls and ensure consumers have the tools to stop them.  This is true in this order as it was in last year's Omnibus ruling.

Today's rules limit the number of robocalls, including text messages, to three per month. The new rules also only allow robocalls concerning debts that are delinquent or at imminent risk of delinquency, unless there is prior express consent otherwise.

The new rules require that, absent consent, callers only call the individual who owes the debt, not his or her family or friends.  This includes limiting the number of robocalls allowed to reassigned numbers, consistent with last year's Omnibus robocall ruling.

The new rules reiterate that consumers have the right to stop calls they do not want at any point they wish, and require callers to inform consumers of that right.

The new rules place limits on the duration of calls (excluding required disclosures).  Specifically, pre-recorded or artificial voice calls cannot exceed 60 seconds and text messages cannot exceed 160 characters.

The new rules apply to each caller, rather than each debt.  Otherwise, consumers who have multiple loans with a single owner of the debt, as many do, could be receiving an excessive number of robocalls per month to their cell phones.  This limitation prevents that from occurring.

In addition, the Commission's rules limit the time of day when robocalls can take place, requiring that no robocalls can may be made before 8 a.m. and after 9 p.m. local time at the called party's location.

These protections are particularly important following a January Supreme Court ruling that federal government entities conducting official business are not subject to robocall limits unless Congress says otherwise.  Our decision implements Congress's directive and responds to thousands of comments from consumers expressing frustration with robocalls and urging clear, strong limits on debt collection calls.

It is important to note that our decision *will not* open a door for telemarking calls.  Congress specified that excepted calls must be "solely" to collect a federal debt, and we have ensured they do not go beyond that.

**Federal Communications Commission**          **FCC 16-99**

Congress gave us a quick deadline to implement these new rules.  I am proud that we have met that deadline and thank my fellow Commissioners and other Federal agencies for their helpful input into the decision.

Federal Communications Commission                                        FCC 16-99

## STATEMENT OF
## COMMISSIONER MIGNON L. CLYBURN

**Re:  *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278**

We have heard loud and clear that consumers hate receiving robocalls.  During the first six months of 2016, Telephone Consumer Protection Act (TCPA) related issues accounted for nearly half of the more than 175,000 tickets filed with the Commission's consumer help center.  In our 'Federal Debt Collection Proceeding,' nearly 16,000 individuals filed comments, with approximately 80 percent expressing a general dislike for robocalls.

As a result, we must strike a delicate balance in this *Order* between the Commission's mandate to protect consumers and specific instructions given to us by Congress in last year's Budget Act regarding robocalls "made solely to collect a debt owed to or guaranteed by the United States."  While I recognize the importance of delivering timely information to an individual who is delinquent on their debt, and am in agreement that direct communication could actually prevent a borrower from experiencing long-term financial consequences, clear limits must be in place to prevent robocalls and texts from becoming harassment.  By setting a limit of three robocalls per month, with explicit flexibility given to federal agencies to request a waiver seeking higher volume limits if needed, we have appropriately tailored a framework which both protects consumers and ensures access to critical information on debt repayment.  Despite the limitations laid out in this *Order*, debt servicers will continue to have many means of communicating with borrowers: calls made with prior express consent; calls manually dialed; as well as email and traditional postal mail.

The TCPA was enacted in part to protect consumers from being inundated with unwanted calls, such as those from debt collectors, and our decision here, consistent with the most recent direction of Congress, furthers that goal by placing clear restrictions on what is permissible when collecting federal debt.

Federal Communications Commission                         FCC 16-99

## CONCURRING STATEMENT OF
## COMMISSIONER JESSICA ROSENWORCEL

**Re:  *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278**

Consumers are fed up with robocalls.  They are irritated when their phones buzz with services that sound like scams and they are troubled by the difficulty they have distinguishing them from calls about debts honestly owed and services actually rendered.

Twenty-five years ago Congress passed the Telephone Consumer Protection Act to help consumers get the calls they need and avoid the ones they do not.  But this law is showing its age.  The years since its passage have brought a mix of technological advances and legal developments, creating new complications for both callers and those who receive calls.  It's no wonder that robocalls represent the single largest category of complaints the Commission receives.

As a result, last year, in the Bipartisan Budget Act, Congress updated the Telephone Consumer Protection Act.  Specifically, Congress authorized the Commission to develop policies for calls made to wireless phones for the collection of government debt.

Today's order responds to this charge by adopting reasonable limits on government debt collection calls, making clear that consumers have a right to stop robocalls, and clarifying who may be called to seek repayment of an outstanding debt obligation.  This is a fair effort to respond to our legislative charge under the law.

Nonetheless, I concur because this result—however warranted by the Bipartisan Budget Act—creates a legal landscape that is undeniably messy.  It is difficult to reconcile the result here with the Commission's recent *Broadnet* Declaratory Ruling which finds that the federal government and its agents are not "persons" under the Telephone Consumer Protection Act and hence fall outside of the Act's reach.  It may be harder still to harmonize both decisions with the Supreme Court's opinion in *Campbell-Ewald v. Gomez*, which holds that no derivative immunity exists under the Telephone Consumer Protection Act when a contractor of the federal government acts outside of the scope of its authority.  Simply put, the legal calisthenics required to navigate this series of decisions are exhausting.  Moreover, the result for consumers is uneven.  It may unfortunately yield more, rather than fewer robocalls—and if it does, consumers will be justifiably angry.

Federal Communications Commission                    FCC 16-99

## DISSENTING STATEMENT OF
## COMMISSIONER AJIT PAI

**Re:  Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, CG Docket No. 02-278**

Last month in the *Broadnet/RTI Declaratory Ruling*, my colleagues voted to find that federal contractors, including federal debt collectors, are not "persons" under the Telephone Consumer Protection Act (TCPA) and thus get a free pass to robocall the American people.[1]  I did not support that decision.  In my view, federal law makes clear that federal contractors are "persons" and thus are subject to the TCPA's consumer protections.[2]

The FCC should reverse this mistake.  As the National Consumer Law Center, the Electronic Privacy Information Center, the NAACP, and 48 other organizations have told us, "[i]f the Commission does not reconsider and change its ruling in [the *Broadnet/RTI*] proceeding, tens of millions of Americans will find their cell phones flooded with unwanted robocalls from federal contractors with no means of stopping these calls and no remedies to enforce their requests to stop these calls."[3]

The FCC takes the same path here as it did in the *Broadnet/RTI Declaratory Ruling* by again failing to follow the law.

Some background:  Section 227(b)(1) of the TCPA prohibits "any person" from using certain automated telephone equipment without the called party's prior express consent.[4]  Section 227(b)(2) authorizes the FCC to "prescribe regulations to implement the requirements of this subsection."[5]

Last year's budget deal snuck a special exemption for federal debt collectors into the TCPA.[6]  First, it amended section 227(b)(1) to exempt calls "made solely to collect a debt owed to . . . the United States."[7]  Next, it amended section 227(b)(2) to give the FCC authority to "restrict or limit the number and duration of calls made . . . to collect a debt owed to . . . the United States."[8]  It also instructed the FCC to adopt final rules implementing these changes by August 2, 2016.[9]

As I said when we started this proceeding to implement this exemption, I do not believe the federal government should be bestowing regulatory largesse upon favored industries such as federal debt collectors.[10]  I hope Congress will soon reverse course and eliminate this special exemption.

---

[1] *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991; Broadnet Teleservices LLC Petition for Declaratory Ruling; National Employment Network Association Petition for Expedited Declaratory Ruling; RTI International Petition for Expedited Declaratory Ruling*, CG Docket No. 02-278, Declaratory Ruling, FCC 16-72 (July 5, 2016) (*Broadnet/RTI Declaratory Ruling*).

[2] *Id.* (Statement of Commissioner Ajit Pai, Approving in Part and Dissenting in Part) ("But I part ways with the Commission's conclusion that federal contractors are not persons under the TCPA.").

[3] National Consumer Law Center *et al.* Petition for Reconsideration of Declaratory Ruling and Request for Stay Pending Reconsideration, CG Docket No. 02-278, at 2 (July 26, 2016).

[4] Communications Act § 227(b)(1).

[5] Communications Act § 227(b)(2).

[6] Bipartisan Budget Act of 2015, Pub. L. No. 114-74, § 301(a), 129 Stat. 584 (Budget Act).

[7] *See* Communications Act § 227(b)(1)(A)(iii), (b)(1)(B).

[8] *See* Communications Act § 227(b)(2)(H).

[9] Budget Act § 301(b).

[10] *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, Notice of Proposed Rulemaking, 31 FCC Rcd 5134, 5154–55 (2016) (*Notice*) (Dissenting Statement of Commissioner Ajit Pai).

Anyway, enough background.  In this case, the FCC tries to solve the problem it created in the *Broadnet/RTI Declaratory Ruling* by arguing that even if the TCPA's consumer protections in section 227(b)(1) do not apply to federal contractors, the Commission is free to regulate non-persons—including "the federal government and its contractors"—under section 227(b)(2).[11]

The Commission's approach is unlawful and makes a dog's breakfast of the TCPA.

*First*, the plain text of the TCPA limits the scope of the FCC's rulemaking authority under section 227(b)(2).  The Commission does not have unlimited power to "restrict or limit the number and duration of [federal debt collection] calls" but only that necessary to (as the preface of that paragraph puts it) "implement[] the requirements of this subsection."[12]  Those requirements are outlined in section 227(b)(1) and apply only to "any person."[13]  Thus, our authority under section 227(b)(2)(H) can only extend to "any person" otherwise subject to the requirements of section 227(b)(1)—and not to the federal government itself, a non-person as all agree.

*Second*, the canons of construction confirm that section 227(b)(2) does not extend to the federal government.  Federal law does not apply to the sovereign absent "some affirmative showing of statutory intent to the contrary."[14]  That principle drove the FCC's decision to exclude the federal government from the scope of the TCPA in the *Broadnet/RTI Declaratory Ruling*.  There, we rightly held that Congress's decision to apply the TCPA to "any person" was insufficient to conclude that it intended to extend the TCPA to the federal government.[15]  A clearer statement of Congressional intent was needed.  And that holding mortally wounds this one:  Congress's decision to indirectly indicate to whom section 227(b)(2) applies (through its reference to the "requirements" of section 227(b)(1)) cannot possibly be a more "affirmative showing" than Congress's decision to directly indicate that section 227(b)(1) applies to "any person."[16]

---

[11] *Order* at para. 62.  Although I focus on the application of section 227(b)(2) to the federal government here, these arguments carry equal force with respect to federal contractors, at least so long as the FCC continues to believe it an "untenable result" to apply the TCPA to federal contractors when those contractors make calls the TCPA allows the government itself to make.  *See Broadnet/RTI Declaratory Ruling*, FCC 16-72, at para. 16.

[12] *See* Communications Act § 227(b)(2)(H) ("The Commission shall prescribe regulations to implement the requirements of this subsection. In implementing the requirements of this subsection, the Commission— . . . may restrict or limit the number and duration of calls made to a telephone number assigned to a cellular telephone service to collect a debt owed to or guaranteed by the United States.").

[13] *See* Communications Act § 227(b)(1) ("It shall be unlawful for any person . . . ."); *Broadnet/RTI Declaratory Ruling*, FCC 16-72, at para. 10.  The *Order* responds that "another requirement in subsection (b) appears in new subparagraph (b)(2)(H)."  *Order* at para. 64.  Not true.  *For one*, new subparagraph (b)(2)(H) is not a "requirement." It mandates no action.  It prohibits no conduct.  It does not even require the FCC to adopt rules.  All it says is that the Commission "may" adopt certain limits.  And any such limits would be "requirements" of the FCC's regulations, not requirements of subsection (b).  *Cf.* Communications Act § 227(b)(3) (distinguishing between violations of "this subsection" and violation of "the regulations prescribed under this subsection").  *For another*, the *Order's* reading renders the prefatory language hopelessly circular.  After all, if the prefatory language refers to the provisions of paragraph (b)(2) (such as new subparagraph (b)(2)(H)), then the Commission would *automatically* be "implementing the requirements of this subsection" whenever it adopted rules under paragraph (b)(2).  In other words, the prefatory language does no work at all and is mere surplusage.  We must interpret this language in a way that gives meaning to every clause.  *See Potter v. United States*, 155 U.S. 438, 446 (1894) (the presence of statutory language "cannot be regarded as mere surplusage; it means something").

[14] *Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765, 781 (2000).

[15] *See Broadnet/RTI Declaratory Ruling*, FCC 16-72, at para. 12.

[16] The *Order* responds that the existence of rulemaking authority under section 227(b)(2) is the "requisite affirmative showing."  *Order* at para. 65.  But that misses the point.  No one doubts that Congress intended the FCC to issue *some* rules.  The question is whether there's an affirmative showing that Congress intended to encompass

(continued….)

Perhaps even more fatal is the "settled propositio[n]" that the United States' waiver of sovereign immunity "cannot be implied but must be unequivocally expressed."[17]  Notably, the necessary consequence of applying section 227(b)(2) to the federal government is a waiver of federal sovereign immunity.  That's because section 227(b)(3) expressly empowers private parties to bring an action for money damages against anyone who violates "the regulations prescribed under this subsection," i.e., the regulations enacted under section 227(b)(2).[18]  But the United States obviously has not delegated authority to the FCC to waive federal sovereign immunity.  And section 227(b)(2) contains no unequivocal expression, no implication, not even a wink suggesting that Congress intended to waive the government's sovereign immunity.[19]

*Third*, the structure of the TCPA does not support an expansive reading of section 227(b)(2)'s scope.  After all, section 227(b)(2)(H) is not unique in omitting the word "person."  In fact, not one of the regulatory authorities contained in subsection 227(b)(2) uses that word.  Not one FCC precedent (until today) has found that omission meaningful.  And not once has the FCC suggested that these other regulatory authorities could apply to the federal government.  The structure is key[20]:  Whereas section 227(b)(1) contains mandatory prohibitions (e.g., barring robocalls to consumers' cellphones), section 227(b)(2) only contains discretionary prohibitions (e.g., asking the FCC to consider banning robocalls to businesses).  And every FCC to date has apparently recognized that it makes no sense to say that Congress intended a narrower scope (only "any person") for the mandatory prohibitions and a broader scope ("any person" plus the federal government) for the discretionary prohibitions.

*Fourth*, the FCC never proposed to extend its new rules to non-persons such as the federal government.  Notice to the public is the critical first step in any rulemaking under the Administrative Procedure Act.[21]  But the Commission never proposed in the *Notice* to extend its rules beyond "any person" already covered by the TCPA.  Indeed, the *Notice* apparently recognized that the TCPA did *not* extend beyond persons and instead asked the converse question, "whether the Budget Act amendments imply that the federal government is a person for TCPA purposes."[22]  And the proposed rules never suggested they'd apply to the federal government.[23]  So it's no surprise that the *Order* does not identify a

---

(Continued from previous page) ————————————————
the federal government in those rules.  And though the *Order* repeatedly points to places where Congress could have inserted such a showing, the lack of a showing just doesn't suffice.

[17] *College Savings Bank v. Florida Prepaid Postsecondary Education Expense Board*, 527 U.S. 666, 682 (1999) (quoting *United States v. King*, 395 U.S. 1, 4 (1969)).

[18] Communications Act § 227(b)(3).

[19] I agree with the *Order* that the FCC should not be deciding questions of sovereign immunity.  *See Order* at para. 65.  Nonetheless, we must grapple with the natural consequences of our construction of the statute.  The *Order*'s reading naturally raises the question of whether the United States has waived its sovereign immunity.  I do not believe that it has.

[20] *See, e.g., King v. Burwell*, 135 S. Ct. 2480, 2483–84 (2016) (noting the "'fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme'" (quoting *Utility Air Regulatory Group v. EPA*, 134 S. Ct. 2427, 2441 (2014)).

[21] *See* 5 U.S.C. § 553(b).

[22] *Notice*, 31 FCC Rcd at 5140, para. 16.

[23] *Id.* at 5146 (Appendix A).  Notably, the *Order* appears to agree and suggests that commenters should have somehow guessed that divergent strands from different sections of the *Notice* could be stitched together to apply these 227(b)(2) regulations to non-persons.  *See Order* at para. 66 (quoting section III.A of the *Notice* (discussing calls exempted from section 227(b)(1)) and section III.B of the *Notice* (discussing rules under section 227(b)(2)).  But the Administrative Procedure Act does not require a post-hoc explanation.  It requires advance notice.  Furthermore, even the *Order*'s attempt to stitch together notice fails.  As the *Order* recognizes, the *Notice* only proposed applying limits to "covered calls," *Notice*, 31 FCC Rcd at 5140, paras. 17–18, *i.e.*, those calls exempted by the Budget Act amendments and thus only calls by "persons" subject to the TCPA, *id.* at 5139, para.

(continued….)

single stakeholder that's even commented on the issue, let alone supported the *Order*'s interpretation. And that includes the Treasury Department, which oversees federal debt collection efforts and with which we are legally required to "consult[]."[24]

In the end, we can't mitigate by misinterpreting. The FCC got the *Broadnet/RTI Declaratory Ruling* wrong. Adding a second wrong to the first does not make a right.

For all these reasons, I respectfully dissent.

---

(Continued from previous page) ————————————

15. And the *Order* omits the relevant context when it says the FCC proposed applying rules to "any call." The *Notice* used that phrase to cover calls "even if unanswered by a person." *Id.* at 5140, para. 18. At no point did the *Notice* suggest it would cover calls made by *anyone*.

[24] Budget Act § 301(b).

## DISSENTING STATEMENT OF
## COMMISSIONER MICHAEL O'RIELLY

**Re:  *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278**

When Congress enacted the Bipartisan Budget Act of 2015 (Budget Act), which included certain relief from the Telephone Consumer Protection Act (TCPA), the intent seemed clear.  Faced with the alarming prospect that the FCC's misguided interpretations of the TCPA, culminating in the order last June, might prevent the United States from collecting its debts, Congress stepped in to exempt calls regarding such debts from the TCPA's prior express consent requirements.  In other words, out of all of the legitimate entities that have valid reasons to autodial consumers, the federal government, along with companies servicing loans or collecting debts on behalf of the federal government, were moved to the front of the line and granted significant relief from the FCC's wrongheaded rules.  After all, the federal government has a significant interest both in helping borrowers avoid the potentially devastating financial consequences of defaulting on loans, as well as ensuring taxpayers recoup the $139.3 billion of delinquent debt owed to or guaranteed by the United States.[1]

The U.S. Department of the Treasury rightfully has pressed for relief for nearly a decade.  In 2007, its Financial Management Service (FMS) wrote that "[a] ruling by the FCC that would apply the restrictions on the use of autodialers to the efforts of private collection agencies collecting debts on behalf of the United States, or leaving the issue unresolved, could hinder FMS' successful partnership with private debt collection agencies and negatively impact collections government-wide."[2]  Again in 2010, FMS wrote to the FCC to reiterate that "autodialer restrictions should not apply to debt collectors."[3]  At a minimum, the "use of autodialers should be permitted when collecting debts owed to the U.S., because additional protections are in place and the prohibition would decrease collections revenue."[4]  Specifically, FMS noted:

- "[D]ebt collection is inherently different than telemarketing, as it is based on the collection of legitimate debts owed by individuals and other entities with a preexisting obligation to pay. Debt collectors are not using autodialers to cold call potential customers, but are instead using autodialers to contact individuals who have an existing relationship or indebtedness.

- [D]ebt collectors are already subject to numerous federal and state consumer protection laws, such as the Fair Debt Collection Practices Act (FDCPA) and the Fair Credit Reporting Act (FCRA), that prevent abusive use of all debt collection practices, including potential misuse of autodialers.

- [B]y reducing the potential for human error, autodialers assist with collectors' compliance with consumer protection laws and sound debt collection practices."[5]

---

[1] *See* Comments of the American Bankers Association and the Consumer Bankers Association, CC Docket No. 02-278, at 2 (filed June 6, 2016) (*ABA/CBA Comments*).

[2] Letter from Rita Bratcher, Financial Management Service, U.S. Department of the Treasury, to Kevin Martin, FCC, CC Docket No. 02-278, at 2 (filed Jan. 26, 2007).

[3] Letter from Scott Johnson, Financial Management Service, U.S. Department of the Treasury, to Marlene Dortch, FCC, CC Docket No. 02-278, at 2 (filed May 20, 2010).

[4] *Id*.

[5] *Id*.

These concerns became even more imperative in the wake of the 2015 *TCPA Omnibus Order*, which placed even more restrictions on legitimate callers.[6]

Against this backdrop, and without knowing how the FCC would ultimately decide pending petitions about whether federal agencies and their contractors were subject to the TCPA, Congress enacted the Budget Act exemption to ensure that, *at a minimum*, federal agencies and their contractors are protected when calling to collect debts owed to or guaranteed by the U.S. government.[7] Just two months ago, however, a near unanimous Commission provided further clarification, determining that all federal agencies and their contractors performing any legitimate, government authorized functions are exempt from the TCPA. That's because the Commission determined, consistent with Supreme Court precedent, that the federal government and its agents are not "persons" under the TCPA.

Having issued that broad and appropriate determination, this narrower item, required only to comply with the Budget Act, should have been simple and straightforward. It should have confirmed that federal agencies and their contractors are not subject to TCPA restrictions, regardless of whether they are calling to locate a debtor, service a debt, collect a debt, or for any other legitimate purpose, because they are not "persons" under the TCPA.

Therefore, it is beyond disappointing that the order decides that the federal government and its contractors will face *more restrictions* when making calls to collect debts than for any other type of call they make. That's the exact opposite of what the Budget Act exemption was designed to accomplish.[8] Clearly, no good law goes unabused in this Commission.

---

[6] *See ABA/CBA Comments* at 2 ("The Commission's recent interpretations of the TCPA . . . fail to reflect technological change and consumer communication preferences, preventing consumers from receiving important communications from businesses and government entities on their mobile phones, communications that provide important information that consumers want and need to receive. This untenable situation prompted the Administration, beginning in 2013, to include in its budget proposals a request to exempt from the TCPA's prior express consent requirement calls to mobile phones to collect on debts owed to or guaranteed by the United States. In 2015, Congress enacted a statutory provision codifying the exemption. Clearly, both the Administration and the Congress recognize that borrowers trying to manage their finances responsibly are best served if they communicate with their lender.").

[7] *See* Comments of ACA International, CC Docket No. 02-278, at 6 (filed June 6, 2016) ("Congress enacted the Budget Act exemption so that one category of debt collectors – those who collect debt owed to or guaranteed by the United States – would have a clear pathway to use modern calling technology to contact consumers on their mobile telephones in order to increase the recovery of government debt. Given this, the Commission must ensure that any final rules adopted reflect Congress's clear intent to exempt government debt collectors from the TCPA's prior express consent requirement.").

[8] *See* Comments of Navient Corporation, CC Docket No. 02-278, at viii (filed June 6, 2016) (*Navient Comments*) ("The FCC's proposal effectively eliminates the exemption enacted by Congress and is contrary to Congress' clear directive in passing the Bipartisan Budget Act (and contrary to the Administration's longstanding efforts to include an exemption as part of the budget)."); *see also id.* at 18 ("Through its amendment, Congress unequivocally prioritized the collection of federal debt above other competing interests underlying the TCPA when it removed calls made solely to collect federal debts from the purview of the TCPA's consent restrictions"); *see also* Reply Comments of the Mortgage Bankers Association, CC Docket No. 02-278, at 2 (filed June 16, 2016) (*MBA Reply Comments*) (observing that, in creating the exemption, "Congress highlighted the importance of collecting these debts owed to or guaranteed by the United States Government."); *see also* Comments of Nelnet, Inc., CC Docket No. 02-278, at 2 (filed June 6, 2016) (*Nelnet Comments*) (Noting that the proposal "fails to effectuate the unequivocal policy objectives of the Budget Act amendments, which the White House has explained include "ensur[ing] that all debt owed to the United States is collected as quickly and efficiently as possible") (citing Analytical Perspectives, Budget of the United States Government, Fiscal Year 2016, at 128, *available at* https://www.whitehouse.gov/sites/default/files/omb/budget/fy2016/assets/spec.pdf).

To reach this illogical outcome, the order pretends that section 227(b)(2)(H), which permits, but does not require, the FCC to adopt certain limits on debt collection calls, applies to non-persons. That's absurd. Section 227(b)(2) directs the Commission "to prescribe regulations to implement the requirements of this subsection." This subsection, of course, is section 227(b), and its requirements set forth in section 227(b)(1) make it "unlawful for any *person* within the United States" or "any *person* outside the United States if the recipient is within the United States" to make a call or send an unsolicited fax, subject to certain exceptions. It could not be clearer, therefore, that the subsection is confined to *persons*. Therefore, any rules adopted to implement the subsection, are also limited to regulating *persons*. If an entity is *not a person*, it is not subject to section 227(b), and it is certainly not subject to rules enacted to implement section 227(b).

Sensing the weakness of its argument, the Commission attempts the legal equivalent of a Hail Mary pass: hoping that a reviewing court will find its argument "at least rendered permissible". It is not. Contrary to the revised order, section 227(b)(2)(H) is not another "requirement" of section 227(b). It states that the Commission "may restrict or limit the number and duration of calls . . . ." Not shall. Not must. May. That means it is *not a requirement*. Nor could it be. The "requirements" of section 227(b) are set forth in 227(b)(1). Section 227(b)(2), on the other hand, simply guides the Commission's adoption of administrative rules implementing section 227(b)(1). Administrative rules, of course, are not statutory requirements.

Even if the Commission were able to overcome this significant threshold problem regarding the scope of its authority, which is impossible, the rules themselves are contrary to the law. The Budget Act exemption was designed to protect federal agencies and their contractors from liability when they make calls without consent of the called party. The revised order counters that there is "no support" for this statement as there is no legislative history. Wow. If only the Commission would read the *text of the law itself*, it would understand the purpose. Section 227(b)(1)(A) prohibits persons from using autodialers to "make any call (other than a call made for emergency purposes or made with the prior express consent of the called party)". To state it another way, only emergency calls or calls made with prior express consent may be made using autodialers. The Budget Act exemption changes that by adding "unless such call is made solely to collect a debt owed to or guaranteed by the United States". Accordingly, federal agencies and their contractors are no longer required to have prior express consent when they use autodialers to place calls solely to collect a debt. The fact that the Commission is authorized to place reasonable limits on the number and duration of calls does not change the fact that the exemption is from the prior express consent requirement.

After all, if callers already have consent to make calls—either from communicating with the borrower, or because the borrower has provided a number and therefore can be contacted for purposes related to the reason for which the number was provided—then there is no need for an exemption.[9] Rather, the relief was intended to protect these specific callers when they do not have prior express consent.[10] That is, when they misdial a number, when they call a number that, unbeknownst to them, has been reassigned, when they make calls in an attempt to track down the borrower's current number, when

---

[9] *See, e.g., Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, Request of ACA International for Clarification and Declaratory Ruling*, CG Docket No. 02-278, Declaratory Ruling, 23 FCC Rcd 559, 564, para. 9 (2007) (concluding that the provision of a cell phone number to a creditor, e.g., as a part of a credit application, reasonably evidences prior express consent by the cell phone subscriber to be contacted at that number regarding the debt).

[10] *See, e.g., Navient Comments* at 3 ("We already have consent to autodial nine out of 10 of the federal student loan borrowers whose loans we service today, and they are far more likely to be current. But reaching the remaining 10 percent of borrowers has been challenging, and they are far more likely to default.").

the borrower provided the wrong number by mistake, and so forth.  In doing so, Congress determined that the well documented benefits of making these calls outweighed any theoretical privacy concerns.[11] Indeed, contrary to the revised order, the fact that Congress permitted the FCC to limit the number and duration of calls—but did not give the Commission authority to limit which numbers may be dialed— shows that Congress expected that, in the process of trying to reach the borrower, some number of calls would be made to people other than the borrower.[12]  While certain, reasonable limits on the number and duration of such calls may be permissible under the law, the order's outright prohibition on misdialed calls and calls to entities other than the borrower, as well as the effective ban on calls to reassigned numbers do not "balance" the benefits and concerns as the revised order claims.  They run counter to the law.[13]

The order takes the position that these types of calls are not calls "made solely to collect a debt". I disagree.  To start, that phrase is not ambiguous as the Commission now claims.[14]  Therefore, it also should not receive deference for any of the limitations that flow from that decision, including the limitations on when calls may be made and who may be called.[15]

Even if the phrase could somehow be construed by someone as ambiguous, the fact that a caller may have simply reached the wrong person—that is, made a mistake—does not change the fact that the call was placed with the sole purpose of trying to collect a debt.  Consider this parallel: if I'm driving to a specific destination and I make a wrong turn along the way, that doesn't change the fact that I am driving to that destination.

Including one free pass for reassigned numbers does nothing to remedy the problem.  As many commenters and I have explained, one call frequently will be insufficient to determine that a number has been reassigned.  In addition, given that over 100,000 numbers are recycled each day, I expect that a particularly high percentage of numbers will have changed hands between the time that student loan borrowers, for example, take out loans when they start school, when they graduate and actually begin to

---

[11] *See also id*. at 15 ("Ultimately, Congress prioritized collecting federal debts (and assisting these borrowers in avoiding delinquency and default) over other concerns that would otherwise suggest a need to obtain 'consent' from callers for exempted calls.").

[12] *See id.* ("Congress also afforded the FCC minimal discretion to adopt rules implementing this clear directive: the enabling legislation only permits the Commission to adopt regulations concerning the number and the duration of exempted calls, and only related to exempted calls to a telephone number assigned to a cellular telephone service."); *see id*. at 35.

[13] *See id*. at v ("If adopted, the proposals would undoubtedly turn the amendment on its head, essentially requiring callers to obtain 'prior express consent' to place calls that are exempt from the 'prior express consent' requirements (e.g., by limiting covered calls to only those to telephone numbers provided by the borrower).").

[14] *See id*. at 15 ("In relatively few words and using clear and concise language, Congress took decisive action to override prior Commission decisions that limited calls to collect federally owned or guaranteed debt."); Comments of the National Council of Higher Education Resources (NCHER), CC Docket No. 02-278, at 3 (filed June 6, 2016) (*NCHER Comments*) ("NCHER believes that there is nothing in the Budget Act suggesting a narrow interpretation of what calls are covered. In fact, parsing the individual words of the statute ignores its plain reading that provides an exception for calls that are made for the purpose of collecting a debt and for no other purpose.").

[15] Separately, the order also refuses to address whether Fannie Mae and Freddie Mac loans are "owed to or guaranteed by" the federal government.  The order claims that there are not enough facts in the record to decide the question.  That ignores detailed filings on the issue.  *See, e.g., MBA Reply Comments* at 3-8; *ABA/CBA Comments* at 3-6.  Similarly, the order is silent as to whether Perkins Loans and HRSA Loans are covered by the exemption, despite filings in the record on the issue.  *See, e.g.,* Comments of the Coalition of Higher Education Assistance Organizations, CC Docket No. 02-278, at 2-3 (filed June 6, 2016).  Failing to answer these and other questions will only create more uncertainty for both callers and borrowers.

repay the loans, and when they finally pay them off.[16]  In addition, as one commenter points out, "[m]ortgage servicers are required to place calls to the last known phone number of record, even if the borrower is not the current subscriber."[17]  This item makes compliance with those requirements illegal.

Moreover, nothing in the law limits the relief to calls made to the borrower.[18]  Perhaps that is because some agencies *require* contractors to call people other than the borrower.  As the item itself notes, the Department of Education requires lenders to contact every "endorser, relative, reference, individual, and entity" identified in the delinquent borrower's loan file as part of their due diligence efforts.[19]  Of course, the order falls back on the tired notion that lenders could manually dial these other people.  But that is both unworkable, given the number of calls that must be made, and contrary to the intent of the law, which was to enable lenders to use modern dialing equipment as part of their efforts to collect debts on behalf of the federal government.[20]  Here again, the revised order finds "no support" for this statement and, here again, one need look no further than *the statute itself*.  Section 227(b)(1)(A) sets forth a general prohibition on the use of autodialers, subject to certain exceptions.  The Budget Act adds an exemption for calls made solely to collect a debt.  Therefore, it is clear *on its face* that the exemption also enables this class of callers to use autodialers to make debt collection calls.[21]  If Congress intended that all of these calls be manually dialed, it would not have provided an exemption because manually dialed calls are not subject to the TCPA.[22]  I suppose the Commission's next argument will be that section 227(b)(2)(H) gives it authority over manually dialed calls (i.e., non-autodialed calls).  But that is no more

---

[16] *Navient Comments* at vii ("Borrower relationships can last 10 to 20 years or even longer, increasing the need to contact references and other non-borrowers, as well as the potential for the borrower's number to change or be reassigned over time. Congress was aware of these situations and chose not to carve them out of the exemption."); *see id*. at 42.

[17] *MBA Reply Comments* at 13 (citing HAMP Handbook, 2.2.1 (01/06/16) (requiring a minimum of four telephone calls to the last known phone numbers of record, at different times of the day, within 30 day period)).

[18] *See Navient Comments* at 35.

[19] *See id.* at 36 (citing 34 C.F.R. § 682.411(h)).

[20] *See Nelnet Comments* at 3 ("One clear purpose of the Budget Act amendments, then, is to facilitate the repayment of student loan and other debts owed to or guaranteed by the United States as a means of protecting federal assets. Toward that end, the Budget Act amendments are intended to and should authorize use of the full range of communication strategies that the federal government itself would undertake to service and collect its debts, including the use of automated and predictive dialing technology and artificial and prerecorded voice messages to contact borrowers through the communication channels that borrowers prefer (e.g., contact via cell phone calls and text messages).").

[21] Even though it is perfectly clear from the text of the law itself, I also note that the Administration was quite explicit that an intent of the Budget Act exemption was to authorize the use of autodialers.  *See, e.g., Nelnet Comments* at 2 (citing Analytical Perspectives, Budget of the United States Government, Fiscal Year 2016, at 128, *available at* https://www.whitehouse.gov/sites/default/files/omb/budget/fy2016/assets/spec.pdf) ("The Budget proposes to clarify that the use of automatic dialing systems and prerecorded voice messages is allowed when contacting wireless phones in the collection of debt owed to or granted by the United States. In this time of fiscal constraint, the Administration believes that the Federal Government should ensure that all debt owed to the United States is collected as quickly and efficiently as possible and this provision could result in millions of defaulted debt being collected.").  In addition, a section-by-section summary posted by the House of Representatives states that "Subsection 301(a) amends the Communications Act of 1934 *to authorize the use of automated telephone equipment* to call cellular telephones for the purpose of collecting debts owed to the United States government."  *See* Bipartisan Budget Act of 2015 Section-by-Section Summary (last visited Aug. 9, 2016) (emphasis added), *available at* http://docs.house.gov/meetings/RU/RU00/CPRT-114-RU00-D001.pdf.

[22] I continue to oppose the idea, set forth in the *TCPA Omnibus Order*, that even manually dialed calls may be treated as autodialed calls, unless placed from a rotary telephone, because the equipment could be modified into an autodialer.

**Federal Communications Commission**                    **FCC 16-99**

plausible than asserting authority over non-persons.  If a call or caller is outside the scope of the requirements set forth in section 227(b)(1), then the Commission has no authority to regulate them.  Moreover, the fact that the law permits the Commission to adopt appropriate limits on the number and duration does not change the fact that the law authorizes the federal government and its contractors to use autodialers in the first instance.[23]

Nor does the law limit calls made before delinquency is imminent.  Indeed, any call to a borrower about the loan should be considered a call made solely to collect the debt.  Yet, the order would bar "routine" communications, including calls to remind borrowers about scheduled upcoming payments.  The Commission states that it will allow certain calls—ones that "often increase the probability that debts will be more readily collected and that a debtor will avoid delinquency"—but then it prohibits routine or other calls that meet this test.  It also limits calls to only 30 days before a qualifying event.

The order further restricts the exemption to three call attempts per month.  While the law gives the Commission the authority to limit the number of calls, this is far too narrow.  The Commission is counting calls that never even go through.  How is that supposed to help borrowers get the relief they might need or want?  Multiple commenters noted that it can take dozens of call attempts just to reach a borrower, much less help them navigate their loan options.  For example:

- The Bureau of the Fiscal Service (Fiscal) at the Treasury Department serviced certain student loan debt as part of a two-year pilot program, and it found that borrowers answered Fiscal's calls less than 2 percent of the time. After one year, the Bureau had obtained live contact with just 33 percent of the borrowers.[24]
- Another commenter noted that its takes "more than 15 call attempts to reach a right point of contact for approximately half of its delinquent federal student loan borrowers, and that for 25 percent of its delinquent federal student loan borrowers, it takes [the company] 40 or more call attempts."[25]

Counting call attempts as calls, therefore, will only hurt the people that the Budget Act exemption is trying to help.[26]

---

[23] I also want to make clear that, contrary to prior misguided Commission orders, predictive dialers are not autodialers.  They do not meet the statutory definition because they do not "store or produce numbers to be called, *using a random or sequential number generator*".  47 U.S.C. § 227(a)(1)(A) (emphasis added).

[24] *See* Letter from Mark Brennan, Counsel to Navient, to Marlene Dortch, FCC, CC Docket No. 02-278, at 1-2 (filed July 8, 2016) (*Navient July 8, 2016 Ex Parte*) (citing BUREAU OF THE FISCAL SERVICE, U.S. DEPARTMENT OF THE TREASURY, REPORT ON INITIAL OBSERVATIONS FROM THE FISCAL-FEDERAL STUDENT AID PILOT FOR SERVICING DEFAULTED STUDENT LOAN DEBT (2016), at https://www.treasury.gov/connect/blog/Documents/student-loan-pilot-report-july-2016.pdf); *see also* Letter from Debra J. Chromy, Education Finance Council, to Marlene Dortch, FCC, CC Docket No. 02-278, at 3 (filed July 18, 2016) (citing the same pilot program and statistics and also noting that, "[p]rior to contacting borrowers, Fiscal attempted to update contact information with a commercially available database.").

[25] *Navient Comments* at 42-43.

[26] *See, e.g., NCHER Comments* at 1-2 ("Live communication is key to borrowers understanding their rights, and a three call attempt per month restriction will largely nullify meaningful borrower contact.  This arbitrary limit will be harmful to millions of federal student loan borrowers who want and need timely and accurate information to better manage their debt to avoid delinquency and default and to rehabilitate their defaulted loans."); *see also id.* at 12 ("Unfortunately, far too many borrowers fail to have any meaningful contact with their student loan servicer, and the Commission's proposed rule will not facilitate such contact, as was intended by the Congress when it passed the Bipartisan Budget Act of 2015."); *see also Nelnet Comments* at 14 ("Borrowers are overwhelmingly relieved to

(continued….)

Moreover, there is absolutely no justification for the number three other than the fact that some particular commenters liked it. These commenters, however, did not provide any explanation or data to support a three call limit. The Commission can't make policies based on the number of likes it gets or emojis. It is required to have a rational basis for its decisions, and that is utterly lacking here.

The Commission's laziness stands in sharp contrast to the comments of parties that could actually be impacted by the rules, who provided plenty of reasons and data for choosing a higher number. Chief amongst these is that fact that some are *required* by federal laws and rules to place more than three calls per month. Commenters summarized these requirements in the filings.[27] I attach one such example to this statement so that it is very clear to the public and any reviewing court that the Commission's decision is arbitrary and capricious.[28]

Notably, several of these requirements take the form of a *minimum* number of required calls. In many cases, more calls are needed to actually reach borrowers and help them obtain relief. Here again, commenters stepped up and provided actual data to show how many calls it can take to assist a borrower. For example, one commenter noted that "20 percent of [its] federal student loan borrowers require more than 50 calls to reach a right point of contact. These borrowers would take well over a year to reach under the FCC's proposal and, during that time, could easily reach default status without having a conversation about their repayment, forbearance, and forgiveness options."[29]

In addition, the Consumer Financial Protection Bureau (CFPB), who has informally consulted with the Commission on the Budget Act exemption, just last week proposed rules for the debt collection practices of consumer financial services providers that would be more flexible than the rules that the Commission is about to impose on the federal government and its contractors.[30] The proposal would permit up to six total contact attempts *per week*.[31] So even though CFPB knew that the Commission is about to adopt more stringent rules for federal agencies, it nonetheless proceeded to propose less restrictive rules for the *private sector*.

Incredibly, the FCC order before us points to all of the data submitted as a reason not to pick a different number or set of numbers. It says there's no consensus in the record. Well, perhaps that's because different agencies have different rules on the number of calls that must be placed. Given the work that commenters did to compile the various provisions, it would not take much for the Commission to review these filings and set different numbers where appropriate. Or it could choose the highest number required by the various federal laws to ensure that no particular type of caller will be left liable for complying with their agency's rules. Instead, the order simply falls back on the number three.

---

(Continued from previous page) ——————————————————
understand their options and to resolve their account, but these solutions only work when servicers are able to reach the borrower.").

[27] *See, e.g.*, *MBA Reply Comments* at 9-10; Letter from Eric Selk, HOPE NOW Alliance, to Marlene Dortch, FCC, CC Docket No. 02-278, at 2-3 (filed June 20, 2016).

[28] *See* Letter from Mark Brennan, Counsel to Navient, to Marlene Dortch, FCC, CC Docket No. 02-278, at Appendix A (filed July 12, 2016).

[29] *Navient Comments* at 43.

[30] Consumer Financial Protection Bureau, Small Business Review Panel for Debt Collector and Debt Buyer Rulemaking; Outline of Proposals Under Consideration and Alternatives Considered (July 28, 2016), http://files.consumerfinance.gov/f/documents/20160727_cfpb_Outline_of_proposals.pdf.

[31] *Id.*

Of course, if there are other laws that are stricter, in terms of the number of calls, time of day, or other restrictions, then the Commission is not fazed at all by the lack of uniformity. In those instances, the item requires that the most restrictive limit apply.

The Commission tries to salvage this mess with a waiver process. Incredibly, even though the Commission has a *complete record* for deciding appropriate limits now, it is putting the burden back on federal agencies to demonstrate, to a Bureau, that more relief would be appropriate. That is a cowardly attempt to avoid responsibility for implementing the law. In short, the FCC will consider providing relief, but only if: (1) someone else can provide the Commission with political cover to act; and (2) Commissioners are shielded from having to vote on it.

In post-adoption edits added to the item in a weak attempt to shore up the three-call-attempt limit and waiver process, the Commission asserts that section 227(b)(2)(H) was added to avoid "open[ing] the floodgates to unwanted robocalls." However, the federal agency calling requirements summarized in the attached chart, and proposed by the CFPB, hardly constitute a flood. Even consumer advocacy groups have proposed limits that are higher than those adopted in this order.[32]

The revised order also claims that given "Congress's enduring goal of limiting the intrusiveness of robocalls, we believe prudence counsels in favor of adopting limits at the lower end of the range". This claim is wrong on many levels. First, Congress's primary goal in enacting the TCPA, as evident in both the law and supporting documentation, was to restrict *telemarketing* calls placed by equipment that would indiscriminately dial *random numbers or blocks of numbers* at a time.[33] Calls by the federal government and its contractors to collect debt are nothing of the sort. The Commission itself has recognized that debt collection calls are informational calls.[34] Moreover, nothing in the record suggests that the federal government or its contractors are calling random numbers or blocks of numbers. Indeed, the Treasury Department has said that it not the case,[35] and it would be a nonsensical waste of time and resources. Second, three call attempts is the rock bottom of the range, as the attached chart makes clear. Third, setting the limit at three call attempts is far from prudent. As the U.S. Department of Education wrote: "[T]he FCC's proposal to limit the number of covered calls to three per month per delinquency . . . would not afford borrowers with sufficient opportunity to be presented with options to establish more reasonable payment amounts and avoid default, especially given that the proposal limits the number of initiated calls, even if calls go unanswered."[36] The Department of Education further characterized the three-call-attempt limit as placing "severe limitations" on calls, with "significant downsides to borrowers in terms of the information they need to make sound decisions to manage their debt effectively."[37]

---

[32] Navient notes that, "in the context of the Fair Debt Collection Practices Act, NCLC urged the Consumer Financial Protection Bureau to limit calls from debt collectors to three per week." *Navient Comments* at 44 (citing APRIL KUEHNHOFF AND MARGOT SAUNDERS, NATIONAL CONSUMER LAW CENTER, DEBT COLLECTION COMMUNICATIONS: PROTECTING CONSUMERS IN THE DIGITAL AGE 4 (June 2015), *available at* http://bit.ly/1LQxpDK.).

[33] *See also Navient Comments* at 15.

[34] *See, e.g., Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, Report and Order, 27 FCC Rcd 1830, 1841, para. 28 (2012) (declining to require that prior express consent for non-telemarketing, informational calls, including debt collection calls, be provided in writing, as is the case for telemarketing calls).

[35] *See supra* page 1 and note 3 ("Debt collectors are not using autodialers to cold call potential customers, but are instead using autodialers to contact individuals who have an existing relationship or indebtedness.").

[36] Letter from Ted Mitchell, United States Department of Education to Marlene Dortch, FCC, CC Docket No. 02-278, at 4 (filed July 11, 2016) (*Department of Education Ex Parte*).

[37] *Id.*

The revised order further states that "[n]othing in the Budget Act indicates that Congress intended to depart from that goal." But that, again, ignores the fact that the Budget Act is proof in and of itself. If the Commission had taken a prudent course in interpreting the TCPA, then there would have been no need for a Budget Act exemption to the Commission's rules. Instead, the Commission's interpretations of the TCPA were so unworkable that the Administration and Congress took the momentous step of overruling the Commission to authorize this specific class of callers to use autodialers without prior express consent to collect debt.[38] By adopting limitations that are the same as those that apply to other callers (or even more restrictive as compared to other federal agency or contractor calls or texts), the Commission brazenly ignores the rebuke and guts the exemption. Far from preventing "abuse and harassment",[39] the order would curtail expected and desired communications and chill speech.[40]

In addition, the revised order attempts to justify its specious waiver process by acknowledging that it lacks expertise regarding other federal laws and rules. I agree that the FCC is not the expert agency, but that is why the law directs the Commission to consult with the Treasury Department. And it is why the Commission should have heeded the comments of the Department of Education, which *is* the expert agency with respect to its loans, stating that covered calls should not be limited to three per month. Instead, agencies will be subject to a waiver process, in which evidence presented by an expert agency "demonstrat[ing] . . . that a genuine conflict exists" will be merely "probative" of the need for a waiver. Moreover, agencies are on notice that the Bureau will also "consider any countervailing issues raised in the record" including whether the rules "necessarily require robocalls instead of, say, manual calls." Additionally, the Commission makes no commitment that the Bureau will rule on any such requests in a timely fashion. In short, the waiver process is cold comfort to any agency that thought it would get a fair shake from this Commission. In reality, it is nothing more than a thinly veiled and wholly inadequate attempt to fend off additional complaints from the Administration and to survive judicial review.

Finally, I object to the conclusion that consumers can stop calls altogether. The order claims that "once a borrower has declared that he or she no longer wishes to receive these calls, there is no longer any reason for the calls to continue." That's flat out wrong. The reason the calls must continue is so that the federal government can collect its debts. That is the ultimate purpose of the Budget Act provision.[41] While I am glad that the law also enables servicers to contact borrowers to offer relief before a loan ever becomes delinquent or enters default, should that occur, the government must be able to protect its financial interests, including by contacting debtors until the debt is paid or otherwise resolved to the government's satisfaction.

---

[38] *See, e.g., Nelnet Comments* at 2 (citing Analytical Perspectives, Budget of the United States Government, Fiscal Year 2016, at 128, *available at* https://www.whitehouse.gov/sites/default/files/omb/budget/fy2016/assets/spec.pdf) ("The Budget proposes to clarify that the use of automatic dialing systems and prerecorded voice messages is allowed when contacting wireless phones in the collection of debt owed to or granted by the United States. In this time of fiscal constraint, the Administration believes that the Federal Government should ensure that all debt owed to the United States is collected as quickly and efficiently as possible and this provision could result in millions of defaulted debt being collected. While protections against abuse and harassment are appropriate, changing technology should not absolve these citizens from paying back the debt they owe their fellow citizens.").

[39] *Id.*

[40] *See Navient Comments* at 39-41 (raising First Amendment concerns about certain restrictions).

[41] *See, e.g.*, *MBA Reply Comments* at 13, 14 ("Creating a 'stop calling' right to receive covered calls frustrates the purpose of the Exemption and threatens to deprive consumers of important, beneficial calls. . . . Congress did not create a 'stop calling' right within the Exemption nor did it authorize the Commission to create such a right. In fact, creating a "stop calling" right would substantively repeal, not implement, the Budget Act Amendment.").

In the end, the order simply ignores the costs to consumers and the economy when these calls are not made, as well as the benefits when they are.  As one Treasury Department official highlighted,

> Delinquencies are reported to the private credit bureaus and can inhibit a borrower's access to future credit for buying a home, starting a business, or completing or furthering education.  Borrowers may also have a portion of their wages taken directly from their paychecks.  In other words, they may disengage from personal and professional development, and may drop into the ranks of those preyed upon by scams.  Additionally, the fresh start afforded by bankruptcy is not available for student loan debt, unless student loan debtors mount a case that proves undue hardship.  Given the weight of these and all the consequences I've discussed, as well as the importance of higher education in our nation's prosperity, it is imperative that we structure an effective servicing and collection regime focused on helping borrowers avoid default and delinquency.[42]

Moreover, as the Department of Education wrote:

> The consequences of default on a federal student loan are indeed severe, and effective communication to borrowers by their loan servicers before default is critical to helping borrowers avoid those consequences.  Defaulted borrowers are subject to offset of federal and state payments (including tax refunds and Social Security benefit payments) under the Treasury Offset Program, administrative wage garnishment, reporting of the default to credit reporting agencies, ineligibility for additional student loans, and potentially a civil judgment.  Given these consequences, some of which are only available to collect on debts owed to the federal government, it seems appropriate to weigh the cost of a potentially unwanted phone call against garnishing the wages of a borrower who could have been enrolled in an income-driven repayment plan.

When callers do reach borrowers, however, borrowers get the information and relief that they need.  As one commenter noted:  "More than 90 percent of the time that we have a live conversation with a federal loan borrower, we are able to resolve a loan delinquency."[43]

Rather than facilitate these critical conversations, the order would chill them.  Countless consumers will see their credit ruined for want of a phone call or text.  Companies working for the federal government will face predatory lawsuits.  And the federal government still won't be able to collect its debts.  That is contrary to the law and detrimental to all parties involved.  I cannot support it.

---

[42] Remarks of Deputy Secretary Raskin on Student Loans at the National Consumer Law Center's Annual Consumer Rights Litigation Conference (Nov. 6, 2014), https://www.treasury.gov/press-center/press-releases/Pages/JL2689.aspx.  *See also ABA/CBA Comments* at 2 ("Communications between a borrower and lender may help the borrower prevent missed payments, minimize negative impacts to a borrower's credit report, take advantage of loan modification or other workout programs, and avoid default. Successful loan workouts and other foreclosure alternatives also reduce credit risk and financial losses to the United States, helping taxpayers recoup the $139.3 billion of delinquent debt owed to or guaranteed by the United States. Using efficient dialing technology to communicate with borrowers enables more contacts and important conversations to occur with fewer personnel, reducing the cost of servicing and collections. This, in turn, promotes the affordability and availability of consumer credit."); Reply Comments of Nelnet, Inc., CC Docket No. 02-278 (filed June 21, 2016) (summarizing comments filed by multiple parties showing the costs to consumers when calls are not made and the benefits when they are).

[43] *Navient Comments* at 6; *see also id*. at 2 ("If we are able to speak to a borrower in real-time, we can counsel the borrower on the more than 16 repayment options—some of which involve monthly payments as low as $0 per month—or the 32 deferment, forbearance and forgiveness options available to the borrower."); *see also id*. at 7-8 ("Conversely, 90 percent of borrowers who default on their federal student loans do not have a live telephone conversation with us, despite our efforts to reach them.").

**Federal Communications Commission**                                   **FCC 16-99**

Finally, I do respect that the Commission must issue an order to comply with the Budget Act. My vote to dissent is not a vote against complying with the law.  Rather, given that the Chairman has secured the necessary votes to approve this item and move it forward, my particular vote line does not impact whether the agency is in compliance with the law.

**Federal Communications Commission** **FCC 16-99**

**Appendix A**
**Table of Government-Required Calls to Borrowers**
**CG Docket No. 02-278[1]**

| Government Entity | Calls Required | Source | Referenced By |
|---|---|---|---|
| Department of Education | Minimum: four calls in 21 days (certain IDR plan applicants). | FSA Business Operations Change Request Form 3571. | Navient Comments at 46. |
| | | | Nelnet Reply Comments at 5. |
| | At least four "diligent efforts" to contact delinquent FFELP borrowers by telephone. | 34 C.F.R. § 682.411. | ABA/CBA Comments at 11, 18. |
| | Urged Congress to allow services to contact student loan borrowers on their cell phones. | Strengthening the Student Loan System to Better Protect All Borrowers at 16. | |
| Fannie Mae and Freddie Mac | Minimum: one call every five days. | Fannie Mae Servicing Guide at D-2-02. | ABA/CBA Comments at 11, 17. |
| | | Freddie Mac Servicing Guide. | Consumer Mortgage Coalition Comments at 8-10. |
| | | | Mortgage Bankers Assn. Reply Comments at 9. |
| Federal Housing Administration (FHA) | Minimum: two calls per week. | FHA Single Family Housing Policy Handbook at 578-79. | ABA/CBA Comments at 11, 15. |
| | | | Consumer Mortgage Coalition Comments at 6. |
| | | | Mortgage Bankers Assn. Reply Comments at 9. |
| Home Affordable Modification Program (HAMP) | Minimum: four calls per 30 days. | MHA Handbook v. 5.1 at 76. | ABA/CBA Comments at 11, 16. |
| | | | Consumer Mortgage Coalition Comments at 5. |
| | | | Mortgage Bankers Assn. reply Comments at 9. |

[1] All of the filings cited herein were submitted in response to the Notice of Proposed Rulemaking released by the Commission on May 6, 2016. *See Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, Notice of Proposed Rulemaking, 31 FCC Rcd 5134 (2016).

| | | | |
|---|---|---|---|
| National Mortgage Settlement | Minimum: four calls per 30 days. | National Mortgage Settlement at A-23. | ABA/CBA Comments at 11, 17. |
| Consumer and Financial Protection Bureau (CFPB) | Must make a "good faith effort" to establish "live contact" with borrowers within 36 days of delinquency. | 12 C.F.R. § 1024.39(a). | ABA/CBA Comments at 11, 13. Mortgage Bankers Assn. Reply Comments at 9. |
| Interagency Task Force | Recommended that "technology-enabled communication" and text messages be used to contact borrowers. | Interagency Task Force Recommendations at 1, 9-11. | Student Loan Servicing Alliance Reply Comments at 6. |
| Office of the Comptroller of the Currency (OCC) | Approved bank compliance plans, which include procedures for telephone outreach to delinquent borrowers. | Foreclosure Prevention: Improving Contact with Borrowers (2007). | ABA/CBA Comments at 8, 11, 17. |
| State of California | Must "attempt to contact" the borrower by telephone at least three times. | Cal. Civ. Code § 2923.5(a)(1)(A), (a)(2), (e)(2)(A). | Mortgage Bankers Assn. Reply Comments at 10. |
| State of Nevada | Must "attempt to contact" the borrower by telephone at least three times. | Nev. Rev. Stat § 107.510(1)(b), (2), (5)(b). | Mortgage Bankers Assn. Reply Comments at 10. |
| Washington State | Must "attempt to contact" the borrower by telephone at least three times. | Wash. Rev. Code § 61.24.031 (1)(a)(i-ii), (1)(b), (5)(b)(i). | Mortgage Bankers Assn. reply Comments at 10. |
| Rural Housing Service (Dept. of Agriculture) | Must attempt to make verbal or written contact before 20 days past due. | HB-1-3555 SFH Guaranteed Loan Program Technical Handbook, Ch. 18. | Consumer Mortgage Coalition Comments at 7-8. Mortgage Bankers Assn. Reply Comments at 9. |
| Veterans Administration (VA) | Must attempt to establish live contact by the 20th day of delinquency. | 38 C.F.R. § 36.4278(g)(1)(ii). | ABA/CBA Comments at 11, 16. Consumer Mortgage Coalition Comments at 6-7. Mortgage Bankers Assn. Reply Comments at 9. |