UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

ISMAEL CEDENO,

    Plaintiff,

v.

                              CASE NO.:  0:16-CV-61049-UU

NAVIENT SOLUTIONS, INC.,

    Defendant.
_____/

**PLAINTIFF'S RESPONSE TO DEFENDANT'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

**I.    Introduction**

1. The Plaintiff in this case, Ismael Cedeno, resides in Fort Lauderdale, FL, where he often works long days and nights as the Outreach Phlebotomy Coordinator at a local hospital. Mr. Cedeno, like countless other individuals aspiring to further their education, took out student loans to earn a nursing degree. Mr. Cedeno's goal was, and still is to this day, to broaden his medical education, so that he can provide the best possible medical care to as many people as possible.

2. We now know that in September of 2014 the Defendant, Navient Solutions, Inc. ("NSI"), began autodialing Mr. Cedeno regarding those student loans. Mr. Cedeno would regularly receive phone calls from Defendant over three to four consecutive days at a time, oftentimes with four to five calls per day. Typically, these calls would interrupt him at work due to the long shifts Mr. Cedeno worked at the hospital. These robocalls were so harassing, oppressive, and at times downright abusive, that Plaintiff found it difficult to function at work.

3. From September 14, 2014 through May 6, 2016, Defendant called Mr. Cedeno 741 times with the use of an automatic telephone dialing system ("ATDS"). This fact is not

disputed by the Defendant. Even more shocking, we have an audio recording from June 18, 2015 as indisputable evidence that Mr. Cedeno, in no uncertain terms, told a collection agent for Defendant named, Davonne Thomas, "I don't want anybody to call me at this number." Following that June 18, 2015 conversation, Mr. Cedeno was harassed with another another 547 phone calls. The Defendant does not dispute those 547 calls placed after June 18, 2015.

       4.     Not more than four days later, on June 22, 2015, despite Mr. Cedeno's clear revocation of any perceived consent to be called on June 18th, he was again harassed, demeaned, and ignored when he received a call from Defendant's collection agent, Alisha Kombat. The audio recording evidence from June 22, 2015 is also crystal clear. Mr. Cedeno told Defendant almost immediately, "I'm making payments…Don't call me anymore. If you call me anymore, I'm going to report that you're harassing me. I'm at work right now." In willful and knowing disregard of Mr. Cedeno's rights and his unequivocal revocation just four days earlier, Defendant interrupted him as he begged for the calls to stop and condescendingly told him, "[w]ell you can report it. Well, you gave us permission….so we'll call you again."

       5.     This case is about those 741 robocalls to Mr. Cedeno over a year and half time span. It's about the 547 times Defendant called Mr. Cedeno potentially in willful and knowing violation of the Telephone Consumer Protection Act ("TCPA"), as well as the harassing, oppressive and abusive nature of those phone calls in violation of the Federal Debt Collection Practices Act ("FDCPA") and Florida Consumer Collection Practices Act ("FCCPA").

## II. Background

In the motion that this memorandum is responsive to [Doc. 32], NSI requests summary judgment as to the Plaintiff's TCPA and FDCPA counts. No such summary judgment is sought as to the Plaintiff's FCCPA claims.

### III. Legal Standards

The Plaintiff largely agrees with NSI's statement of the legal standards applicable to summary judgment motions, so, in the interests of judicial economy, these standards will not be rehashed. That being said, and as is further explained below, the Plaintiff asserts that NSI has failed to meet its initial factual burden in some respects. Also, the Plaintiff asserts that the Defendant has failed to establish in other respects that it is entitled to judgment as a matter of law.

#### A. NSI's Request For Summary Judgment For Plaintiff's TCPA Claims Should Be Denied

##### 1. The Amendments Made To The TCPA By The Bipartisan Budget Act of 2015 Do Not Extinguish The Plaintiff's Claims For Calls After That Date

In its partial summary judgment motion, NSI takes the position that Congress effectively recreated the "Wild West"[1] by establishing a temporary period between enactment of amending legislation and adoption of FCC regulations in which U.S. government debt collectors such as NSI would be shielded from any governance under the TCPA. Specifically, NSI contends that Section 301 of "[t]he Bipartisan Budget Act of 2015. . ., effective as of November 2, 2015, amended the TCPA to eliminate the prior express consent requirement for calls 'made solely to collect a debt owed to or guaranteed by the United States'" [Doc. 32, p. 2]. Noting that FCC regulations regarding this change have not yet become effective, NSI argues that the statutory amendments must be applied "as written," i.e. without any limitations as to NSI's ability to make robodialed calls [Doc. 32, p. 6]. NSI's self-serving arguments, however, are not even close to

---

[1] It should be noted that, even before the Bipartisan Budget Act of 2015 came into effect, NSI was one of the most sued TCPA defendants in the country. As such, it can hardly be said that any change in the law affected by that Act changed NSI's conduct. Rather, NSI seeks to use the statutory amendment as cover for its routine practice of violating the TCPA.

being grounded in reality. Indeed, as is reflected in NSI's own motion, the Bipartisan Budget Act of 2015 "directed the FCC to 'prescribe regulations **to implement the amendments made**' by Section 301 within nine months of enactment'" [Doc. 32, pp. 5] (*quoting* §301(b) of the Bipartisan Budget Act of 2015) (emphasis added). As such, it is evident that the relevant changes in the law were not self-executing upon enactment of the Bipartisan Budget Act of 2015, but rather were intended to take effect only after being implemented by FCC regulation.

Notably, the FCC clearly agrees with the Plaintiff's interpretation in this regard. In its regulations released August 11, 2016, the FCC stated the following:

> As noted in the discussion above, two portions of our rules implicate the Paperwork Reduction Act (PRA). These portions involve the rules for the recording of a debtor's request to stop receiving autodialed, artificial-voice, and prerecorded-voice calls to collect a debt owed to or guaranteed by the United States, and rules for the conveyance of that stop-call request from one servicer or collector to another. Because these portions of our rules implicate the PRA, they will not become effective until 60 days after the Commission publishes a Notice in the Federal Register indicating approval of the information collection by the Office of Management and Budget (OMB).
>
> The remaining rules will not become effective until the rules requiring OMB approval become effective. While these remaining rules do not require OMB approval and could become effective immediately upon release of this *Order*, we determine that the consumer-protection rules regarding stop-call requests and conveyance of those requests are so integral to this regulatory scheme that the remaining rules should not become effective until the consumer-protection rules are in place. **The rules that could become effective immediately permit a caller to make calls—they specify how many calls may be made, who may make the calls, when the calls can be made, and to which numbers the calls may be made, among other things.** These rules give effect to one of the reasonable interpretations we have identified for Congress' passage of the Budget amendments: to make it easier for owners of debts owed to or guaranteed by the United States and their contractors to make calls to collect debts. But the second reasonable interpretation—to make it easier for consumers to obtain useful information about debt repayment—carries with it a consumer's prerogative to determine that the debtor does not want the information conveyed in the calls and to ask that the calls stop. The rules that give effect to this interpretation of Congress' intent are delayed by PRA requirements and OMB approval. **We determine that the regulatory scheme we implement today must include both the ability for callers to make calls and the right of debtors to ask that calls**

4

> **stop—and that both portions of the regulatory scheme become effective simultaneously. To do otherwise would be to allow callers to make calls but to leave debtors with no consumer protections until OMB approval is complete.** We determine that both portions of the rules must become effective for the regulatory scheme to be effective.

*In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, Report and Order, FCC 16-99, ¶¶59–60 (August 11, 2016) (the "August 2016 FCC Order"). To put the above in other words, the FCC decided to delay allowing collectors of U.S. Government owned or guaranteed debt to make calls without prior express consent under the new statutory provision because not all of the FCC regulations could be made immediately effective. NSI's position that such non-consent calls can currently be made without restriction is thus blatantly at odds with this governing FCC authority, which is subject to Hobbs Act deference and therefore is binding on this Court. *See Mais v. Gulf Coast Collection Bureau, Inc.*, 768 F.3d 1110, 1119 (11th Cir. 2014) (noting that, pursuant to the Hobbs Act, the U.S. Courts of Appeal are the exclusive venue for challenging FCC regulations).

Furthermore, the August 2016 FCC Order refutes much of the other "authority" relied upon by NSI. For example, NSI for some reason cites a Department of Education press release discussing the supposed reasons why that department wanted changes to the TCPA. The August 2016 FCC Order roundly rejected very similar arguments regarding the purpose of the Bipartisan Budget Act of 2015 amendments to the TCPA, stating the following:

> We find no support for the claim in one dissent that "[t]he Budget Act exemption was designed to protect federal agencies and their contractors from liability when they make calls without consent of the called party," or that the "intent of the law . . . was to enable lenders to use modern dialing equipment as part of their efforts to collect debt." No legislative history is cited for these assertions, nor does any appear to exist. Further, had Congress wanted callers to be wholly exempt from liability, or never to manually place calls, it would not have granted the Commission express authority to adopt rules limiting the number and duration of debt-collection robocalls.

5

*August, 2016 FCC Order*, fn. 178.  As can be seen, the FCC's salient remarks in this regard cut not only against the unavailing "authority" cited by NSI, but also the fundamental premise of NSI's argument that Congress intended to create a "Wild West" period where such a complete TCPA exemption would be in place.

Of course, particularly in light of Bipartisan Budget Act of 2015's mandate that the FCC create regulations to **implement** the relevant statutory changes (including the express authority to restrict or limit the number and duration of calls made) the very premise that Congress intended to create such a lawless period for U.S. Government debt collectors such as NSI is illogical in the extreme.  In particular, it is well established that a paramount goal of Congress in adopting the TCPA as a remedial statute was to "protect consumers from unwanted automated telephone calls," which frequently constitute "a nuisance and an invasion of privacy."  *Gager v. Dell Fin. Services*, LLC, 727 F.3d 265, 271 (3d Cir. 2013) (*citing Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 952 (9th Cir. 2009)).  As correctly recognized by the FCC, absolutely nothing in the Bipartisan Budget Act of 2015 indicates that Congress intended to depart from that goal, even in the context of the collection of U.S. government debt.  Considered in this light, NSI's position that the TCPA applied to them before November 2, 2015, and will apply to them once again after the FCC regulations become effective simply makes no sense.

For the above reasons, NSI's motion for summary judgment should be denied.

> **2. Because NSI Has Failed To Establish That Its Calls Were "Made Solely To Collect A Debt Owed To Or Guaranteed By The United States," Its Summary Judgment Motion Must Fail**

In this case, NSI has adequately demonstrated that the debt in question is federally guaranteed, so that aspect of the case is not in dispute.  However, even if its improbable "Wild West" theorem is accepted, NSI has failed to establish a second inherent requirement of its

claimed TCPA exemption under the changes made by the Bipartisan Budget Act of 2015, namely that its calls were made "**solely** to **collect**" this debt.  Utterly absent from the affidavit of NSI employee Carl Cannon is any reference to the purpose of NSI's calls. [Doc 32-1].  Indeed, the closest the affidavit comes to answering this question is its assertion that ". . . in the course of servicing student loans, [NSI] may take actions to collect repayment of these loans." [Doc 32-1, Cannon Aff., ¶3.]  This statement is woefully inadequate to establish that the **sole purpose** of NSI's calls was to **collect** the federally guaranteed debt, as opposed to having some additional or other presumably servicing-related purpose.  Taking it even a step further, NSI's own corporate representative affirmatively stated that each and every call placed to Plaintiff was **not** made "solely to collect" a debt. (Hahn Depo., **Exhibit A,** 154: 8–25, 155: 1–13, 213: 24–25, 214:16–25, 215: 1–20).

> Q.   **Ms. Hahn, what was the purpose of the phone calls to Mr. Cedeno?**
>
> A.   Off of reviewing the notes and review of the account, it would be to service his loans.
>
> Q.   **And when you say "service his loan," do you mean to collect a debt?**
> MS. VAN HOOSE: Object to form.
>
> A.   I mean to provide assistance to Mr. Cedeno to resolve his delinquency.
>
> Q.   **So the purpose of the calls was not to collect a debt?**
>
> MS. VAN HOOSE: Asked and answered.
>
> A.   Ultimately it would be to resolve the delinquency.  Whether that meant we were taking a payment or whether that meant we were providing a different option for the customer, it's to service and assist the customer in their best interest. (154: 8–25)
>
> Q.   **So not every call was made with the purpose to collect a debt, is that what you're saying?**
>
> MS. VAN HOOSE: Object to form. Go ahead.

> A.    The calls to the customer would be in order to assist them in resolving their delinquency.
>
> Q.    **Okay. And I know you testified already that part of that servicing would include the collection of debt; correct?**
>
> MS. VAN HOOSE: Object to form.
>
> A.    If the account is past due, again, we're trying to resolve the delinquency, so, yes, that could include collecting on the loan as well. (155: 1–13)
>
> […]
>
> A.    From my understanding, any phone calls placed on the account would have been due to attempting to service the account.
>
> Q.    **That would include the 194 calls after November 2, 2015; is that correct?**
>
> A.    From my understanding, if the account was still past due, then they were still attempting to assist Mr. Cedeno in resolution of his account. (214: 21–25)
>
> […]
>
> Q.    **The sole purpose of those calls after November 2, 2015, was not just to collect a debt; is that correct?**
>
> MS. VAN HOOSE: Object to form. Again, you're mischaracterizing her testimony.
>
> Q.    **Ms. Hahn, can you be more specific when you say servicing?**
>
> A.    If an account is past due, then we will attempt to resolve the account. Whether that is by means of collecting a payment or by means of putting them into a repayment program or attempting to find out what their current status is and what they're able to pay. In order to try and assist them to be able to afford those payment. So when I say service, I truly mean service for the best interest of the customer. (215: 4–25)

NSI's corporate representative made it abundantly clear that "service" means "[o]ffering the customer guidance, offering the manager loans access, assist consumers with repayment options as well as deferment or forbearance on those loans as well." (Hahn Depo, **Exhibit A**, 30:23–25).

Thus, NSI cannot establish a second inherent requirement of its claimed TCPA exemption under the changes made by the Bipartisan Budget Act of 2015, namely that its calls were made "**solely to collect**" this debt.

Particularly in light of the fact that NSI's claim of exemption under this statutory amendment is an affirmative defense[2] upon which it bears the burden of proof, there can be no "burden shifting" to the Plaintiff requiring evidence to refute this entirely unsupported factual contention. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991) (emphasizing that "[t]he moving party bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial."). Furthermore, even if the Plaintiff did have some burden to address this issue, the Plaintiff declares that additional discovery would be required, as the Plaintiff is quite obviously not in a position to fully know every purpose for which NSI made its calls.

For this additional reason, NSI's request for partial summary judgment should be denied.

### B. NSI's Request For Summary Judgment As To The FDCPA Should Be Denied

As a threshold matter, much of the authority cited by NSI is utterly inapposite to its contention that a servicer than begins servicing a debt prior to default is not subject to the FDCPA. For example, the first case cited by NSI, *Pelfrey v. Educ. Credit Mgmt. Corp.*, 71 F. Supp. 2d 1161 (N.D. Ala. 1999) ("*Pelfrey*"), is particularly off-point. In *Pelfrey*, the FDCPA defendant was not a servicer, but rather an entirely different type of entity, a "guarantee agency."

---

[2] NSI correctly recognizes that its claim of exemption under the TCPA is an affirmative defense, having pleaded it as such as its Eleventh Affirmative Defense [Doc. 11, p. 12]. Such a statutory exemption is well established to be an affirmative defense. *See Morrison v. Executive Aircraft Refinishing, Inc.*, 434 F. Supp. 2d 1314, 1318–19 (S.D. Fla. 2005) (holding that "[a] claim of [statutory] exemption under the FLSA is an affirmative defense").

*Id*. at 1180. Further, *Pelfrey* was decided upon the basis of a "bona fide fiduciary obligation" exemption which NSI does not claim is applicable here. *Id.* Similarly, the second case cited by NSI, *Horton v. HSBC Bank*, 2013 WL 2452273, No. 1:11-CV-3210-TWT, (N.D. Ga. June 5, 2013), is also not particularly supportive of NSI's position in that it merely dismissed a FDCPA claim because the contention in the complaint that the defendant was a debt collector was conclusory and unsupported by proper allegations of fact.

Notwithstanding these problems with its cited authority, NSI indeed cites two aged federal district court cases and one similarly-stale state case that could be construed as supporting its position, *Jones v. InTuition, Inc.*, 12 F. Supp. 2d 775, 779 (W.D. Tenn. 1998); *Coppola v. Conn. Student Loan Found.*, Case No. N-87-398 (JAC), 1989 U.S. Dist. LEXIS 3415, at **6–7 (D. Conn. 1989); and *Fischer v. Unipac Serv. Corp. & Student Loan Mktg. Ass'n*, 519 N.W.2d 793, 799–800 (Iowa 1994). Further, out of respect for the duty to identify adverse authority, the Plaintiff feels compelled to point out that NSI appears to have missed perhaps the most authoritative case on this issue in that it issued from a federal circuit court, albeit more than thirty years ago. *See Perry v. Stewart Title Co.*, 756 F.2d 1197, 1208 (5th Cir. 1985) ("The legislative history of §1692a(6) indicates conclusively that a debt collector does not include the consumer's creditors, a mortgage servicing company, or an assignee of a debt, as long as the debt was not in default at the time it was assigned."). This smattering of hardly-recent authority notwithstanding, the Plaintiff believes that her FDCPA case should be allowed to proceed.

Specifically, each of the above cases is at least implicitly founded upon a statutory exception to the term "debt collector" that excludes from that definition:

> [A]ny person collecting or attempting to collect any debt owed or due or asserted to be owed or due another to the extent such activity . . . (ii) concerns a debt which was originated by such person [or] (iii) concerns a debt which was not in default at the time it was obtained by such person. (15 U.S.C. §1692a(6)(G).)

Where the above cases go awry is that, unlike the original creditor or assignee before default described in the exception, a servicer neither "originates" a debt nor "obtains" that debt. As such, it does no violence to the FDCPA to treat a servicer as a debt collector when that servicer's "servicing" of the loan transitions to debt collection upon delinquency of the serviced debt.

It should also be noted that NSI has consistently failed to raise this defense in prior cases, which leads to obvious concerns regarding its strength. Just one example of such a situation is *McCaskill v. Navient Sols., Inc.*, 178 F. Supp. 3d 1281 (M.D. Fla. 2016). While NSI's affiliate Student Assistance Corporation unsuccessfully argued on somewhat different grounds that it fell outside the definition of a debt collector, NSI raised no argument on this point. *Id*. at 1295.

### IV. Conclusion

NSI's motion for partial summary judgment should be denied.

*/s/Stefan Alvarez*
Stefan A. Alvarez, Esquire
Florida Bar No: 100681
William Peerce Howard, Esquire
Florida Bar No: 0103330
The Consumer Protection Firm
210-A South MacDill Avenue
Tampa, FL 33609
Telephone: (813) 500-1500
Facsimile: (813) 435-2369
Stefan@TheConsumerProtectionFirm.com
Billy@TheConsumerProtectionFirm.com
*Counsel for Plaintiff*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that, on this 5th day of December, 2016, a true and correct copy of the foregoing has been furnished via the CM/ECF system to:

Rachael A. Morris, Esquire
Sessions, Fishman, Nathan & Israel
3350 Buschwood Park Drive, Suite 195
Tampa, Florida  33618
Telephone:	(813) 890-2469
Facsimile:	(866) 466-3140
Email:		ramorris@sessions.legal

				 /s/Stefan Alvarez
				Attorney for Plaintiff